FILED

APR – 4 2012

THOMAS G. BRUTON
CLERK, U S DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SIMING YANG, PRESTIGE TRADE INVESTMENTS LIMITED, CAIYIN FAN, SHUI CHONG (ERIC) CHANG, BIAO CANG, JIA WU, and MING NI, <br><br> Defendants. | 1:12-cv-02473 <br> Judge Matthew F. Kennelly <br> Magistrate Judge Michael T. Mason <br><br><br> **Jury Trial Demanded** |

### FILED UNDER SEAL

### COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges as follows:

### NATURE OF THE ACTION

1.      This is an insider trading case involving the Defendants' recent highly profitable and highly suspicious trading in the securities of Zhongpin Inc. ("Zhongpin") a China-based company.

2.      Defendants purchased a substantial amount of Zhongpin shares and call options in the days and weeks before Zhongpin's March 27, 2012 public announcement that its Chairman and CEO, Xianfu Zhu, offered to acquire all of Zhongpin's outstanding stock for $13.50 per share (a 46% premium over the previous trading day's closing price).  The

market reaction to Zhongpin's public announcement was immediate: the day Zhu's proposal was announced, Zhongpin's share price increased approximately 21.8%.

3. The Defendants in this matter are six individual traders – and one entity trader that was created by Defendant Siming Yang – whose timely purchases of Zhongpin securities generated realized and unrealized gains of over $9.2 million. All of the Defendants either are citizens of and/or reside in the People's Republic of China ("PRC").

4. On information and belief, each Defendant purchased Zhongpin securities while in the possession of, and on the basis of, material, nonpublic information concerning Zhu's plan to take Zhongpin private.

5. Before mid-March 2012, trading in Zhongpin securities was thin. For example, in February 2012, Zhongpin had an average daily volume of 208,188 shares traded.

6. However, in the two weeks before Zhu's offer was publicly announced, Zhongpin's trading volume skyrocketed over 600% to an average daily trading volume of 1,270,200 shares. That surge was fueled in large part by Defendants' timely purchases of Zhongpin stock.

7. In the two weeks before Zhongpin's public announcement of Zhu's proposal, Defendants bought a substantial number of Zhongpin shares and call options (a contract that grants the purchaser the right to buy an agreed number of shares by a certain time for a certain price – effectively allowing the option purchaser to place a bet that the share price will rise). This timely trading made up a significant portion of the market for Zhongpin stock. For example, trading by Defendant Prestige in the two week period before

Zhongpin's March 27th announcement represented about 41% of the total trading volume during that period.

8.      These timely trades were notably inconsistent with the Defendants' prior trading behavior.  For example, all but one of the Defendants did not place any trades in Zhongpin securities before the timely March 2012 trades.  In fact, Defendant Chang's brokerage account was completely dormant for over one year before he bet heavily on Zhongpin securities.  The trading activity also was wildly out of profile given the individual defendants' financial situation.  For example, for most of the individual defendants, the purchases of Zhongpin securities in the two weeks before the company's public announcement equaled or exceeded their stated annual incomes and often represented a significant percentage of their total net worth.  There also is evidence – in the form of shared Internet Protocol and Media Access Control addresses – reflecting that several of the defendants may have been working in concert using the same computer networks and hardware.

9.      One of the individual Defendants, Siming Yang, stands out for the size of his trading.  Although his employer – a New York-based registered investment adviser – has a stated policy that prohibited him from personal trading in public companies, Yang (a) created Prestige Trade Investments Limited ("Prestige"), an independent wholly-owned LLC in the British Virgin Islands, (b) opened a brokerage account in Prestige's name just two weeks before Zhongpin announced the proposal to go private, (c) fueled the Prestige account with over $29 million transferred from overseas, and then (d) used those assets to purchase over 3 million shares of Zhongpin stock in the days leading up to Zhongpin's

3

public announcement. On March 27, 2012, the first trading day after Zhongpin's announcement, Prestige garnered over $7.6 million in unrealized gains from its timely Zhongpin stock purchases.

10.     Although the proceeds of Defendants' insider trading are currently held in United States brokerage accounts, certain Defendants already have sold a portion of their shares and could withdraw proceeds at any time. Absent a freeze on the Defendants' accounts, there is a substantial risk that all Defendants will attempt to liquidate some or all of their positions and transfer their trading profits out of the United States – potentially beyond the jurisdiction and reach of this Court. Accordingly, the Commission brings this action to freeze the proceeds of the Defendants' securities purchases.

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), 78u-1].

12.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

14.     On information and belief, all of the individual Defendants are PRC citizens and, with the possible exception of Defendant Yang, all individual defendants reside in the PRC. Although Defendant Yang may have a New York address, he is in the United States on a temporary work visa; he is not a permanent resident of the United States within the

4

meaning of the venue provisions. The sole entity Defendant, Prestige, is a British Virgin Islands corporation. According to its brokerage records, Prestige is based in Guangzhou, Guangdong Province, China with no principal place of business in the United States.

15.     The Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged herein.

16.     The Defendants will, unless enjoined, continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar purport and object.

## FACTS

### Defendants

17.     Siming Yang ("Yang"), age 35, is a PRC citizen. Yang maintains a residence in New York, New York, and, until recently, was employed as a research analyst with Baron Capital Management ("Baron"), a New York-based registered investment adviser that manages a family of mutual funds. Yang was terminated from that position effective March 30, 2012. Yang has a brokerage account with Wang Investment Associates ("Wang Investments"), which also is based in New York, New York. Yang also is the founder and sole owner of Prestige Trade Investments Limited.

18.     Prestige Trade Investments Limited, is a British Virgin Islands corporation, created and wholly-owned by Siming Yang. According to brokerage records, Prestige is based in Guangzhou, Guangdong Province, China. Yang created Prestige in January 2012.

Prestige has a bank account at China Construction Bank Corporation in Hong Kong ("China Construction Bank") and a brokerage account at Interactive Brokers, which has an office in Chicago, Illinois. In its account opening documents, Prestige describes itself as a "long term, research driven, deep value investor" that "actively pursue[s] share holder activism…"

19. Caiyin Fan ("Fan"), age 38, is a PRC citizen and, according to brokerage records, is a resident of Guangzhou, Guangdong Province, China. Fan is a joint accountholder with Yang in a brokerage account held at New York-based Wang Investments.

20. Shui Chong (Eric) Chang ("Chang"), age 33, is a resident of Hong Kong. On information and belief, he is a PRC citizen. Chang was employed as a securities analyst with Deutsche Bank Securities, Inc. in New York, New York from August 2001 to October 2003. Chang has a brokerage account with E*Trade Financial ("E*Trade").

21. Biao Cang ("Cang"), age 29, is a PRC citizen and a resident of Hong Kong. Cang has two brokerage accounts with Interactive Brokers.

22. Jia Wu ("Wu"), age 29, is a PRC citizen and a resident of Taizhou, Jiangsu Province, China. Wu has two brokerage accounts with Interactive Brokers.

23. Ming Ni ("Ni"), age 29, is a PRC citizen and a resident of Hong Kong. Ni has a brokerage account with Interactive Brokers.

**Additional Relevant Entity**

24. Zhongpin, Inc. ("Zhongpin"), is a Delaware Corporation headquartered in Changge City, Henan Province, China. Zhongpin is a meat and food processing company

that specializes in pork and processed pork products. The company's common stock is registered under Section 12(b) of the Exchange Act and trades on the NASDAQ (under the ticker symbol "HOGS"). Its options trade on the Chicago Board Options Exchange ("CBOE") and other options markets.

### Zhongpin's March 27, 2012 Announcement of its CEO's Proposal to Take the Company Private by Buying All of its Shares

25.     Before the NASDAQ opened on Tuesday March 27, 2012, Zhongpin announced that its Chairman and CEO, Xianfu Zhu, had submitted a non-binding proposal to take Zhongpin private by acquiring all of Zhongpin's common stock for $13.50 per share. The $13.50 per share price represented a 46% premium over the previous day's closing price.

26.     In response to the announcement, Zhongpin's share price immediately rose 21.8% from the March 26 close of $9.21 per share to a March 27 close of $11.22 per share.

27.     At all times relevant to this Complaint, Zhongpin had a policy – available on its website – that prohibited any of Zhongpin's officers and directors from (a) trading Zhongpin securities while in possession of material non-public information about the company or (b) disclosing any material non-public information about Zhongpin without the company's authorization.

### Defendants' Suspicious and Profitable Zhongpin Trading

### Defendants Yang, Fan, and Prestige

28.     From 2008 until March 30, 2012, Siming Yang was employed as a research analyst at New York-based Baron Capital, Inc. where he provided analysis for the Baron International Growth Fund.

29.     At all times relevant to this Complaint, Baron had an internal policy that required pre-clearance of all personal equity trades. In February 2012, Baron adopted a written code of ethics that prohibited all personal trading by its analysts in the equities of publicly traded companies.

30.     Yang graduated with a Masters of Business Administration from Columbia University in New York, New York in 2008.

31.     Siming Yang maintains a residence in New York, New York.

32.     On November 25, 2011, Yang and Defendant Caiyin Fan opened a joint brokerage account at Wang Investments, an online discount brokerage firm located in New York, New York.

33.     In the account opening documents, Yang and Fan listed separate residences in Guangzhou, Guangdong, China. Yang identified himself as an "accountant" with a "retail company," and Fan stated that she was a kindergarten teacher. Both completed IRS Certificates of Foreign Status, attesting that their permanent residences were in China. Yang did not disclose to Wang Investments that he was a research analyst for a registered investment adviser and mutual fund administrator, and stated that he was a Guangzhou resident even though he went to school, had a job, and maintained a residence in New York City.

34.     In the account opening documents for his joint Wang Investments account, Yang disclosed annual income of $52,500 as of March 2011 and a net worth of $125,000 to $249,000 as of March 2011.

8

35.     In the account opening documents for the joint Wang Investments account, Defendant Fan disclosed an annual income of $65,000 to $124,999 as of November 16, 2011 and net worth of $500,000 to $999,999 as of the same date.

36.     From March 14 through March 26, 2012 – the two weeks before Zhongpin publicly disclosed the proposal to go private – Yang and Fan made net purchases of 2,571 Zhongpin call options through their Wang Investments account for a net purchase price of $182,500.

37.     During the same time period, Yang and Fan made net purchases totaling 58,000 shares of Zhongpin stock through their Wang Investments account for a total net purchase price of $506,462.

38.     In sum, in the two weeks before Zhongpin announced Zhu's proposal to take the company private, Yang and Fan invested $688,962 in Zhongpin securities.  That figure far exceeds the combined annual income that Yang and Fan disclosed to Wang Investments, is more than double the high end of Yang's disclosed net worth, and represents approximately 68.8% of the high end of Fan's disclosed net worth.

39.     At the close of trading on March 27, 2012 – the first trading day after Zhongpin announced the proposal to go private – Yang and Fan had garnered $733,006 in unrealized gains from their timely purchase of Zhongpin stock and call options through their Wang Investments account.

40.     Yang and Fan's March 2012 trading in Zhongpin securities is highly suspicious given (a) the suspicious volume and timing of their  purchases, (b) the fact that the purchases are wildly out of profile given Yang's and Fan's disclosed net worth and income,

(c) the equally suspicious, massive trading by Prestige, Yang's wholly-owned corporation (described below), and (d) the evidence of coordinated trading activity with Defendant Chang (discussed in ¶¶ 83-86 below).

41.     On information and belief, Yang and/or Fan purchased the Zhongpin stock and call options while in possession of – and on the basis of – material non-public information regarding Zhu's proposal to take Zhongpin private.

42.     In addition to the foregoing, Yang obtained more than $7.6 million in unrealized profits by trades made through Prestige Trade Investments, Ltd. – a corporation he recently created.

43.     In January 2012, Yang founded Prestige under the law of the British Virgin Islands.

44.     On March 13, 2012 – just two weeks before Zhongpin's announcement of Zhu's proposal to take the company private – Yang opened a brokerage account in Prestige's name at Interactive Brokers.

45.     Between March 15 and March 21, 2012, Yang transferred $29.8 million from an overseas account at China Construction Bank into Prestige's account at Interactive Brokers.

46.     This $29.8 million amount was far in excess of the net worth that Yang disclosed on his account opening statements and is wildly out of profile considering Yang's disclosed income of $52,500.

47.     Prestige used the funds in its Interactive Brokers account to purchase over 3 million shares of Zhongpin stock in the two weeks before Zhongpin's announcement of Zhu's proposal to take the company private.

48.     At the close of trading on March 27, 2012 – the first trading day after Zhongpin's announcement – Prestige had earned unrealized gains of over $7.6 million on its timely purchase of Zhongpin stock.

49.     The equity trades placed by Prestige represented about 41% of the trading volume of Zhongpin stock during the two-week period before the March 27, 2012 announcement, and about 8% of Zhongpin's total outstanding common stock.

50.     Prestige's March 2012 trading in Zhongpin stock is highly suspicious given (a) the timing of Yang's opening of a brokerage account for Prestige (just two weeks before Zhongpin's public announcement), (b) the high volume and fortunate timing of Prestige's purchases, (c) the fact that the $29 million that fueled the Prestige account is wildly out of profile given Yang's disclosed net worth and income, and (d) the evidence of coordinated trading activity with Defendant Chang (discussed in ¶¶ 83-86 below).

51.     On information and belief, Yang's company, Prestige, purchased Zhongpin stock while in possession of, and on the basis of, material non-public information regarding Zhu's proposal to take Zhongpin private.

**Defendant Chang**:

52.     Defendant Chang has a brokerage account with E*Trade.

53.     In his July 2007 E*Trade account opening documents, Chang disclosed an annual income between $50,000 and $99,999 and a liquid net worth between $100,000 and $200,000.

54.     From March 14 through March 27, 2012 – the two weeks before Zhongpin announced Zhu's proposed purchase of all company stock – Chang purchased through his E*Trade account 4,035 Zhongpin call options and 32,500 shares of Zhongpin stock for a total cost of $446,895.

55.     At the close of trading on March 27, 2012, the day Zhongpin announced Zhu's proposal to take the company private, Chang had earned $828,188 in unrealized gains on his Zhongpin securities.

56.     Before his purchase of Zhongpin securities in March 2012, Chang's E*Trade account had been completely dormant since November 30, 2010.  For most of that dormant period, Chang maintained an account balance of less than $7.00.

57.     Chang's March 2012 trading in Zhongpin securities is highly suspicious given (a) the high volume and fortunate timing of Chang's purchases, (b) the fact that, before purchasing large amounts of Zhongpin securities, Chang had not used his E*Trade account at all for over a year, and (c) the evidence of coordinated trading activity with Defendant Yang (discussed in ¶¶ 83-86 below).

58.     On information and belief, Chang purchased the Zhongpin stock and call options while in possession of, and on the basis of, material non-public information regarding Zhu's proposal to take Zhongpin private.

**Defendant Cang**:

59. Defendant Cang had two brokerage accounts with Interactive Brokers. The first was opened in July 2010 and the second was opened in May 2011.

60. In his most recent brokerage account application in May 2011, Cang disclosed to Interactive Brokers an annual income of $50,001.

61. Between March 14 and March 21, 2012, Cang bought 306 Zhongpin call options for a purchase price of $17,135.

62. That $17,135 investment in Zhongpin securities represents approximately 34% of Cang's annual income disclosed in his account application just 10 months before.

63. On March 27, 2012, the first trading day after Zhongpin disclosed Zhu's offer to purchase all outstanding shares, Cang closed each of his option positions for a total net realized profit of $39,745.

64. Prior to his timely purchases of Zhongpin call options in March 2012, Cang had not placed any trades in Zhongpin securities for at least two years.

65. Cang's March 2012 trading in Zhongpin call options is highly suspicious given (a) the comparatively high volume and auspicious timing of Cang's purchases, (b) the cost of the securities relative to Cang's disclosed income, (c) the fact that Cang had not traded in Zhongpin securities for at least two years prior to his timely purchases, and (d) the evidence of coordinated trading activity with Defendants Ni and Wu (discussed in ¶ 87 below).

66. On information and belief, Cang purchased the Zhongpin call options while in possession of, and on the basis of, material non-public information regarding Zhu's proposal to take Zhongpin private.

13

**Defendant Wu**:

67.     Defendant Wu has two brokerage accounts at Interactive Brokers.

68.     On his most recent account application in December 2011, Wu disclosed to Interactive Brokers an estimated net worth of $77,022, liquid net worth of $20,539 and annual income of $41,181 per year.

69.     From March 14 through March 21, 2012, Wu bought 257 Zhongpin call options for a total purchase price of $15,568.

70.     That $15,568 investment in Zhongpin securities in the course of one week represents approximately 20% of Wu's total net worth and 38% of Wu's annual income as disclosed in his account application just four months earlier.

71.     On March 27, 2012 – the first trading day after Zhongpin announced Zhu's proposed purchase of Zhongpin's outstanding shares – Wu closed out each of the option positions for a total net realized gain of $34,288.

72.     Wu had not traded Zhongpin securities in either of his accounts at Interactive Brokers in the year prior to his timely call option purchases in March 2012.

73.     Wu's March 2012 purchases of Zhongpin call options are highly suspicious given (a) the volume and auspicious timing of Wu's purchases, (b) the cost of the securities relative to Wu's income and net worth, (c) the fact that Wu had not traded in Zhongpin securities in at least the year prior to March 2012, and (d) the evidence of coordinated trading activity with Defendants Ni and Cang (discussed in ¶ 87 below),

74.     On information and belief, Wu purchased the Zhongpin call options while in possession of, and on the basis of, material non-public information regarding Zhu's proposal to take Zhongpin private.

**Defendant Ni:**

75.     Defendant Ni opened a brokerage account with Interactive Brokers in May 2011.

76.     In the account application, Ni disclosed a total net worth of $102,928 and annual income of $41,171.

77.     In the two weeks before Zhongpin announced Zhu's planned purchase of all Zhongpin stock, Ni purchased 4,300 Zhongpin shares and 169 Zhongpin call options for a total purchase price of $68,980.

78.     In sum, in the two weeks before Zhongpin announced the Zhu offer, Ni invested $68,980 in Zhongpin securities – a figure representing almost 67% of Ni's total net worth and approximately 168% of Ni's annual income as disclosed in account opening documents just 10 months before.

79.     On March 27, 2012, the first trading day after Zhongpin announced Zhu's proposal to take the company private, Ni closed out each option position and sold all of his Zhongpin shares for a total net realized gain of $57,108.

80.     Before Ni's timely March 2012 trades, Ni had not placed any trades in Zhongpin securities for at least 10 months.

81.     Ni's March 2012 purchase of Zhongpin stock and options is highly suspicious given (a) the volume and auspicious timing of Ni's purchases,(b) the cost of the securities

15

purchases relative to Ni's income and net worth, (c) the fact that Ni had not traded in

Zhongpin securities for at least the 10 months prior to March 2012, and (d) the evidence of

coordinated trading activity with Defendants Wu and Cang (discussed in ¶ 87 below).

82.     On information and belief, Ni purchased the Zhongpin stock and options

while in possession of, and on the basis of, material non-public information regarding Zhu's

proposal to take Zhongpin private.

### Evidence of Coordinated Activity

83.     Available evidence reflects likely coordination among some of the

Defendants.

84.     It appears that Defendants Yang and Chang have used the same computer to

access their brokerage accounts in the two weeks leading up to the Zhongpin

announcement.

85.     For example, on March 14, 2012, Chang accessed his account with E*Trade

using a network with the same Internet Protocol ("IP") address that was later used to access

the Prestige account with Interactive Brokers on numerous occasions between March 15 and

March 23, 2012.

86.     Chang and Prestige also used a second matching IP address to access their

respective brokerage accounts on March 21, 2012.

87.     Likewise, Defendants Cang, Wu and Ni each accessed their respective

brokerage accounts using networks with the same IP addresses and hardware with identical

Media Access Control ("MAC") addresses at various times between August 2011 and

March 2012.

16

## COUNT I
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

88.     The Commission realleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

89.     All Zhongpin shares and options referenced in this Complaint are securities, as that term is used in the Exchange Act, which are listed and traded on a domestic national exchange – *i.e.*, the NASDAQ and CBOE.

90.     Upon information and belief, the Defendants purchased shares and call options as set forth above, while they were in possession of, and on the basis of, material, nonpublic information regarding Zhu's proposal to take Zhongpin private by purchasing the company's outstanding stock. Each Defendant: (a) knew, or recklessly disregarded, the fact that their trading was in breach of a fiduciary duty or similar duty of trust and confidence owed to the shareholders of Zhongpin, or to the source from whom they received the material, nonpublic information; and/or (b) knew or should have known that material, nonpublic information about the contemplated acquisition had been communicated to them in breach of a fiduciary or similar duty of trust and confidence.

91.     Upon information and belief, any and all material, nonpublic information that Defendants received concerning Zhongpin, as set forth above, was disclosed in exchange for a personal benefit that benefited the communicator of such information.

92.     As more fully described in paragraphs 1 through 87 above, the Defendants, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national

securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person, including purchasers and sellers and prospective purchasers and sellers of securities.

93.     The Defendants each acted with scienter.

94.     By engaging in the conduct described above, the Defendants each, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

### II.

Issue a Temporary Restraining Order and Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining each of the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from,

directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue an asset freeze order in a form substantially similar to the order contained in the proposed order submitted in connection with the Commission's motion for relief which, among other things, prevents the Defendants, and each of Defendants' financial and brokerage institutions, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, email service, or service in accordance with such Order, or otherwise, from withdrawing, transferring, pledging, encumbering, assigning, dissipating, concealing, or otherwise disposing of any assets in their accounts maintained at the brokerage and financial institutions referenced in this Complaint.

### IV.

Issue an Order requiring Defendants to repatriate any assets or funds transferred to foreign accounts that were obtained as a result of Defendants' insider trading in Zhongpin securities, including assets or funds that were obtained through other brokerage accounts, if any, and freezing those assets or funds.

### V.

Issue an Order permitting expedited discovery.

### VI.

Issue an Order enjoining and restraining the Defendants, and any person or entity acting at their discretion or on their behalf, from destroying, altering, concealing, or

otherwise interfering with the access of the Commission to relevant documents, books or records.

## VII.

Issue an Order requiring each Defendant to disgorge all ill-gotten gains from the violative conduct alleged in this Complaint, and to pay prejudgment interest thereon.

## VIII.

Issue an Order requiring each Defendant to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Granting such other relief as this Court may deem just and appropriate.

## JURY DEMAND

The Commission requests a trial by jury.

Respectfully Submitted,

Dated: April 4, 2012

Robert J. Burson (IL#3126909)
Timothy S. Leiman (IL#6270153)
Jedediah B. Forkner (IL#6299787)
Marlene B. Key (IL#6296919)
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
U.S. Securities and Exchange
Commission