UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 12-cv-02473 |
| v. | ) ) | Honorable Matthew F. Kennelly |
| SIMING YANG, PRESTIGE TRADE INVESTMENTS LIMITED, CAIYIN FAN, and SHUI CHONG (ERIC) CHANG, | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF SEC'S UNOPPOSED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") -- without opposition from Defendants Siming Yang, Prestige Trade Investments Ltd. ("Prestige") and Shui Chong (Eric) Chang -- pursuant to Federal Rule of Civil Procedure 15(a), respectfully moves this Court for leave to file a Second Amended Complaint to make a minor change to one of the SEC's factual allegations. A copy of the proposed Second Amended Complaint is attached as Exhibit A to this motion. In support of this motion, the Commission states as follows:

1. On December 3, 2012, the Commission filed its Amended Complaint in this matter. (Dkt. #124, Am. Compl.)

2. In response to the Commission's discovery requests in this litigation, Defendants Yang and Prestige have produced Chinese versions of a Powerpoint

presentation dated February 19, 2012 – which the Commission alleges were created by Defendant Yang and presented to prospective investors in Prestige.

3.      After receiving Defendants' document production, the Commission obtained a third-party translation of that Powerpoint presentation. The SEC's December 3, 2012 Amended Complaint identified the presentation and included a quote from the translation at part (b) of ¶ 44, that read "[d]oes not allow for the possibility that over 80% of the position is in a single stock holding." (Dkt. #124, Am. Compl. at ¶ 44.)

4.      After consultation with local counsel in Hong Kong, the Commission determined that further review of the third-party translation of that passage was warranted. The Commission has been working with its translation vendor and has confirmed that the Chinese to English translation of the passage quoted in part (b) of ¶ 44 of the Amended Complaint may not be accurate.

5.      The Commission, therefore, wishes to file a Second Amended Complaint substantially in the form of attached Exhibit A. In the proposed amendment, the Commission corrects ¶ 44 of the Complaint by deleting the potentially inaccurately translated phrase. (Ex. A at ¶ 44.) The proposed Second Amended Complaint does not contain any other substantive changes.

6.      This minor change to ¶ 44 of the Amended Complaint does not modify the charges against Defendants and does not substantively change the overall factual allegations included in the Complaint. The Commission anticipates that the proposed modification would not substantively change Defendants' Answers and, as a result, the filing of a Second Amended Complaint will not unduly prejudice any of the Defendants.

7.     The SEC has conferred with Defendants Yang, Prestige and Chang and they do not oppose this Motion.  The parties agree that the filing of a Second Amended Complaint will not affect the deadlines in the Court's scheduling orders.

WHEREFORE, Plaintiff, the United States Securities and Exchange Commission, without opposition from the Defendants, respectfully requests that this Court grant it leave to file a Second Amended Complaint substantially in the form of attached Exhibit A.

Respectfully Submitted,

Dated: January 29, 2013

_____ s/Timothy S. Leiman
Robert J. Burson (IL#3126909)
Timothy S. Leiman (IL#6270153)
Marlene B. Key-Patterson (IL#6296919)
Jedediah B. Forkner (IL#6299787)
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
U.S. Securities and Exchange
Commission

## CERTIFICATE OF SERVICE

I, Timothy S. Leiman, an attorney, hereby certify that on January 29, 2013, I caused the foregoing Motion and the related Notice of Motion to be filed with the Clerk of the Court by using the CM/ECF system, which will send notice of the electronic filing to the counsel of record for this matter.

 s/  Timothy S. Leiman
Timothy S. Leiman

# Exhibit

# A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,        ) )<br><br>            ) | |

U.S. SECURITIES AND EXCHANGE
COMMISSION,

               **Plaintiff,**

               **v.**

SIMING YANG, PRESTIGE TRADE
INVESTMENTS LIMITED, CAIYIN FAN,
and SHUI CHONG (ERIC) CHANG,

               **Defendants.**

**Case No. 12-cv-02473**

**Honorable Matthew F. Kennelly**

### [PROPOSED] SECOND AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission")

alleges as follows:

### NATURE OF THE ACTION

1.      This case concerns the Defendants' highly profitable insider trading in the

securities of Zhongpin Inc. ("Zhongpin") and other illegal acts perpetrated by Defendant

Siming Yang ("Yang").

2.      Defendants purchased a substantial amount of Zhongpin shares and call

options (a contract that grants the purchaser the right to buy an agreed number of shares by

a certain time for a certain price – effectively allowing the option purchaser to place a bet

that the share price will rise) in the days and weeks before Zhongpin's March 27, 2012

public announcement that its Chairman and CEO offered to acquire all of Zhongpin's

outstanding stock for $13.50 per share (a 46% premium over the previous trading day's

closing price). The market reaction to Zhongpin's public announcement was immediate:

EXHIBIT

A

PENGAD 800-631-6989

the day the proposal was announced, Zhongpin's share price increased approximately 21.8%.

3.     The Defendants' trading of Zhongpin securities generated unrealized gains of over $8.7 million. On information and belief, each Defendant purchased Zhongpin securities while in the possession of, and on the basis of, material, nonpublic information.

4.     Defendant Yang was employed as a research analyst by a New York-based registered broker/dealer and investment adviser and provided analysis on companies in China and emerging markets for two of his employer's mutual funds. In January 2012 -- while still employed -- Yang secretly created his own start-up investment firm, Prestige Trade Investments Limited ("Prestige"). In February 2012, Yang traveled to China to recruit investors for Prestige. On his trip, Yang raised approximately $30 million from investors for Prestige's fund. Yang then returned to his home in the United States without informing his employer of the existence of Prestige or the fact that he had raised $30 million for his own private fund.

5.     In a presentation to prospective investors, Yang had indicated that Prestige was designed to be a diversified fund with investments across industries, sectors and countries. Instead, Yang prepared to place all of Prestige's assets in one company – Zhongpin.

6.     Knowing that he was about to place enormous, market-moving purchases of Zhongpin stock for Prestige's account, Yang first sought to take advantage by purchasing Zhongpin stock and call options for a personal brokerage account that he held jointly with Defendant Caiyin Fan. On March 14, 2012, Yang purchased nearly 2,000 Zhongpin call

options (almost all of them very risky, near-term "out of the money" options) and 50,000 shares of Zhongpin stock through his joint personal account.

7.      The next day, Yang began a stock-buying binge for Prestige's account that resulted in the purchase of over 3 million shares of Zhongpin stock during the two weeks leading up to Zhongpin's public announcement. Yang's purchases of Zhongpin stock for Prestige's account represented about 41% of the total trading volume during the period and roughly 8% of the total outstanding shares of Zhongpin. All tolled, by the end of Yang's purchasing spree, over 93% of Prestige's assets were invested in Zhongpin stock.

8.      At every turn, Yang has sought to obscure his trading activity from scrutiny. Yang never told his employer about his brokerage accounts, his creation of a new private fund, his efforts to raise funds from investors, or his trading in Zhongpin, even though his employer had policies in place that required disclosure of employee brokerage accounts and barred trading in public companies. Yang also lied to his broker about his occupation and residence, presumably to avoid the heightened scrutiny that would have come if Yang had disclosed his true place of employment. Further, just before Yang left his job, he deleted documents from his computer that related to Prestige and his plan to purchase Zhongpin securities. Among the documents he attempted to destroy was a non-public November 2011 presentation by a Hong Kong-based investment bank that was part of a proposed plan to take Zhongpin private through a management buyout.

9.      Yang's attempt to cover up his personal trading included a false filing with the Commission. On April 2, 2012, Yang and two other managing executives of Prestige filed a Schedule 13D with the Commission, disclosing Prestige's acquisition of Zhongpin shares.

In that submission, Yang did not disclose his personal trading in Zhongpin securities as he was required to do.

10.     Defendant Shui Chong (Eric) Chang ("Chang") also purchased Zhongpin securities based on material, non-public information.

11.     Defendant Chang's wife was Defendant Yang's friend and former co-worker, and she placed trades for Prestige's account at Yang's direction.  On or around March 14, 2012, Chang came across a communication between his wife and Yang that revealed Prestige's plans to purchase a large, market-moving volume of Zhongpin stock.  Chang claims that he did not disclose to his wife that he had learned of Prestige's plans.  To profit from this information, Chang immediately began buying Zhongpin stock and call options for his personal account.  Over the ensuing days, Chang surreptitiously observed his wife placing initial orders to purchase shares of Zhongpin stock for the Prestige account and continued to purchase Zhongpin securities for himself.  In total, Chang purchased 4,035 Zhongpin call options and 32,500 shares of Zhongpin stock for a total cost of over $446,000 during the two weeks leading up to Zhongpin's announcement of the going-private proposal.  By the close of trading on March 27, 2012, Chang had unrealized gains of $496,823 – more than a 100% gain in less than 14 days.  Chang had unrealized gains of $64,537 as of March 23, 2012, the final day on which Prestige purchased Zhongpin stock.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d),

4

78u(e), 78u-1] and Section 209 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9].

13.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

15.     The individual Defendants are citizens and residents of Hong Kong or the People's Republic of China ("PRC").  The sole entity Defendant, Prestige, is a British Virgin Islands ("BVI") corporation.  According to its brokerage records, Prestige is based in Guangzhou, Guangdong Province, China.

16.     Until at least April 1, 2012, Defendant Yang maintained a residence in New York, where he was staying on a work visa.  He is not a permanent resident of the United States within the meaning of the venue provisions.

17.     The Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged herein.

18.     All of the trading described herein occurred through U.S.-based brokerage accounts and was placed through U.S.-based securities exchanges.  Moreover, at all times relevant to the Complaint, the target company of the trading at issue – Zhongpin – was incorporated in the United States and its securities traded on U.S.-based exchanges and were registered with the Commission.

19.     The Defendants will, unless enjoined, continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar purport and object.

## FACTS

### Defendants

20.     Siming Yang ("Yang"), age 35, is a PRC citizen.  From January 2008 through at least April 2012, Yang maintained a residence in New York, New York. Until March 2012, Yang was employed as a research analyst with a New York-based registered broker/dealer and investment adviser that manages a family of mutual funds.  Yang was terminated from that position effective March 30, 2012.  Yang has a personal brokerage account with Wang Investment Associates ("Wang Investments"), which also is based in New York, New York. Yang helped found Prestige in January 2012.

21.     Prestige Trade Investments Limited ("Prestige") is a BVI corporation, founded by Yang and others.  Prestige has no substantive operations in the BVI.  Yang helped create Prestige in January 2012.  Prestige has a bank account at a China-based bank and a brokerage account at Interactive Brokers, LLC ("Interactive Brokers"), which has an office in Chicago, Illinois.  In its account opening documents, Prestige describes itself as a "long term, research driven, deep value investor" that "actively pursue[s] shareholder activism…"

22.     Caiyin Fan ("Fan"), age 38, is a PRC citizen and, according to brokerage records, is a resident of Guangzhou, Guangdong Province, China.  Fan is a joint

6

accountholder with Yang in a brokerage account held at New York-based Wang Investments.

23.     Shui Chong (Eric) Chang ("Chang"), age 33, is a citizen and resident of Hong Kong. Chang was employed as a securities analyst in New York, New York from August 2001 to October 2003. Chang has a brokerage account with E*Trade Financial ("E*Trade"). Chang's wife is Yang's friend and former co-worker, and she placed trades for Prestige's account.

### Additional Relevant Entity

24.     Zhongpin, Inc. ("Zhongpin") is a Delaware Corporation headquartered in Changge City, Henan Province, China. Zhongpin is a meat and food processing company that specializes in pork and processed pork products. The company's common stock is registered under Section 12(b) of the Exchange Act and trades on the NASDAQ (under the ticker symbol "HOGS"). Its options trade on the Chicago Board Options Exchange and other options markets.

### Defendant Yang Secretly Opens a Joint Brokerage Account With Caiyin Fan

25.     Yang graduated with a Masters of Business Administration from Columbia University in New York, New York in 2008, and he maintained a residence in New York, New York between 2008 and 2012.

26.     From 2008 until March 30, 2012, Siming Yang was employed as a research analyst at a New York-based broker/dealer and registered investment adviser where he provided analysis of companies based in China and emerging markets.

7

27.   At all times relevant to this Complaint, Yang's employer maintained policies designed to prevent insider trading. Among other things, those policies (a) prohibited employees from trading in equities of publicly traded companies, (b) required employees to seek preclearance before executing any personal trades, and (c) required employees to disclose all brokerage accounts.

28.   Yang's employer provided Yang with training related to the policies identified in paragraph 27.

29.   In December 2008, Yang placed three trades in the common stock of publicly traded companies without obtaining preclearance from his employer. At that time, members of the company's management discovered the trades, informed Yang of his violations and explained the company's policies to Yang in further detail.

30.   On November 25, 2011, Yang and Fan opened a joint brokerage account at Wang Investments, a brokerage firm located in the United States.

31.   In the account opening form, Yang (a) stated that he resided in Guangzhou, Guangdong, China, (b) identified himself as an "accountant" with "Guangzhou Goldstar Retail," and (c) stated that he was not an "associated person of a Broker." None of those statements were true. At the time he filled out his account opening forms with Wang Investments, Yang had resided in New York for over three years and worked for a New York-based broker-dealer and investment adviser.

32.   Along with the account opening documents, both Yang and Fan each completed an IRS Form W-8BEN Certificate of Foreign Status of Beneficial Owner. The Form W-8BEN is tax form to be used by non-resident aliens. In his Form W-8BEN, Yang

8

certified that he was a resident of Guangzhou, Guangdong, China. He did not disclose that, at that time, he was a full-time resident of New York, NY.

33.     Yang did not disclose the Wang Investments brokerage account to his employer although he was required to do so under his employer's policies.

34.     Further, Yang affirmatively lied to his employer about the existence of the Wang Investments account. In November 2011 and March 2012, Yang falsely certified to his employer that he did not hold a personal brokerage account.

### Yang Creates Prestige and Raises Almost $30 million From Investors

35.     While still employed as a research analyst, Yang secretly began taking steps to establish his own investment firm.

36.     In January 2012, Yang helped form Prestige under the laws of the BVI.

37.     Yang was a Director of Prestige, a part-owner of Prestige, Prestige's General Manager and was in charge of all trading decisions for Prestige.

38.     Unbeknownst to his then-employer, Yang sought to create a new private investment fund through Prestige.

39.     Yang acted as an investment adviser to Prestige. He was Prestige's "investment manager," was responsible for creating Prestige's investment strategy and directed all trades on Prestige's behalf. In exchange for those services, Prestige investors were to be charged a management fee. Yang, in turn, was to receive a salary equal to .5% of Prestige's net asset value and a bonus tied to Prestige's investment gains.

40.     As an investment adviser, Yang owed a fiduciary duty to Prestige.

41.    During January and February 2012, while he was living and working in New York, Yang created a roadshow presentation to market Prestige to prospective investors.

42.    In mid-February 2012, Yang told his New York-based employer that he needed to travel to China due to a death in his family.

43.    On February 16, 2012, Yang met with an individual at a hotel in China to finalize the roadshow presentation. Later that week, Yang began a roadshow to market Prestige's investment fund to potential investors.

44.    On or about February 19, 2012, Yang presented the roadshow materials to investors. The roadshow materials that Yang created and disseminated described Prestige as a diversified investment, declaring that the investment portfolio would be "properly diversified…by industry…by sector and country."

45.    In reality, of the $29,999,990.69 deposited into Prestige's bank account in Hong Kong, approximately $28,123,578.10 (93.7 % of the total) was used to purchase the common stock of a single company – Zhongpin, Inc. The rest remained in cash.

46.    Drafts of Yang's presentation materials also shed light on how he chooses investments for Prestige, stating that, in selecting companies in which to invest, ideas come from "multiple aspects" including "exclusive information networks," "CEO networks," and "current employees."

47.    The presentation to prospective Prestige investors also suggested that Yang was aware of non-public plans of management to privatize certain companies, stating that many of the companies in which he was considering investing Prestige's money "are proactively considering management level privatization."

10

48.     While he was in China, Yang repeatedly told his employer that he was unable to return to the United States due to issues with his visa and passport and that he was researching companies for his employer at his own cost while stuck overseas.  Yang never disclosed to his employer (a) the existence of Prestige or (b) that Yang had used his China trip to raise money for Prestige.

### Yang's Fraudulent "Front-Running" Scheme: Yang Places Personal Trades In Advance of Trades He Placed on Behalf of Prestige

49.     Yang's roadshow to prospective investors was successful.  On March 9, 2012, while still in China, Yang opened a bank account for Prestige at a China-based bank.  Between March 13 and March 20, 2012, the Prestige account received $30 million in deposits from at least five investors.

50.     Prestige's corporate records show that Yang was given credit for a $3 million deposit to Prestige.  However, Prestige's bank records do not reflect any deposits from Yang.  Rather, the $3 million appears to reflect a payment to Yang from one or more of Prestige's investors.

51.     On March 13, 2012 – just two weeks before Zhongpin's announcement of the proposal to take the company private – Yang opened a brokerage account in Prestige's name at Interactive Brokers, a brokerage firm based in the United States.

52.     After the market closed on March 13, 2012, Zhongpin announced weaker than expected earnings for the 4th quarter of 2011.  Zhongpin's stock price dropped more than 20% from $10.52 on March 13 to $8.36 on March 14.

53.     Despite Zhongpin's disappointing earnings and resulting price drop, Yang immediately started to place large, risky bets that Zhongpin's stock price would shoot up in the very near future.

54.     As Yang planned to purchase large quantities of Zhongpin stock and options, Yang engaged in a fraudulent "front-running" scheme, whereby he sought to personally profit by purchasing Zhongpin securities in his joint personal account when he knew that he would soon complete massive, market moving purchases of Zhongpin stock on behalf of Prestige.

55.     Knowing that he planned to buy a huge sum of Zhongpin shares for Prestige's account, Yang first sought to take advantage of this buying opportunity for himself and purchased 50,000 shares of Zhongpin stock and 1,978 Zhongpin call options in his joint account with Fan on March 14.

56.     All of the call options that Yang purchased on March 14, 2012 were "out of the money." In other words, the strike price of the options – $10.00 per share – exceeded the market price of Zhongpin's common stock at the time the options were purchased.

57.     The overwhelming majority of the options Yang purchased on March 14, 2012 were also near-term, with expiration dates in mid-April.

58.     Yang's near-term, "out of the money" options presented a unique risk: if the share price of Zhongpin did not reach $10.00 per share by the option's rapidly approaching exercise date, that option would become worthless.

59.     Fortunately for Yang, he knew that demand for Zhongpin shares would soon be fueled by his purchases on Prestige's behalf.

12

60.     On March 15, 2012 – the day after Yang started buying his Zhongpin call options – Yang bought additional Zhongpin call options for his personal account and began buying hundreds of thousands of shares of Zhongpin stock for Prestige's account.

61.     Prestige's purchases were massive: They represented about 41% of the trading volume of Zhongpin stock during the two-week period before the March 27, 2012 announcement and about 8% of Zhongpin's total outstanding common stock.

62.     By the time Prestige finished its purchases of large blocks of Zhongpin stock, Zhongpin's share price had risen over 15% -- from $8.31 per share (the closing price the day that Prestige started buying) to $9.60 per share (the closing price on March 23, 2012, the day of Prestige's final purchase).

63.     Yang did not disclose to Prestige's investors that he would place his own personal trades in the same securities purchased on behalf of Prestige or that he would try to gain an extra advantage by placing his personal trades before placing massive, market-moving trades on behalf of Prestige.

64.     Yang's "front-running" of Prestige's trades was material. First, by not disclosing to investors that he was placing trades for his own benefit before those of his investors, Yang was hiding a serious conflict of interest from Prestige's investors. Moreover, by placing his personal Zhongpin stock trades before buying stock on behalf of Prestige, Yang was able to obtain a financial benefit: he was, all tolled, able to secure a more lucrative return for himself and Caiyin Fan.

65.     By engaging in his "front running" scheme – and failing to disclose the resulting conflict of interest to Prestige's investors – Yang engaged in a fraud, and breached his fiduciary duty to Prestige.

66.     In conducting his fraudulent front-running scheme, Yang acted with scienter. At the time he placed trades in his joint personal account, he knew that he was about to purchase enormous quantities of Zhongpin stock through Prestige.  Yang knew – or recklessly disregarded – that he and Fan would obtain a personal benefit from placing his personal trades before placing Prestige's trades.

### Yang, Fan and Prestige Make Huge Trading Gains By Buying Stock and Options in the Two Weeks Before Zhongpin Announces the Proposal to Go Private

67.     From March 14 through March 26, 2012 – the two weeks before Zhongpin publicly disclosed the proposal to go private – Yang and Fan made net purchases of 2,571 Zhongpin call options through their Wang Investments account for a net purchase price of $182,500.

68.     During the same time period, Yang and Fan made net purchases totaling 58,000 shares of Zhongpin stock through their Wang Investments account for a total net purchase price of $506,462.

69.     With those purchases, Zhongpin securities represented the overwhelming majority of securities in Yang's and Fan's joint account. By March 26, 2012 – the day before Zhongpin's public announcement of its CEO's privatization proposal – Zhongpin securities represented 84% of the value of the equities in the Yang/Fan joint account and (including obligations related to short positions in the account) represented 104% of the total account value.

14

70.     Yang did not disclose or seek preclearance for these trades from his employer – even though he was required to do so under the company's trading policies.

71.     Between March 15 and March 21, 2012, Yang transferred $29.8 million from Prestige's overseas bank account into Prestige's brokerage account at Interactive Brokers. Prestige used these funds to purchase over 3 million shares of Zhongpin stock in the two weeks before Zhongpin's announcement of the proposal to take the company private.

72.     Yang did not disclose or seek preclearance for these trades from his employer – even though he was required to do so under the company's trading policies.

73.     Before the NASDAQ opened on Tuesday March 27, 2012, Zhongpin announced that its Chairman and CEO had submitted a non-binding proposal to take Zhongpin private by acquiring all of Zhongpin's common stock for $13.50 per share. The $13.50 per share price represented a 46% premium over the previous day's closing price.

74.     In response to the announcement, Zhongpin's share price rose 21.8% from the March 26 close of $9.21 per share to a March 27 close of $11.22 per share.

75.     At the close of trading on March 27, 2012 – the first trading day after Zhongpin's announcement – Prestige had earned unrealized gains of over $7.6 million on its timely purchases of Zhongpin stock.

76.     For their part, Yang and Fan garnered $611,961 in unrealized gains from their timely purchases of Zhongpin stock and call options as of the day following the announcement.

77.     The New York-based registered broker/dealer and investment adviser terminated Yang's employment effective March 30, 2012 for performance-based reasons.

78.    Following Yang's termination, his employer located a number of documents related to Zhongpin that Yang had deleted from his work laptop.

79.    Among other documents, Yang had deleted a non-public presentation that was created by a Hong Kong-based investment bank and detailed a plan to take Zhongpin private.  The presentation was marked "HIGHLY RESTRICTED" on each page and used the code word "Project Zeus" to avoid using the name "Zhongpin."  The document also contained a disclaimer that stated that the document "is not for public circulation, must not be copied, transferred or the content disclosed to any third party."

80.    Yang's possession (and subsequent deletion) of the Project Zeus presentation reflects that Yang had access to material, non-public information about Zhongpin's interest in a management buy-out.

81.    The "Project Zeus" presentation was not publicly distributed and, according to records from the Hong Kong investment bank, Yang was not an authorized recipient of the "Project Zeus" presentation or any other information related to Zhongpin's privatization efforts.

82.    On information and belief, Yang, Fan and Prestige purchased their Zhongpin securities while in possession of, and on the basis of, material non-public information regarding the proposal to take Zhongpin private.

### Yang Files a False Schedule 13D with the Commission

83.    The federal securities laws require a person, group or entity that acquires beneficial ownership of more than 5% of a class of a common stock to file a Schedule 13D with the Commission disclosing, among other things, the acquirer's identity, the purpose of

16

the acquisition, the number of shares owned and the details of the acquirer's transactions in the stock during the previous sixty days.

84.     By late March 2012, Prestige and Yang had acquired so much Zhongpin stock that they were required to file a Schedule 13D with the Commission to disclose their positions.

85.     On April 2, 2012, Prestige, Yang and two other purported managing executives of Prestige (collectively, the "Reporting Persons") filed a Schedule 13D with the Commission, disclosing Prestige's acquisition of Zhongpin stock.

86.     An attorney for the Reporting Persons signed the Schedule 13D on Yang's behalf over Yang's signature block.

87.     Yang and the other Reporting Persons stated on the Schedule 13D that they shared voting and dispositive power over the shares and that none of them held sole voting or dispositive powers over any other shares.

88.     Further, they stated that during the previous sixty days "no transactions in the Common Stock were effected by any Reporting Person" other than those disclosed on the form.

89.     The Schedule 13D reflected only those shares acquired by Prestige and excluded Yang's trading in, trading authority over, and co-ownership of Zhongpin securities in his joint account with Fan – even though Yang was required to report those holdings.

90.     The representations in the Schedule 13D described in paragraphs 87-88 were false when made.  As of the date of filing, Yang (through his joint account with Caiyin Fan) had purchased 45,000 shares of Zhongpin stock and more than 2,500 Zhongpin call options

17

and had directed numerous trades in Zhongpin stock during the sixty days prior to filing the Schedule 13D.

91.     The misrepresentations and omissions in the Schedule 13D regarding Yang's personal ownership of shares described in paragraphs 87-88 were material and directly related to information required to be disclosed to the investing public.

92.     Later on April 2, 2012, the Reporting Persons (including Yang) filed an Amended Schedule 13D. The Amended filing contained the same misrepresentations and omissions described in paragraphs 87-88 regarding Yang's purchase of Zhongpin securities through his personal account with Defendant Fan.

93.     Yang knew or recklessly disregarded that the Schedule 13D (and the April 2, 2012 Amended Schedule 13D) contained material misrepresentations and omissions regarding Yang's personal transactions in Zhongpin securities.

94.     The Reporting Persons did not file an amended Schedule 13D disclosing Yang's personal trading until after the Commission filed the original complaint in this matter.

### Defendant Chang's Zhongpin Trading

95.     Defendant Chang has a brokerage account with E*Trade, a brokerage firm located in the United States.

96.     Chang's E*Trade account was completely dormant from November 30, 2010 to March 2012. For most of that dormant period, Chang maintained an account balance of less than $7.00.

18

97. Chang's wife was Yang's friend and former co-worker. In March 2012, Chang's wife began processing trades for Prestige's account at Yang's direction.

98. On or around March 14, 2012, Chang found a non-public "execution plan" that his wife had printed on their home computer showing that Prestige planned to purchase up to 10% of the outstanding shares of Zhongpin.

99. Chang decided to take advantage of that information and immediately began buying large quantities of Zhongpin stock in his E*Trade account.

100. A couple of days after seeing the execution plan, Chang obtained the login information for Prestige's account from his wife and accessed the Prestige account online. He observed that Prestige had already purchased shares of Zhongpin stock, which convinced him that Prestige was acting on the non-public "execution plan."

101. Over the ensuing days, Chang witnessed his wife placing additional orders to purchase Zhongpin stock for the Prestige account and continued to purchase Zhongpin shares in his own E*Trade account.

102. Chang did not perform any research or analysis on Zhongpin, and instead he purchased Zhongpin stock based on the material, non-public information he learned about Prestige's trading plans.

103. From March 14 through March 27, 2012 – the two weeks before Zhongpin announced the going-private proposal – Chang purchased through his E*Trade account 4,035 Zhongpin call options and 32,500 shares of Zhongpin stock for a total cost of $446,895.

104. All of Chang's call options were particularly risky near-term, "out of the money" options. They each had a strike price of $10 and almost all of them had an expiration date in April 2012.

105. At the close of trading on March 27, 2012, Chang had earned $496,823 in unrealized gains on his Zhongpin securities. Chang's unrealized gains totaled $64,537 at the close of trading on March 23, 2012, the final day on which Prestige purchased Zhongpin stock.

106. According to Chang, he did not inform his wife that he (a) had come across the non-public Prestige "execution plan," (b) monitored Prestige's account activity to confirm that Prestige was executing its non-public plan to buy up to 10% of Zhongpin's shares, and (c) was purchasing large amounts of Zhongpin securities to capitalize on the non-public information that he had obtained regarding Prestige's plans.

107. Chang purchased the Zhongpin stock and call options while in possession of, and on the basis of, material non-public information regarding Prestige's plan to purchase up to 10% of Zhongpin's outstanding stock.

## COUNT I
### Insider Trading
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against Defendants Yang, Fan, and Prestige)

108. The Commission realleges and incorporates by reference paragraphs 1 through 94 as though fully set forth herein.

109. All Zhongpin shares and options referenced in this Complaint are securities, as that term is used in the Exchange Act, which are listed and traded on a domestic national exchange – *i.e.*, the NASDAQ and CBOE.

20

110.    Upon information and belief, Defendants Yang, Fan and Prestige purchased shares and call options as set forth above, while they were in possession of, and on the basis of, material, nonpublic information regarding the intent of Zhongpin management to pursue privatization through a management buy-out of the company's outstanding stock. Defendants Yang, Fan and Prestige: (a) knew, or recklessly disregarded, the fact that their trading was in breach of a fiduciary duty or similar duty of trust and confidence owed to the shareholders of Zhongpin, or to the source from whom they received the material, nonpublic information; and/or (b) knew or should have known that material, nonpublic information about the contemplated acquisition had been communicated to them in breach of a fiduciary or similar duty of trust and confidence.

111.    Upon information and belief, any and all material, nonpublic information that Defendants Yang, Fan and Prestige received concerning Zhongpin, as set forth above, either was misappropriated by those Defendants or disclosed in exchange for a personal benefit that benefited the communicator of such information.

112.    As more fully described in paragraphs 1 through 94 above, Defendants Yang, Fan and Prestige, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of

business which operated or would operate as a fraud or deceit upon another person,

including purchasers and sellers and prospective purchasers and sellers of securities.

113. Defendants Yang, Fan and Prestige each acted with scienter.

114. By engaging in the conduct described above, Defendants Yang, Fan and

Prestige, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b)

of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-

5].

## COUNT II
### Insider Trading
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against Defendant Chang)**

115. The Commission realleges and incorporates by reference paragraphs 1

through 107 as though fully set forth herein.

116. All Zhongpin shares and options referenced in this Complaint are securities,

as that term is used in the Exchange Act, which are listed and traded on a domestic national

exchange – *i.e.*, the NASDAQ and CBOE.

117. Upon information and belief, Defendant Chang purchased shares and call

options as set forth above, while he was in possession of, and on the basis of, material,

nonpublic information regarding Prestige's plan to purchase up to 10% of Zhongpin's

outstanding stock. Defendant Chang: (a) knew, or recklessly disregarded, the fact that his

trading was in breach of a fiduciary duty or similar duty of trust and confidence owed to the

source from whom he received the material, nonpublic information (*i.e.*, his wife); and/or

(b) knew or should have known that material, nonpublic information about Prestige's

22

planned purchases and actual purchases had been communicated to him in breach of a fiduciary or similar duty of trust and confidence.

118.    As more fully described in paragraphs 95 through 107 above, Defendant Chang, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person, including purchasers and sellers and prospective purchasers and sellers of securities.

119.    Defendant Chang acted with scienter.

120.    By engaging in the conduct described above, Defendant Chang, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT III
### Fraud in the Purchase or Sale of Securities – Yang's Fraudulent "Front-Running" Scheme: Violations of Exchange Act Section 10(b) and Rules 10b-5(a), (b) and (c) [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), (b) and (c)] (Against Yang)

121.    The Commission realleges and incorporates by reference paragraphs 1 through 82 as though fully set forth herein.

122.    As more fully described in paragraphs 49 through 66 above, Defendant Yang, in connection with the purchase and sale of securities, by the use of the means or

instrumentalities of interstate commerce, or of the mails, or of any facility of any national

securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to

defraud; (b) made untrue statements of material fact or omitted to state materials facts

necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading; or (c) engaged in acts, practices, or courses of

business which operated or would operate as a fraud or deceit upon another person,

including purchasers and sellers and prospective purchasers and sellers of securities.

123.     Defendant Yang acted with scienter.

124.     By engaging in the conduct described above, Defendant Yang, directly or

indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-

5(a), (b) and (c)].

## COUNT IV
### Fraud by an Investment Adviser – Yang's "Front- Running" Scheme: Violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. § 80b-6(1) and 80b-6(2)] (Against Yang)

125.     The Commission realleges and incorporates by reference paragraphs 1

through 82 as though fully set forth herein.

126.     During the relevant time period, Defendant Yang acted as an investment

adviser to Prestige within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C.

§ 80b-2(a)(11)].

127.     As more fully described in paragraphs 49 through 66 above, Defendant Yang,

by use of the mails, and the means and instrumentalities of interstate commerce, directly or

indirectly, while acting as an investment adviser, knowingly, willfully, or recklessly: (a) employed devices, schemes, or artifices to defraud clients or prospective clients; and (b) engaged in transactions, practices, and courses of business that operated as a fraud or deceit upon clients or prospective clients.

128.     Defendant Yang acted with scienter.

129.     By engaging in the conduct described above, Defendant Yang, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

**COUNT V**
**Violation of Shareholder Reporting Requirements**
**Violation of Exchange Act Section 13(d) and Rule 13d-1**
**[15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d-1]**
**(Against Yang)**

130.     The Commission realleges and incorporates by reference paragraphs 1 through 94 as though fully set forth herein.

131.     Section 13(d) of the Exchange Act and Rule 13d-1 thereunder require a person, group or entity that acquires beneficial ownership of more than 5% of a class of a registered equity security to file a statement, specifically, Schedule 13D, with the Commission.

132.     The related Schedule 13D must disclose, among other things, the acquirer's identity, the purpose of the acquisition, the number of shares owned and the details of the acquirer's transactions in the stock during the previous sixty days.

133.     By engaging in the conduct described in paragraphs 83 through 94 above, –
*i.e.*, failing to disclose his personal trading in Zhongpin on Schedule 13D and falsely stating

in that form that Yang had not made transactions in Zhongpin stock during the previous sixty days – Defendant Yang, directly or indirectly, violated, and unless enjoined will again violate, Section 13(d) of the Exchange Act and Rule 13d-1 thereunder [15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d-1].

### COUNT VI
**Fraud – Misrepresentations in Schedule 13D**
**Violations of Exchange Act Section 10(b) and Rule 10b-5(b)**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5-(b)]**
**(Against Yang)**

134.     The Commission realleges and incorporates by reference paragraphs 1 through 94 as though fully set forth herein.

135.     As more fully described in paragraphs 83 through 94 above, Defendant Yang made material false representations and omissions on Schedule 13D regarding his personal transactions in Zhongpin stock.  Therefore, Defendant Yang, in connection with the purchase and sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

136.     Defendant Yang acted with scienter.

137.     By engaging in the conduct described above, Defendant Yang, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

### II.

Issue a Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendants Prestige, Fan and Chang, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue a Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendant Yang, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from, directly or indirectly, violating Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. § 78j(b) and 78m(d)] and Rules 10b-5 and 13d-1thereunder [17 C.F.R. § 240.10b-5 and 240.13d-1] and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

27

## IV.

Issue an Order requiring each Defendant to disgorge all ill-gotten gains from the violative conduct alleged in this Complaint, and to pay prejudgment interest thereon.

## V.

Issue an Order requiring Defendants Prestige, Fan and Chang to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and requiring Defendant Yang to pay civil monetary penalties pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. § 78u(d)(3) and 78u-1] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Granting such other relief as this Court may deem just and appropriate.

## JURY DEMAND

The Commission requests a trial by jury.

Respectfully Submitted,

Dated: January __, 2013

_____
Robert J. Burson (IL#3126909)
John E. Birkenheier (IL#
Timothy S. Leiman (IL#6270153)
Marlene B. Key-Patterson (IL#6296919)
Jedediah B. Forkner (IL#6299787)
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
U.S. Securities and Exchange
Commission

29