UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 12-cv-02473** |
| **v.** | ) ) | **Honorable Matthew F. Kennelly** |
| **SIMING YANG, ET AL.,** | ) ) | |
| | ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS SIMING YANG AND PRESTIGE TRADE INVESTMENTS LIMITED

After the SEC boldly announced an asset freeze based on "aberrant trading"; and after

more than a year of exhaustive discovery, the facts remain:

- Defendants did not possess material, nonpublic information about Zhongpin, Inc. ("Zhongpin") at the time of the trades at issue.

- Defendants were not Zhongpin insiders.  There is no connection between Defendants and Zhongpin.

- Defendants owed no duty to Zhongpin or to the unidentified source of any purported material nonpublic information.

- There is no beach of any duty to Zhongpin, to its shareholders or to the source of any purported material nonpublic information.

- Siming Yang did not make any personal purchases of Zhongpin securities.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no showing of a genuine issue of material

fact in the "pleadings, depositions, answers to interrogatories, admissions on file, and affidavits,

and where the moving party is entitled to judgment as a matter of law." *Springer v. Durflinger*,

518 F.3d 479, 483 (7th Cir. 2008).  If the movant meets its burden, the burden shifts to the

nonmoving party to set forth specific facts demonstrating there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Becker v. Tenebaum-Hill Assoc.,* 914 F.2d 107, 110 (7th Cir. 1990).

The nonmoving party must go beyond the fact of the pleadings to demonstrate through specific evidence that there remains a genuine issue of material fact. *Nieves v. Bd. Of Educ. Of the City of Chicago*, 297 F.2d 690, 693 (7th Cir. 2002). The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; the nonmoving party must demonstrate there is evidence upon which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 252 (1986).

## STANDARDS FOR THE SEC'S CLAIMS

### A. Illegal Insider Trading (Count I, against Yang and Prestige).

The SEC alleges that Defendants Siming Yang ("Yang") and Prestige Trade Investments Limited ("Prestige") (Yang and Prestige collectively referred to as "Defendants") illegally used material nonpublic information to trade in Zhongpin securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. (Defendants' Statement of Material Facts ("Facts") ¶ 1.) To succeed on such a claim, the SEC must prove that Defendants traded in a security on the basis of material, nonpublic information in violation of a fiduciary or other duty arising out of trust and confidence to the information's source. *Dirks v. SEC*, 463 U.S. 646, 654 (1983); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).

As a threshold issue, the SEC must prove that Defendants actually possessed material, nonpublic information at the time of the alleged illegal trades. *See* 17 C.F.R. § 240.10b5-1 ("a purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale").

2

There are two theories under which the SEC may establish a breach of duty sufficient to support its insider trading claims. The "classical" theory of insider trading brings corporate insiders within the ambit of Rule 10b-5. *See Dirks*, 463 U.S. at 654; *Chiarella v. United States*, 445 U.S. 222, 227-228 (1980). The "misappropriation theory" of insider trading extends the reach of Rule 10b-5 to those who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade if: (1) there was a misappropriation of material, nonpublic information; (2) in breach of a fiduciary duty to the information's source; (3) in connection with the purchase or sale of securities; and (4) with the requisite scienter, *i.e.*, the defendant knew or should have known that the information he traded on was misappropriated. *SEC v. Maio*, 51 F.3d 623, 630 (7th Cir. 1995); *SEC v. Cherif*, 933 F.2d 403, 408 (7th Cir. 1991). Thus, to prove insider trading by an outsider, the SEC must prove, among other things, that a tipper possessed material nonpublic information, and that the tipper gave this information to the tippee who traded based on this information. *Maio*, 51 F.3d at 631 (violation results from "misappropriating and trading upon material information entrusted by virtue of a fiduciary relationship."); *Cherif*, 933 F.2d at 409-10 (noting misappropriation theory focuses on "whether the insider breached a fiduciary duty to any lawful possessor of material nonpublic information.")

Under the misappropriation theory, the deception requirement of Section 10(b) is met by the misappropriating party's "feigning fidelity to the source of [the confidential] information." *United States v. Falcone*, 257 F.3d 226, 232 (2d Cir. 2001), quoting *O'Hagen*, 521 U.S. at 655. Thus, one violates the federal securities laws when he misappropriates and trades upon material information entrusted to him by virtue of a fiduciary relationship. *Maio*, 51 F.3d at 631.

The mere possession of material nonpublic information, without more, does not create a duty to disclose or abstain from trading. See *Chiarella*, 445 US at 235 ("there is no general duty

3

to disclose before trading on material nonpublic information"); *Dirks*, 463 U.S. at 654 (a duty to disclose does not arise from the mere possession of nonpublic market information); *O'Hagen*, 521 U.S. at 663 (same). Rather, the information must have come from an insider. See *Maio,* 51 F.3d at 631. Without a connection to an insider, there cannot be an insider trading case. *Id.*

There also must be a duty between the parties. Before liability may be imposed it is necessary to identify the duty that the defendant has breached. *U.S. v. Corbin*, 29 F. Supp. 2d 607, 612 (S.D.N.Y. 2010), citing *Chiarella*, 445 U.S. at 232 n.4, 237.

It is equally clear that a source of information may not unilaterally impose a duty on another person simply by sharing it. See *U.S. v. Chestman*, 947 F.3d 551, 567 (2d Cir. 1991) ("a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information"); *Falcone*, 257 F.3d at 234 (a fiduciary relationship exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties).

Trading on such information is illegal only if its disclosure is improper *and* the tippee knows or should know it. *SEC v. Maio*, 51 F.3d at 632, citing *Dirks*, 463 U.S. at 660; *SEC v. Roszak*, 495 F. Supp.2d 875, 886 (N.D.Ill. 2007). Also, there is no liability based on a negligent or inadvertent tipping of material nonpublic information. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976); *SEC v. Switzer*, 590 F. Supp. 756, 766 (W.D. Okla. 1984).

**B. Ancillary claims (Counts III, IV, V and VI, against Yang).**

The SEC asserts that Yang violated Section 10(b) of the Exchange Act by failing to inform Prestige of personal trades in Zhongpin (Count III), and by failing to disclose those trades in Prestige's Schedule 13D (Count VI). The SEC also asserts that the failure to inform Prestige violated Sections 206(1) and (2) of the Adviser's Act (Count IV).

4

To prevail under 10(b), the SEC must prove (in relevant part): (1) the defendant made an untrue statement of fact or (alternatively) omitted to state a material fact where he had a duty to speak; (2) the statement or omission was material; (3) the statement or omission was made in connection with the purchase or sale of a security; and (4) statement or omission was made with scienter. *SEC v. Jakubowski*, 912 F. Supp 1073, 1079 (N.D.Ill. 1996).

Sections 206(1) and (2) are similar to Section 10(b), except that they apply to investment advisers. 15 USC § 20b-6(1) and 80b-6(2).

The SEC also claims Yang violated Section 13(d) of the Exchange Act and Rule 13d-1 (Count V). Section 13(d) requires an acquirer a beneficial ownership of more than 5% of a class of a registered equity security to file a Schedule 13D with the SEC.

## DISCUSSION[1]

There is no evidence that supports the SEC's allegations, either for the illegal insider trading claims, or for the ancillary front-running and form filing claims.

### A. There is no evidence to support an illegal insider trading claim.

Allegations alone cannot prove a claim of illegal insider trading. "Aberrant features" alone do not establish insider trading. To succeed, the SEC must have admissible evidence to substantiate its claims. Here, there is a glaring lack of evidence—direct or circumstantial—relating to the material nonpublic information, duty, breach, and knowledge thereof.

---

[1] Some of the facts set forth herein are taken from Plaintiff's Second Amended Complaint. Defendants accept these facts as true for purposes of this motion only, and reserve the right to contest those facts at a later time.

The SEC has always understood its allegations were speculative at best, and hedged its

claims by pleading each material fact upon "information and belief":

- "On information and belief, each Defendant purchased Zhongpin securities while in the possession of, and on the basis of, material, nonpublic information." (Facts ¶ 2.)

- "On information and belief, Yang, Fan and Prestige purchased their Zhongpin securities while in possession of, and on the basis of, material nonpublic information regarding the proposal to take Zhongpin private." (Facts ¶ 3.)

- "Upon information and belief, Defendants Yang, Fan and Prestige purchased shares and call options as set forth above, while they were in possession of, and on the basis of, material, nonpublic information regarding the intent of Zhongpin management to pursue privatization through a management buy-out of the company's outstanding stock." (Facts ¶ 4.)

- "Upon information and belief, any and all material, nonpublic information that Defendants Yang, Fan and Prestige received concerning Zhongpin, as set forth above, either was misappropriated by those Defendants or disclosed in exchange for a personal benefit that benefited the communicator of such information." (Facts ¶ 5.)

That information and belief is baseless. The SEC has obtained documents from more

than twenty sources worldwide. It has taken depositions in two hemispheres. It has dissected

Yang's business computer hard drive, including his emails, bit-by-bit. In the US, the SEC has

taken depositions in Illinois and Texas. The SEC also flew three Enforcement attorneys from

Chicago to Hong Kong, a translator from London to Hong Kong, and hired a videographer and a

Hong Kong-based law firm to sit through 6 depositions in Hong Kong.

The SEC's efforts to find evidence supporting its claims have come up empty. That is

because its allegations are false. There is no evidence that Defendants possessed material,

nonpublic information at the time of the trades at issue, let alone evidence of a duty to the source

of the information. In fact, the SEC does not, and cannot, identify an alleged source of material,

nonpublic information. There is also no evidence of a breach of duty to that unidentified source

of the information. Of course, therefore, it follows that Defendants had no knowledge of such breach. There is simply no evidence to support a claim of insider trading.

### 1. Defendants had no material nonpublic information when they are alleged to have purchased Zhongpin securities.

#### a. There is no foundation for the purportedly non-public document.

There is no evidence that Defendants had any material nonpublic information when they purchased Zhongpin securities. The SEC alleges that Yang had access to material nonpublic information about Zhongpin's interest in a management buy-out, in the form of a document created by a Hong Kong-based investment bank [HSBC] on his work computer. (Facts ¶ 6.) That HSBC document is the only purported material nonpublic information to which the SEC even attempts to point. The SEC has confirmed that the only "material nonpublic" information upon which it alleges Defendants traded is the purported HSBC document. (Facts ¶ 7.) There is, however, no foundation for that document. The document is dated more than three months before the trades at issue but, more importantly, there is no testimony regarding who created it; how it was created; when it was created; or why it was created. Moreover, even if a foundation for the document could be established, the SEC recognizes there is no evidence that the document was nonpublic at the time of the trades at issue. (Facts ¶ 8.)

#### b. Even with a foundation, there is no tie to Zhongpin's announcement.

Ultimately, there is nothing indicating that the HSBC document, or even HSBC, had anything to do with Zhongpin's CEO, Xianfu Zhu's ("Zhu"), attempt at a management buy-out of Zhongpin. To the contrary, when the SEC asked Zhu about the HSBC Document, he unequivocally represented to the SEC (through counsel) that HSBC had nothing to do with the management buy-out plan. (Facts ¶ 9.) In response to an SEC information request shortly after the trades at issue, Zhu (through counsel) describes in great detail who had any role, or was

7

involved in any communications relating to the Zhongpin management buy-out. Absent from that correspondence is any mention of Yang, Prestige, or even HSBC. (Facts ¶ 9.) Zhu even specifically represents that he had no contact with HSBC in connection with his proposed management buy-out of Zhongpin. (Facts ¶ 10.) Indeed, Zhu's proposal to take Zhongpin private did not even take shape until approximately ten days *after* Defendants are alleged to have been illegally accumulating Zhongpin shares. (Facts ¶¶ 11-13.)

### c. Regardless, the document was public, as Yang found it on the Internet.

Even assuming, *arguendo,* HSBC had a role in Zhu's proposal, Yang obtained the HSBC document legally. The only testimony about the document is Yang's testimony. He testified that he downloaded it from the Internet in December 2011. (Facts ¶ 14.)

Thus, to the extent this Court could even consider this foundationless document and find that it was somehow related to the Zhongpin management buy-out, the uncontroverted testimony is the document was public and was downloadable off the Internet. (*Id.*) Indeed, while the link to the document is no longer active, a link to the HSBC document's icon remains live. Even today, one can view the HSBC document icon at the following Internet URL: http://mail.qq.com/cgibin/ftnExs_download?k=5f3465625900b4cf8ac15c691561001c550107570 b0554564f060404064c06565057485b0a55061e0757515005500103500c04013369327b3176264 c4305543323&temp=b4eb3a23&t=exs_ftn_download&code=b4eb3a23&s=email.) (Facts ¶ 15.)

### d. The document did not contain material non-public information.

There is no evidence that a possible transaction to take Zhongpin private was non-public at the time of the alleged illegal trades. Much as the SEC would like to portray Zhongpin going private as a secret, it was anything but. Most notable is a public statement from Zhongpin itself that it could be a take-private candidate. In November 2011, Zhongpin's CFO publicly

8

confirmed that Zhongpin is closely watching other companies going private, and will inform the public if Zhongpin is going to take that step. (Facts ¶ 16.) Indeed, the transcript of the CFO's comments are available (in Chinese) at http://xueqiu.com/1287305957/20516620. (Facts ¶ 17.) People reading this transcript understood it to mean that Zhongpin was considering going private. (Facts ¶ 18.) Some understood it as a confirmation that there was a strong likelihood that Zhongpin would go private. (Facts ¶ 19.) To the extent, therefore, that anyone could argue that the foundationless HSBC document could be considered material or nonpublic, that argument is negated completely by Zhongpin public statements about the same thing.

## 2. There is no source of improper information and no tie to Zhongpin or HSBC.

It is undisputed that there is no evidence that Defendants were in possession of material nonpublic information at the time of the trades at issue. Even if such evidence did exist there must also be evidence of someone who passed information to Defendants. *Maio,* 51 F.3d at 631.

The SEC admits, however, that there is no evidence of where Defendants obtained any purported improper information related to Zhongpin. (Facts ¶ 20.) The SEC also admits that there is no evidence of who supposedly passed the purported material nonpublic information to Defendants. (Facts ¶ 21.) There is not even evidence of a connection to Zhongpin, let alone evidence of who supposedly passed the information to Defendants. (Facts ¶ 22.) Without a connection to an insider, there cannot be an insider trading case. *Maio,* 51 F.3d at 631.

Moreover, SEC also issued a subpoena to HSBC, the alleged creator of the purported nonpublic document. The subpoena sought, among other things, all communications with Defendants. (Facts ¶ 23.) Despite employing more than ten key word searches, HSBC had no

9

responsive documents. (Facts ¶ 24.) The SEC then interviewed two HSBC employees who also told the SEC that they were aware of no connections with Yang or Prestige.[2]

### 3. There is no breach of duty to the purported information's source.

Assuming, *arguendo*, there was evidence of material nonpublic information, and that there was evidence of the person who passed that information to Defendants, the SEC must also show that the information was obtained by Defendants in breach of a duty to the source of the information. *Maio*, 51 F.3d at 630; *Cherif*, 933 F.2d at 408. The SEC admits, however, that there is no evidence whatsoever of any breach of duty to the source of the information. (Facts ¶ 25.) Indeed, there exists no evidence of a duty to begin with, let alone a breach of such duty.

### 4. There is no knowledge of any breach.

Without a breach there can be no knowledge of a breach. The SEC concedes Defendants had no knowledge of a breach. Asked to support its contention that Defendants knew of any breach of duty, the SEC was unable to do so. (Facts ¶ 26.) Instead, the SEC stated that the foundationless HSBC document relates "the sort of material corporate event" that usually is kept private, that the document was labeled "highly restricted," and that Yang did not tell anyone about it. (*Id.*) While the SEC's response tries to address whether Prestige or Yang had knowledge of the supposed nonpublic nature of the HSBC document, the response fails to put forth any evidence of either a breach of duty or knowledge of any breach of duty. (*Id.*) Indeed, nothing in the case record indicates that Defendants were aware of any breach of duty to any

---

[2] Not only did the SEC fail to disclose the existence of these interviews in its Interrogatory responses until after Defendants independently discovered evidence of the interviews independently, but it has refused to produce its notes of those interviews, claiming work product privilege.

source of any material nonpublic information. Of course, that is because there was no breach of duty, because there was no source, because there was no material nonpublic information.

## 5. The SEC does not have sufficient circumstantial evidence.

Having no direct evidence, the SEC undoubtedly will assert that it is relying on circumstantial evidence to prove its case. But it certainly does not rise to a level that takes this case past summary judgment. In this same district recently, Judge Darrah and Judge Aspen presided over insider trading cases with the SEC stuck in a similar position – that is, lacking any direct evidence to prove its case and insufficient circumstantial evidence. *SEC v. Garcia,* 2011 WL 6812680 (No. 10-CV 5268, N.D. Ill, Dec. 28, 2011) (attached as "Exhibit A,"); *SEC v. Horn*, 2010 WL 5370988 (No. 10-cv-955, N.D. Ill. Dec. 16, 2010) (attached as "Exhibit B").

In *Garcia,* just like here, the SEC had no indication that the accused knew an insider. *Garcia* 2011 WL 6812680 *9. Granting the defendants' motions for summary judgment, the court stated that "some connection to an insider is essential in an insider trading case." *Id., at *9, * 15.* In *Horn,* like here, the SEC had no indication that the accused had material nonpublic information at the time of the trades. *Horn*, 2010 WL 5370988 * 5-8. Granting summary judgment in favor of the defendant, the court explained "it is not enough for the SEC simply to identify suspicious trading and ask a jury to infer that it was the product of insider trading." *Id.*

## 6. The evidence supports a reasonable rationale for trading Zhongpin.

Although it is the SEC's burden to prove its case, Defendants have provided a rational basis for the trading. Yang is exceptionally smart and insightful and an excellent researcher. (Facts ¶¶ 27, 34.) Highly educated, Yang possesses an economics degree from Jinan University in China with a specialty in investment and finance, and holds an MBA from Columbia

11

University in the US. (Facts ¶ 28.) Yang worked in the investment management industry, analyzing Chinese and other international companies. (Facts ¶ 29.)

Yang spent many hours studying Chinese companies that he believed had artificially depressed prices due to misguided short selling. (Facts ¶ 30.) Yang believed that there were opportunities to purchase Chinese stocks due to the short selling, and he decided to become involved with what would become Prestige to capitalize on that opportunity. (Facts ¶¶ 30, 31.) Yang also had discussions with Leslie Lu ("Lu"), a fellow investment professional, about becoming an activist investor. (Facts ¶ 32.)

Lu told Yang that Zhongpin was a good company back in the beginning of 2011. (Facts ¶ 33.) Yang had repeated extensive discussions about Zhongpin as a potential good investment with investment professionals for many months prior to the trades at issue. (Facts ¶ 35.) Indeed, as far back as June 2011, Yang was studying Zhongpin's financials and prospects. (Facts ¶ 36.) Yang studied, followed and extensively researched Zhongpin many months before any of the trades at issue occurred. (Facts ¶ 37.) Yang conducted private equity style due diligence on Zhongpin, monitoring its competitors and visiting its locations in China. (Facts ¶ 38.)

In the summer of 2011, Yang confirmed that Zhongpin's representations about its performance were accurate. (Facts ¶ 39.) After confirming its financials, Yang discussed with Lu that Zhongpin was a good buy. (Facts ¶ 40.) Yang had similar discussions about Zhongpin being an excellent investment opportunity in September or October 2011. (Facts ¶ 41.)

Yang was the general manager of Prestige, a BVI corporation, as well as a director and part owner. (Facts ¶ 42.) Yang determined that Prestige would take a large stake in Zhongpin and seek to become a Zhongpin activist investor. (Facts ¶ 43.) In other words, Prestige, through

12

Yang, would seek to have Zhongpin implement Prestige's recommendations in order to maximize shareholder value.

Mid-March 2012 proved a terrific time to purchase Zhongpin securities. The trading at issue coincided with Zhongpin's public earnings release. (Facts ¶¶ 13, 44.) The release and subsequent drop in Zhongpin's stock price created an immediate significant buying opportunity in Zhongpin securities. (Facts ¶ 45.) Yang's investing colleague Michael Markbreiter said "it was an opportunity for the CEO to say … I've got this really low price if I put an offer in now." (*Id.*) Additionally, investment professional Judy Hu said after the earnings release, she approached Yang and her clients to re-recommend Zhongpin. (*Id.*)

In fact, after Zhongpin's earnings release investors called Zhongpin a "golden buying opportunity." (Facts ¶ 47.) Further, right after its earnings release investment analysts issued positive reports about Zhongpin. (Facts ¶ 48.) Yang called Lu the morning of March 14, 2012 and Lu told Yang that Zhongpin was a "screaming buy" at its current trading price. (Facts ¶ 49.)

In connection with Prestige's desire to become a Zhongpin activist investor, Prestige, through Yang, sought legal advice on activist investing and hired Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury Winthrop"), a well-known international law firm. (Facts ¶¶ 50, 52.) Among other things, on April 2, 2012, Pillsbury Winthrop publicly disclosed Prestige's purchases of Zhongpin securities. (Facts ¶ 52.)

Through acquiring a least 8.5% of Zhongpin, Yang sought a Zhongpin board seat. (Facts ¶ 51.) Yang contacted Zhongpin to discuss Prestige's activist investor plans. On March 26, 2012, Yang, as an activist investor, sent a letter to Zhongpin management discussing improvement recommendations for Zhongpin's future. (Facts ¶ 53.)

On Tuesday March 27, 2012, before the markets opened, Zhongpin announced that its Chairman and CEO had submitted a non-binding proposal to take Zhongpin private by acquiring all of Zhongpin's common stock. (Facts ¶ 54.) Rather than sell on the news and move the money out of the US, Prestige actually purchased additional Zhongpin securities in its US based account. (Facts ¶ 55.) The day after Zhongpin's management buy-out announcement, Yang lamented his inability to access Zhongpin management, and continued to seek a meeting with Zhongpin's management. (Facts ¶ 56.) In every respect, Prestige acted like a rational investor seeking an interest in Zhongpin, and not like the aberrant trader the SEC portrays.

## B. There is no evidence to support front-running or improper filing claims.

The SEC claims Yang engaged in illegal front-running by purchasing Zhongpin securities in an account held with SogoTrade, a division of Wang Investments, because he did not disclose the trades to Prestige. (Facts ¶ 57.) The SEC also claims that the Schedule 13D that Prestige filed did not disclose Yang's personal holdings. (Facts ¶ 58.)

The undisputed facts, however, reveal that Yang did not have an interest in the SogoTrade account at issue or the funds in that account. (Facts ¶ 63.) Yang did not open the account and did not make any trades in the account. (Facts ¶ 59.) Yang was not responsible for any trading in the account and did not control it. (Facts ¶ 60.) Yang did not even have the ability to control the account. (Facts ¶ 61.) Someone else controlled the account and made the trade decisions. (Facts ¶ 62.) Yang did not even discuss with the account owner the idea of purchasing Zhongpin options. (Facts ¶ 59.) Moreover, certain of Yang's purported signatures on the account opening form were not his, and he did not recognize the writing on the account opening form. (Facts ¶ 65.)

14

In any event, Yang had approval from Prestige for trades outside Prestige accounts. (Facts ¶¶ 66, 68.) Prestige board member Wang Chidong and Prestige board Chair Fei Xiao told Yang there would not be problems with Yang making personal trades. (Facts ¶ 67.) This is significant because Yang had an agreement with Prestige that permitted him to make personal trades in the same securities as Prestige traded upon Prestige's approval. (Facts ¶ 65.) Pursuant to that agreement, Yang had permission to make the alleged trades. (Facts ¶ 68.) Indeed, after an investigation, Prestige found no wrongdoing by Yang.

Without evidence that Yang had any interest in the SogoTrade account, there cannot possibly be a front-running claim against Yang based on trades in that account. Moreover, even if Yang did have an interest in the SogoTrade account, Prestige authorized him to make personal trades in the same securities as Prestige. (Facts ¶ 68.) With regard to the failure to file the requisite ownership forms, with no evidence that Yang personally held any shares, there cannot be a claim for failing to disclose ownership of Zhongpin shares. (Facts ¶ 69.)

## CONCLUSION

The SEC cannot succeed in its case against Defendants. Accordingly, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss Counts I, III, IV, V and VI with prejudice. In the alternative, Defendants respectfully request that the Court dissolve the preliminary injunction in this matter and unfreeze Defendants' frozen assets.

Dated: May 29, 2013                     Respectfully submitted by:

| | |
|---|---|
| /s/ Howard J. Rosenburg | /s/ Thomas Leinenweber |
| For Siming Yang | For Prestige Trade Investments Limited |
| | |
| Kopecky Schumacher Bleakley Rosenburg, PC | Leinenweber Baroni & Daffada LLC |
| 203 N. LaSalle St. Suite 1620 | 203 N. LaSalle Street, Suite 1620 |
| Chicago, IL 60601 | Chicago, IL 60601 |
| Phone: (312) 380-6631 | Phone: (866) 786-3705 |

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on May 29, 2013, he caused the foregoing document to be served upon all counsel of record via the ECF filing system.

/s/ Howard Rosenburg

# EXHIBIT A

# TO BRIEF IN SUPPORT OF

# MOTION FOR SUMMARY JUDGMENT

S.E.C. v. Garcia, Not Reported in F.Supp.2d (2011)

Fed. Sec. L. Rep. P 96,703

2011 WL 6812680
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

SECURITIES and EXCHANGE COMMISSION,
Plaintiff,
v.
Juan Jose Fernandez GARCIA and Luis Martin
Caro Sanchez, Defendants.

No. 10 CV 5268. | Dec. 28, 2011.

**Attorneys and Law Firms**

Dee A. O'Hair, Frank Daniel Goldman, James G. Lundy, Jonathan Stephen Polish, Securities & Exchange Commission, Chicago, IL, for Plaintiff.

Pravin B. Rao, Jonathan R. Buck, Perkins Coie L.L.P., Chicago, IL, for Defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge.

\*1 Presently before us is a motion for summary judgment in a case that involves allegations of insider trading based on the purchase and sale of Potash Corporation of Saskatchewan, Inc. ("Potash") call option contracts. The United States Securities and Exchange Commission ("SEC") originally brought this action against two defendants, Juan Jose Fernandez Garcia and Luis Martin Caro Sanchez. Defendant Garcia subsequently settled with the SEC and is no longer party to the action.

Sanchez is a 37–year old Spanish citizen residing in Madrid, Spain. (Def. 56.1 Stat. ¶ 14.) On August 12 and 13, 2010, Sanchez purchased relatively risky Potash call options. Potash, based in Saskatchewan, Canada, is the world's largest producer of potash and the second and third largest producer of nitrogen and phosphate, respectively—all of which are primary crop nutrients used to produce fertilizer. (Pl. 56.1 Stat. ¶ 5.) Potash trades on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange; options on its stock are traded on the Chicago Board Options Exchange ("CBOE") and

other options exchanges. (*Id.* ¶ 5.)

On August 17, 2010, Potash made a public announcement that it had received and rejected an unsolicited proposal from BHP Billiton Plc ("BHP") to acquire Potash for \$130 per share, a premium of 16% over Potash's closing stock price on August 16. (*Id.* ¶ 6.) As a result, the stock price of Potash increased roughly 27%, and Sanchez was able to sell his options for a profit of \$496,953.33, a return of 1,046%. (*Id.* ¶¶ 7, 41; Compl. ¶ 13.) The SEC claims that Sanchez's suspicious trading, his implausible explanation, and his obstructive post-filing conduct suffice to support a jury verdict in the SEC's favor. (Resp. at 3.) Sanchez, on the other hand, argues that the SEC has not identified a connection between Sanchez and any insider but instead hangs its hat on bare assertions about "suspicious" trades. (Mem. at 1.) Accordingly, Sanchez has moved for summary judgment. For the reasons set forth below, we grant the motion.

### II. BACKGROUND

Unless otherwise indicated, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and accompanying exhibits.

### A. Sanchez's Trading Background

Sanchez testified at his deposition that he started trading in stocks and options when he was approximately 16 or 17 years old and has traded in equities on behalf of his family company for years. (Def. 56.1 Stat. Ex. F.) His experience purportedly includes purchases in securities, options, foreign exchange trade, contracts for differences, warrants, and exchange traded funds, using a variety of trading strategies; many of these transactions were on behalf of his family business. (Pl. 56.1 Stat. ¶ 16; Def. 56.1 Stat. ¶ 16.) Sanchez states that his primary job or livelihood involves handling his personal investments in real estate and stock exchanges, that he has substantial personal assets and significant monthly cash flow, and that he has traded in sophisticated financial instruments with a significant amount of capital at stake. (Def. 56 .1 Stat. ¶ 15.) These assertions are not directly supported by evidence before the court. It is undisputed, however, that Sanchez traded in the warrants of four Spanish-based entities in 2007. After letting more than 2,500,000 of those warrants expire worthless, Sanchez sustained losses aggregating 1,242,613 euros. (Pl. 56.1 Stat. Ex. C–1 at 98; *Id.* Ex. D ¶ 35; *Id.* Ex. D–21.)

\*2 Sanchez has maintained an Interactive Brokers ("IB")

account since June 2008. (*Id.* Ex. A ¶¶ 8, 9; *Id.* Ex. A–1 at 1.) IB is a global market maker and broker specializing in offering routing of orders and executing and processing trading in a variety of financial instruments on 90 electronic exchanges and trading venues around the world. (Def. 56.1 Stat. ¶ 31.) In documents submitted when opening the account, Sanchez indicated that he had four years of stock experience and two years of experience in options, commodities, and foreign exchange trading. (Pl. 56.1 Stat. Ex. A–1 at 2–7.) He further indicated that he made more than 100 trades annually and had extensive experience in stocks, options, commodities, and foreign exchange. (*Id.*) Between January 1, 2010 and August 12, 2010, Sanchez used his IB account only to trade futures and foreign exchange products. (*Id.* Ex. D ¶ 29.)

Sanchez testified that he has always been interested in the fertilizer industry, but before the Potash purchase, he had never invested in fertilizer companies. (*Id.* Ex. B–1 at 2; *Id.* Ex. C–1 at 68–69.) Moreover, Sanchez never purchased Potash securities before or after the transaction in question and did not invest in other fertilizer companies after the Potash purchase. (*Id.* Ex. B1 at 3; *Id.* Ex. C–1 at 68–69.)

**B. The Potash Trade**

On August 11, 2010, Sanchez made a decision to buy Potash options. (Pl. 56.1 Stat. Ex. A–3; *Id.* Ex. B–1 at 3.) Sanchez did not, however, have authority to purchase options in his IB account and thus requested permission to do so on the same day. IB sent, and Sanchez received and returned, a risk disclosure form soon after. (*Id.* Ex. A ¶ 12(a); *Id.* Ex. A–1; *Id.* Ex. A–3 at 1–2.) The approval process took longer than Sanchez anticipated, and he contacted IB customer service. After being informed that approval might take up to 48 hours, he indicated that he would appreciate if the process would move as quickly as possible. (*Id.* Ex. A–3.) IB granted Sanchez permission to trade options on August 12, and Sanchez began placing orders for September 125 Potash Calls[1] less than ten minutes after trading opened for the day. (*Id.* Ex. A ¶ 12(d); *Id.* Ex. D ¶ 22; *Id.* Ex. D–16.)

On August 12 and 13, 2010, Sanchez purchased a total of 331 September 125 Potash Call options. Sanchez paid a total of $47,499 to purchase these calls. (*Id.* Ex. D ¶ 20; *Id.* Ex. D–15; Compl. ¶ 36.) Specifically, on August 12 Sanchez entered eight limit orders to buy 161 Potash calls; four of the eight orders were executed at the original bid price, the other four cleared only after Sanchez raised his bid price. (Pl. 56.1 Stat. ¶ 31.) The purchased contract prices ranged from $1.08 to $1.58 per contract while the

underlying stock was trading between $106.56 and $112.88, or 9.70% to 14.75% below the $125 strike price. (*Id.* ¶ 29.) During the trading on August 12, Sanchez requested a transfer of roughly 25,000 euros from his Banco Pastor account to his IB account. (*Id.* ¶ 32.) IB credited the money to Sanchez's account on August 13 at 2:16 am. (*Id.*) On August 13, Sanchez purchased another 170 September 125 Potash Call options. The contract prices on these options ranged from $1.33 to $1.51, and Potash stock was trading 9.80% to 11.95% below the $125 strike price. (*Id.* ¶ 35.) All of the September 125 Potash Call options purchased by Sanchez were out-of-the-money.[2]

*3 Before trading on the NYSE or CBOE opened on August 17, 2010, Potash announced that it had received and rejected an unsolicited proposal from BHP to acquire Potash for $130 per share, a premium of 16% over Potash's closing stock price on August 16. (*Id.* ¶ 6.) It also released a copy of a letter from BHP to Potash memorializing a meeting between the two companies' chief executive officers a week earlier about BHP's unsolicited bid. (*Id.* ¶ 6.) Potash stock quickly increased $30.96 per share, or 27.61%, over the closing price from the previous day, to open at $143.11. (*Id.* ¶ 7.) The shares closed on August 17 at $143.17. As a result, all of Sanchez's September 125 Potash Call options were in-the-money and in fact quite valuable. (*Id.* ¶ 39.) Sanchez sold his entire position of 331 Potash calls for $544,452.37 that day and made a profit of $496,953.33, equal to a return of 1,046%. (*Id.* ¶¶ 40, 41.)

On August 18, 2010, Sanchez attempted to withdraw 412,000 euros from his IB account and transfer the funds to his Banco Pastor account in Madrid, Spain. (*Id.* ¶ 43.) Sanchez points out that the amount of money then in the IB account greatly exceeded his historical average balance for trading activity in that account. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 43.) However, instead of transferring the money, IB temporarily froze his account, notifying Sanchez that it was "conducting a routine review related to recent trading activity in his IB account." (Pl. 56.1 Stat. ¶ 44.) IB compliance told Sanchez that it would contact him once review was complete; Sanchez nonetheless continued to make attempts to transfer the money. (*Id.*) Sanchez asserts that these subsequent attempts were undertaken at the direction of IB staff. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 44.)

The parties dispute the relevance of historical Potash stock prices, but the facts indicate the following. On July 28, 2010, Potash stock closed at $97.71. By August 6, 2010 it had appreciated nearly 20% to a daily high of $116.49. The stock declined after August 6 to its close on

August 10 at $111.76. The price fell further on August 11, 2010, closing at $108.20–this represented the largest down-day for Potash stock between July 29, 2010 and August 17, 2010, in terms of both absolute dollars and percentage loss. On August 12, 2010, the stock again opened lower, at $106.85, but climbed through the day to close at $112.04. (Pl. 56.1 Stat. Ex. D1 .)

During roughly the same time period, July 29, 2010 to August 17, 2010, the S & P 500 Index peaked on August 9, closing at a value of 1128. On August 10 and 11 the S & P index fell 0.62% and 2.85%, respectively. (*Id.* Ex. D–13.) In so doing, the index traded through and closed well below its 200–day exponential moving average. (*Id.* ¶ 9.) August 11 was the largest down day for the S & P over this time period; it was also the most volatile trading session over the period. The S & P continued to decline on August 12 and 13, falling 0.46% each day. (*Id.* Ex. D13.)

## C. Investigation

*4 According to the IB Director of Compliance Operations, who flagged Sanchez's Potash trades, he instituted the hold in part because of the extremely large profits Sanchez incurred relative to the timing of Potash's public announcement. (*Id.* ¶ 45.) IB compliance then reviewed the trades and reported their finding to the SEC. (*Id.* ¶ 45.) The SEC immediately filed this action.

After Sanchez found out about the suit, he quickly went to Chicago and voluntarily met with representatives from the SEC and other federal agencies; the interview lasted there hours, and Sanchez did not bring legal counsel. (Def. 56.1 Stat. ¶ 4.) The SEC has since conducted an extensive investigation, including interviews and communications with domestic and international companies and government agencies. (*Id.* ¶ 3.) As part of the investigation, Sanchez has produced bank, telephone, and historical trading records, as well as a hard drive analysis. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 5.) Sanchez sat for a full day deposition on July 1, 2011. (Def. 56.1 Stat. ¶ 6.)

The SEC admits that it has yet to learn of any source that could have provided Sanchez with non-public, material information regarding Potash. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 22.) The SEC has not identified the specific information Sanchez purportedly received or from whom Sanchez could have obtained the information. (Def. 56.1 Stat. ¶¶ 22, 23; Pl.'s Resp. to Def.'s 56.1 Stat. ¶¶ 22, 23.) Because the SEC has not identified the source of the alleged inside information, it has not presented evidence that the alleged source breached a fiduciary duty. (Def. 56.1 Stat. ¶ 25.) The following facts related to the trade

were revealed through the investigation.

## I. Explanation for Sanchez's Potash Trade
Immediately after learning of this suit, Sanchez traveled from Spain to the federal courthouse in Chicago and voluntarily met with representatives of the SEC. (*Id.* ¶ 5.) Sanchez sat for a three hour interview on August 25, 2010 without an attorney. (Pl. 56.1 Stat. Ex. B–1.) The interview was conducted in Spanish and English; Sanchez spoke in both languages and an SEC representative acted as translator. (*Id.*) Sanchez stated that he had been tracking Potash for months prior to purchasing the call options. Specifically, he said that he researched its stock and option volume, observed its stock bid/ask spread, read company news, and analyzed its quarterly earnings and stock price; he also looked into the fertilizer industry generally. (*Id.* ¶ 47.) Sanchez brought to the interview various news articles and other research concerning Potash, including two Credit Suisse analyst reports dated May 20, 2010 and July 29, 2010. (*Id.* ¶ 48; *Id.* Ex. D–5; *Id.* Ex. D–6.) Some of these articles were published after he had started purchasing the call options. (*Id.* ¶ 48.) The SEC asserts that Sanchez claimed to have relied on these documents when he decided to trade. (*Id.*) However, in his deposition, Sanchez states that he did not rely on these documents prior to trading, but that he brought them to the interview as evidence that Potash stock was a good purchase. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 48; Pl. 56.1 Stat. Ex. C–1 at 117–135.)

*5 In his deposition, Sanchez identified factors that he relied on when making his decision to buy Potash calls. He testified that he looked generally at wheat prices, agricultural business, and the energy sector before buying the Potash call. (Pl. 56.1 Stat. ¶ 47 .) He also stated that in March or April 2010 he heard rumors that BHP might be interested in purchasing Potash, but he discounted this as a factor in his decision. (*Id.* ¶ 50.) Other factors he relied on included technical signals, confirmation of the technical signals, and intuition. (*Id.*) The following explanations purportedly further support Sanchez's conclusion that Potash had a significant upside in the short term.

Sanchez explained that he received his first technical signal to buy on August 2, 2010 when he observed a crossover signal in the exponential moving average for the price of Potash stock. (*Id.* ¶ 51; *Id.* Ex. C–1 at 83–86.) The SEC asserts that Sanchez made no mention of this signal during his August 25 interview, but Sanchez points out that the interview was conducted without a certified, neutral translator and that no verbatim summary is available; in addition, he argues that the notes of the

meeting produced by the SEC demonstrate that he brought up similar signals during the interview. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 51.)

Sanchez testified that he received his confirmation of the technical signal on August 10, 2010:

Q: So why didn't you buy on August 2nd?

A: Because technically it is not a good idea—it is not a good idea to purchase at the time of the first signal. It is recommended to wait for a confirmation of that signal, because normally there's many false signals of that type in the marketplace.

Q: So when did you receive the confirmation in this case?

A: The confirmation I received approximately on August 10th.

Q: What form did the confirmation take?

A: That confirmation I had because there was a consolidation of the impulse of the cross of mediums, average, and that consolidation is known as pull-back, and consists of a slight drop in the price after a push for a higher price. And there was a hole that was filled-a gap that was produced during the increase-the previous increase.

(Pl. 56.1 Stat. Ex. C–1.) While the SEC again argues that Sanchez made no mention of this confirmation during the initial interview, Sanchez reiterates that the interview was conducted without a certified, neutral translator and that no verbatim summary is available. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 53.)

Finally, to make his decision, Sanchez explained that he relied also on his intuition. While admitting it is hard to explain intuition, Sanchez testified that he looked at the trading volume of the stock and the general marketplace. (Pl. 56.1 Stat. ¶ 50.) Specifically, Sanchez testified that after reviewing various market indexes he had the impression that the market would increase. He explained that the indexes wouldn't confirm his intuition but would act as additional elements. For example, he explained, "if a cross is produced, but the market is dropping quite a bit, it is not recommended-to take position is not recommended. But if the market is peaceful, there's not bad news in the economic environment, you can say, Go ahead." (Id. Ex. C–1 at 94–95.) The SEC points out, however, that both Potash stock and the S & P 500 were declining in volatile trading on August 11, 2010. (Id. ¶ 54.)

*6 In his deposition, Sanchez explained his choice to buy options, rather than the underlying security, as an attempt to increase the risk level of his overall portfolio. (Id. Ex. C–1 at 83–86.) While, Sanchez explained that he did not consider the September 125 Potash Call options to contain a particularly high level of risk, he did understand that options are a risky investment and that an investor who trades in options has to be able to assume the loss of the investment. (Id.) Sanchez maintains that he was unaware of BHP's offer at the time he traded Potash options. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 20.)

### ii. Alleged Spoilation

Sanchez owned two computers in August 2010: a laptop computer and a desktop computer. (Pl. 56.1 Stat. Ex. C–1 at 110.) The parties dispute whether Sanchez intentionally threw away the laptop to hide relevant information and whether he "scrubbed" his desktop computer to destroy or alter computer files. (Id. ¶ 1; Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 1.)

According to his deposition, Sanchez did have a desktop and an old laptop in August 2010, but he did not frequently use the old laptop. (Pl. 56.1 Stat. Ex. C–1 at 111.) Sanchez did not recall whether he ever executed a stock transaction on the laptop, but said that it was very slow and that he threw it out in December 2010. (Id. Ex. C–1 at 112–14.) He further stated that he conducted all his research for and bought the Potash stock on the desktop computer. (Id. Ex. C–1 at 112.)

By a court order issued on August 20, 2010, Sanchez was directed to preserve all documents and information that "refer or relate to the allegations described in the Commission's Complaint," including any information related to IB. (Id. Ex. C–2 at 7.) On August 24, counsel for the SEC sent an email to Sanchez explaining that he had to preserve all relevant documents; the email ended with a general request to "preserve all of your computers that you have used since at least January 1, 2010." (Id. Ex. C–3.) The SEC sent a request for production of documents on August 26, 2010 that requested the production of "A copy of the hard drive for all computers used by you or on your behalf during the period January 1, 2008 to the present." (Id. Ex. C–4 at 4.) Additional emails were exchanged between counsel relating to actual production of the hard drives, (Id. Ex. C–5; Id. Ex. C–6; Id. Ex. C–7; Id. Ex. C–8) and a similar email was sent to Sanchez directly on January 31, 2011.³ (Id. Ex. C–10.) Sanchez contends that these documents show that the SEC repeatedly narrowed and focused its inquiry upon Sanchez's desktop, despite its admitted knowledge that

Sanchez had multiple electronic devices. (Def.'s Res. to Pl's 56.1 Stat. ¶ 1.) It is true that the correspondences starting on November 17, 2010 referred to the "hard drive" while prior letters referred to "hard drives." (*Compare* Pl. 56.1 Stat. Ex. C–6, Ex. C–7, Ex. C–8 *with* Pl. 56. Stat. Ex. C–3, Ex. C–4.) However, an email sent on January 31, 2011, citing the August 26, 2010 document request, again refers to "hard drives." (Pl. 56.1 Stat. Ex. C–10.) Sanchez further asserts that the hard drive that was produced during discovery was from the computer that he used to purchase Potash options and to conduct all of his research. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 1.)

**\*7** There is an additional dispute related to Sanchez's iPhone. (Pl. 56.1 Stat. ¶ 1.) While the SEC asserts that Sanchez did not provide a list of his contacts or access to his iPhone records, Sanchez asserts, and the record shows, that Sanchez did not have his iPhone with him at the deposition. (*Id.* Ex. C–1 at 112–13.) The parties do not point to any other discussion about the phone or its contact list.

On May 17, 2011, Sanchez produced documents to the SEC from a computer hard drive that was analyzed by FTI Consulting ("FTI") based on an agreed-upon protocol. (*Id.* ¶ 2.) The analysis revealed that "the Windows operating system installed on the hard drive conducted disk defragmentation at periodic intervals as a scheduled background task." (*Id.* Ex. C–12 at 2.) It also revealed that Sanchez had a program called CCleaner on his computer, a free optimization and cleaning software that is advertised as making a computer faster and more secure. The program had last run in January 2011. When installed in April 2010, the program was configured to delete temporary files, temporary internet files, and the recycle bin, and wipe free space. According to FTI, the program had recently deleted or wiped approximately 200 files—consisting of temporary files, files in the recycle bin, and temporary internet files. (*Id.*)

IB records and maintains information—including the IB account number, the user name, the Internet Provider ("IP") address, the Media Access Control ("MAC") address, and the time and date—whenever a user logs onto IB's Trader Workstation trading platform to access their account. (*Id.* ¶ 3.) The records show that between November 30, 2008 and August 24, 2010, thirteen different MAC addresses were associated with Sanchez's trading account.[4] (*Id.* ¶ 3.) The records also show that two different MAC addresses accessed the account between August 11, 2010 and August 24, 2010. Sanchez asserts that FTI consulting analyzed the only hard drive and computer he used for trading in Potash and that the other

MAC address associated with the account during this period was not logged in during a time when trading activity took place. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 3.)

### *iii. Former Co–Defendant Garcia's Potash Trades*

Garcia was the head of the European Equity Derivatives division at Banco Santander, an advisor to BHP in connection with its tender offer of Potash. (Def. 56.1 Stat. ¶ 29.) The SEC alleged that on August 12, 13, and 16, 2010, Garcia purchased 282 call options, for approximately \$13,699. The vast majority of these calls were set to expire on August 21, 2010. (*Id.* ¶ 28.) After the announcement on August 17, Garcia sold his call options for a profit of approximately \$576,000. (*Id.* ¶ 28.) Garcia eventually consented to a Final Judgment in this matter on May 3, 2011. The settlement included an injunction, an order to disgorge \$576,032.99 in profits from his Potash trades, and a civil penalty of \$50,000. (*Id.* ¶ 30.)

**\*8** Both Sanchez and Garcia reside in Madrid, Spain and both utilized IB to execute their Potash trades. (*Id.* ¶ 31.) These are the only established connections between the two codefendants. In 2010, IB had approximately 158,000 institutional and individual brokerage customers. (Def. 56.1 Stat. ¶ 31.) And the population of Madrid is over 6 million. (Mem. at 8.) Sanchez testified that he does not know Garcia, and the SEC has not demonstrated any other connection between Sanchez and Garcia. (Def. 56.1 Stat. ¶ 32.) In fact, the SEC admits that it has no direct evidence of any connection between Sanchez and Garcia. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 33.)

### D. Procedural History

The SEC filed a complaint and Emergency Motion for a Temporary Restraining Order on August 20, 2010. (Dkt.Nos.1, 8, 10.) The complaint alleges that Sanchez engaged in "highly profitable and highly suspicious trading" by trading Potash Calls on material, non-public information about BHP's proposed acquisition of Potash. (Compl. ¶ 1; Def. 56.1 Stat. ¶ 21.) Sanchez denies all the allegations. (Answer ¶ 43; Def. 56.1 Stat. ¶ 21.) After an *ex parte* hearing, the district court originally granted the SEC's motion for a temporary restraining order to freeze assets on August 20, 2010. (Dkt. No. 10.) The restraining order was last extended on September 1, 2011 and is currently set to expire on February 16, 2012. (Dkt. No. 103.) Sanchez filed the current motion for summary judgment soon after, on September 22, 2011. (Dkt. No. 105.)

**S.E.C. v. Garcia, Not Reported in F.Supp.2d (2011)**

Fed. Sec. L. Rep. P 96,703

## III. STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.;* Fed.R.Civ.P. 56(C). "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2515. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See id.,* 477 U.S. at 255, 106 S.Ct. at 2513.

## IV. DISCUSSION

The SEC has alleged that Sanchez traded in Potash securities in violation of Sections 10(b) and 14(e) of the Exchange Act. Section 10(b) of the Exchange Act makes it unlawful to "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to its statutory authority, the SEC has promulgated Rule 10b–5, which provides:

*9 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

a. To employ any device, scheme, or artifice to defraud,

* * *

c. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17. C.F.R.. § 240.10b–5. "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 1 0b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *U.S. v. O'Hagan,* 521 U.S. 642, 651–52, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997). The misappropriation theory extends the reach of Rule 10b–5 to outsiders—those "who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade." *S.E.C. v. Cherif,* 933 F.2d 403, 409 (7th Cir.1991). Thus to establish insider trading by an outsider, the SEC must prove, among other things, that an insider, tipper, possessed material nonpublic information, that the tipper gave this information to the outsider, tippee, and that the tippee traded based on this information. *See S.E. C. v. Maio,* 51 F.3d 623, 631 (7th Cir.1995) ("[A] person violates Rule 10b–5 by 'misappropriating and trading upon material information entrusted to him by virtue of a fiduciary relationship.' "); *Cherif,* 933 F.2d at 409–10 (noting the misappropriation theory focuses "on whether the insider breached a fiduciary duty to any lawful possessor of material non-public information."). Similarly, § 14(e) of the Exchange Act prohibit "any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." 15 U.S.C. § 78(n)(e). "Fraudulent, deceptive, or manipulative acts or practices," as described by Rule 14e–3, include trading on material, nonpublic information related to a proposed tender offer, if the information is obtained from "(1) The offering person, (2) The issuer of the securities sought or to be sought by such tender offer, or (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer." 17 CFR § 240.14e–3. As the SEC must prove possession of material nonpublic information obtained from an insider under both rules, and the summary judgment motion in front of us is based on the purported lack of such proof, we address the two claims together.[5]

The SEC rests its case on two contentions: (1) the SEC can establish insider trading through purely circumstantial evidence, and (2) Sanchez's failure to produce all of his electronically stored information should prohibit summary judgment. More specifically, due to the lack of evidence connecting Sanchez to an insider, the SEC is asking us to do two seemingly unprecedented things. First, it wants us to rule that a jury could find Sanchez traded on insider information, even though the SEC has no indication that Sanchez knew an insider. Second, it wants us to impose an adverse inference against Sanchez because he trashed a computer, even though the SEC has no indication that there was relevant information on the

computer. The problem for the SEC is that it cannot point us to any case where a court allowed either of these requests to succeed. As discussed in detail below, Sanchez does not, and could not, refute that insider trading cases can be based on circumstantial evidence. Instead, Sanchez convincingly argues that the SEC has not produced enough circumstantial evidence to go to trial. In every tippee insider trading case cited by the SEC, the SEC established facts that showed contact between an identified insider and the alleged tippee. We agree that some connection to an insider is essential in an insider trading case, and in this case there is no such evidence. As such, to find for the SEC, a jury must assume that the missing electronic information would have established a relationship with an insider, and from that the jury would have to infer that Sanchez received material non-public information from this insider on which he eventually traded.[6]

**\*10** As the inferences that can be drawn from the missing electronically stored information will dictate what evidence the SEC can rely on to prove its circumstantial case, we start by addressing the spoliation issue. We then discuss whether, based on the undisputed circumstantial evidence, and drawing all inferences in favor of the SEC, a reasonable jury could return a verdict for the SEC.

## A. Spoliation

Spoliation occurs when a party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002). "The destruction of evidence presumption has two elements: (1) the totality of the circumstances must show that the destruction was in bad faith, and (2) if the first prong is met, then the court 'may infer from this state of mind that the contents of the evidence would be unfavorable to the party if introduced in court.' " *Mintel Intern. Group, Ltd. v. Neergheen,* No. 08–cv–3939, 2010 WL 145786 at \*7 (N.D. Ill. Jan 12, 2010) (citing *S.C. Johnson & Son, Inc. v. Louisville & Nashville Railroad Co.,* 695 F.2d 253, 258 (7th Cir.1983)). As such, "[a defendant's] destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the [defendant's] case. *Park v. City of Chicago,* 297 F.3d 606, 615 (7th Cir.2002) (citing *Rummery v. Ill. Bell Tel. Co.,* 250 F.3d 553, 558 (7th Cir.2001)). The Seventh Circuit has equated "bad faith" to the destruction of documents "for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.,* 136 F.3d 1153, 1155 (7th Cir.1998); *see also Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 644 (7th Cir.2008). "Thus, the crucial element is not that evidence was destroyed but rather the reason

for the destruction." *Park,* 297 F.3d at 615 (citing *S.C. Johnson & Son, Inc.,* 695 F.2d at 258).

The SEC asserts that "bad faith is established when a party destroys evidence after the opposing party in litigation has requested such evidence." (Resp. at 20 (citing *MacNeil Automotive Products Ltd. v. Cannon Automotive Ltd.,* No. 09–cv–139, 2010 WL 5904124, at \*6 (N.D.Ill. Nov.2, 2010); *Krumwiede v. Brighton Assoc., LLC,* No. 05–cv–3003, 2006 WL 1308629, at \*8 (N.D.Ill. May 8, 2006).) However, the SEC's citation is not wholly accurate. In *MacNeil,* the court adopted a previous court's finding that it was bad faith to allow "specific relevant documents" to be destroyed. *MacNeil* 2010 WL 5904124, at \*6 (finding bad faith when the employer told employees not to destroy emails regarding the plaintiff, but did not mention retaining emails regarding the employee accused of the sexual harassment). *Krumwiede* similarly states: "Once a party is on notice that files or documents in their possession are relevant to pending litigation, the failure to prevent the destruction of relevant documents crosses the line between negligence and bad faith." *Krumwiede,* 2006 WL 1308629, at \*8 (finding bad faith after defendant "continued to delete ... files after being put on notice that the contents of the laptop computer were the subject of litigation" and noting that there was clear evidence that defendant deleted relevant documents). In both cases, the destroyed evidence was not just requested, it was clearly relevant to the litigation.

**\*11** Here, however, the SEC has not produced any evidence such that we can infer that Sanchez's discarded laptop contained relevant information. The SEC instead relies on Sanchez's testimony that it "could be" that he used his laptop in 2010 and that Sanchez didn't remember whether he sent emails from that laptop. (Sur–Reply at 3.) Neither of these remarks gives rise to even a reasonable suspicion that relevant evidence was on the laptop. Further, IB's records showing that multiple computers logged into Sanchez's IB account is besides the point. As the SEC admits, "the fact and timing of Sanchez's trading in Potash is undisputed. What is hotly disputed is what Sanchez did before he started trading, in particular how he got his information about Potash." (*Id.* at 3.) Without evidence of relevant information, we have no reason to believe that the destruction was for the purpose of hiding adverse information.

Further, under the circumstances of this case, requiring evidence that the laptop likely contained relevant information does not create incentives for defendants to destroy evidence. The SEC's reliance on *N. Marrocco v. General Motors Corporation,* 966 F.2d 220, 223 (7th Cir.1992), is misplaced. The SEC specifically quotes the

Seventh Circuit's affirmation of the dismissal: "We find it ironic that the plaintiffs also contend that GM has not adequately explained what an intact bearing assembly would have shown, for it was the plaintiffs' own misconduct which prevented GM from acquiring that very information." *N. Marrocco,* 966 F.2d at 223. The Seventh Circuit explained that what the evidence would have shown was irrelevant, because "GM was denied the opportunity to find out." *Id.* Based on this, the SEC would like us to infer that the laptop contained relevant evidence by finding that Sanchez "engaged in spoliation precisely because the evidence was relevant." (Sur–Reply at 2.) Yet, there are two critical differences between *N. Marrocco* and this case. In *N. Marrocco,* plaintiffs brought a products liability action alleging that the rear axle of their GM car was defective. After plaintiffs' experts, during an *ex parte* inspection of the car, accidently deformed the axle and made any further investigation by GM virtually impossible, the court dismissed the entire action—there was no question that plaintiffs had ruined essential evidence. The trashed laptop, on the other hand, is at best tangentially relevant to the SEC's case, and there is no evidence that the computer contained relevant evidence. Further, the plaintiffs in *N. Marrocco* deformed physical evidence in a products liability case. Unlike deforming an axle that either was or was not defective—the primary evidence pointing either way being the axle itself—destroying a laptop can hardly be seen as depriving the opposing party of an opportunity to find a source of material, non-public information. It seems extremely unlikely that the only evidence of a relationship between Sanchez and an insider was contained on the trashed laptop. The SEC does not claim it was denied access to phone or email records. The SEC presumably followed other avenues to prove a relationship, and it doesn't explain what type of information might be found on the laptop (and only on the laptop) that could prove a relationship between Sanchez and an insider.[7]

\*12 As the Seventh Circuit opined in *Rummery,* a party seeking to rely on destroyed evidence must provide more than mere speculation that the documents contained adverse information. 250 F.3d at 558. In this case, we agree that Sanchez should not have thrown out the laptop after the SEC had requested access to all his hard drives. However, in light of the lack of evidence that any relevant information was on the laptop, we cannot find that Sanchez acted in bad faith, and as such, it would not be appropriate to impose an adverse inference. *See Mintel Intern.,* 2010 WL 145786 at \*8 ("No inference is appropriate because the evidence did not establish that it was more likely than not that any of Neergheen's actions were taken in bad faith."). Furthermore, the inference that

the SEC asks us to draw—that the computer files would have proven a link between Sanchez and a Potash insider—would require additional speculation, going beyond that required to impose a simple inference that destroyed evidence would have been unfavorable. Considering the circumstances surrounding the laptop, this is simply too great a speculative leap, and we decline to draw such an inference.

We further decline to draw an adverse inference from the deletion of computer files on the desktop. This analysis, however, is much simpler. Here, the SEC again failed to show it was likely that any relevant documents were deleted. Even drawing inferences in favor of the SEC, it has not shown that the deletion was intentional. Further, the SEC's own brief points out that the documents that were deleted were more likely to be beneficial to Sanchez. (*See* Sur–Reply at 5 ("[I]t is safe to infer that if Sanchez ever performed any internet-based research of Potash, CCleaner wiped any resulting digital evidence from the desktop.").) *See Scalera v. Electrograph Systems, Inc.,* 262 F.R.D. 162, 179 (E.D.N.Y.2009) (denying adverse inference because "while Defendants have unquestionably breached a duty to preserve emails in this case, Plaintiff has ultimately failed to demonstrate that any destroyed emails would have been favorable to her position"). As there is no evidence of bad faith, an adverse inference is not warranted here either.

**B. Insider Trading**
As the SEC asserts, it is possible to establish insider trading through circumstantial evidence. This is true because you cannot expect a tipper or tippee to voluntarily confess to passing or receiving non-public information, thus triers of fact will sometimes have to infer that such action occurred. *See SEC. v. Roszak,* 495 F.Supp.2d 875, 887 (N.D.Ill.2007) ("Direct evidence is rarely available in insider trading cases, since usually the only witnesses to the exchange are the insider and the alleged tippee, neither of whom are likely to admit to liability."). The exact amount of circumstantial evidence required to avoid summary judgment is harder to define.

As a preliminary matter, the SEC asks us to give Sanchez's deposition testimony little or no weight. It claims that Sanchez "identified his 'signal, confirmation, intuition' triumvirate excuse" a year after he first met with the SEC. The SEC believes that because his story is "too convenient," we should ignore it. (Resp. at 18.) We, however, will not penalize Sanchez for voluntarily meeting with the SEC when it first opened the investigation. It is not surprising that after time to think, and with the advice of a lawyer and a certified, neutral

**S.E.C. v. Garcia, Not Reported in F.Supp.2d (2011)**

Fed. Sec. L. Rep. P 96,703

translator, Sanchez was more clearly able to articulate his explanations. Even drawing inferences in favor of the SEC, there is no reason to ignore his testimony.

### I. Circumstantial Evidence Presented by the SEC

\*13 The SEC's circumstantial evidence consists of: (1) the suspicious Potash trades, (2) the fact that the trades "marked a dramatic departure from Sanchez's trading historically," (3) Sanchez's "implausible reasons for such trades," and (4) "Sanchez's bad faith spoliation of his electronically stored information." (Resp. at 13.) As the facts have been laid out in detail and the spoliation argument was addressed above, we briefly discuss here the SEC's view on the first three pieces of evidence.

The SEC's first and second point can be summed up by their assertion: "Sanchez's stunning profits from his Potash trades is [sic] intrinsically suspicious." (*Id.* at 13.) Specifically, the SEC points to the following "suspicious" facts: Sanchez had never before invested in fertilizer companies; there is no evidence that he recently had invested in any options; the purchase was relatively large and very risky; he had not previously traded in options using his IB account, and he had to get authorization to do so; he needed to transfer funds to purchase the 331 options; and finally, the trades resulted in profits of nearly $500,000, or a 1,000% return on his investment. To support its argument that these actions are suspicious, the SEC relies on the testimony of a Chartered Financial Analyst; however, reference to this expert's testimony is not included in the SEC's amended 56.1 Statement and the SEC incorrectly states the expert's findings in its brief. Nonetheless, the expert testified that Sanchez's trades were consistent with the trading of an insider who sought to maximize profits based upon non-public knowledge of the takeover target, the announcement month, and the takeover bid. (Pl. 56.1 Stat. Ex. E.)

The SEC's third area of circumstantial evidence is Sanchez's allegedly incredible explanations. The SEC makes a few speculative points. First, that there is no obvious connection between Sanchez and Potash. (Resp. at 15.) We do not find this relevant because most traders do not have a connection to the companies in which they invest. Second, the SEC finds it hard to believe that anyone would invest large sums of money without printing research. (*Id.* at 16.) This is extremely speculative and does not give rise to a fact that would preclude summary judgment.

The SEC does, however, raise significant questions about the likeliness of Sanchez's explanations. It disputes Sanchez's reliance on the articles he brought to his

August 2010 interview. As the articles were published after Sanchez's trading started, we agree that they could not have informed his decision. Further, the SEC asserts that publicly available information could not have lead Sanchez to a decision to purchase the September 125 Potash Call options. Specifically, it argues, that the analyst reports predicted a steady gain over 12 months, not a dramatic spike in only five weeks, and that, assuming an efficient market,[8] the reports from May and July would have already been fully reflected in the Potash stock price. (*Id.* at 17.) It also provides three reasons that Sanchez's purported reliance on macro considerations (i .e. the fertilizer industry, the energy sector, agribusiness, rising wheat prices, global population growth) is not credible. First, again assuming an efficient market, those considerations were already reflected in Potash stock, and to the extent that they were not, Sanchez cannot explain why any undervaluation would be corrected in five weeks. Second, "big picture" considerations should lead to purchasing a more diversified portfolio, not one specific stock, and particularly not a soon-expiring call option on one stock. Third, the Potash trade is inconsistent with Sanchez's depiction of himself as a careful, methodical investor. (*Id.* at 18.) Finally, the SEC asserts that, in contradiction to Sanchez's testimony, the market on August 10 was not a "peaceful market." (*Id.* at 19; Pl. 56.1 Stat. Ex. C–1 at 94–95; Pl. 56.1 Stat. Ex. D–13 (the S & P index declined as follows: Aug. 10: 0.62%, Aug. 11: 2.85%, Aug 12: 0.46%, Aug 13: 0.46%).)

### ii. Sufficiency of Circumstantial Evidence

\*14 A brief review of the facts in the cases cited by the SEC shows that the circumstantial evidence submitted in this case is not sufficient. The SEC cites three cases for the preposition that "courts uniformly hold that the SEC can establish insider trading through purely circumstantial evidence": *SEC v. Steffes,* —— F.Supp.2d ——, No. 10–cv–6266, 2011 WL 3418305 (N.D.Ill. Aug.3, 2011), *Rosak,* 495 F.Supp.2d 875, and *SEC v. Van Wagner,* No. 97–c–6826, 1999 WL 691836 (N.D.Ill. Aug.25, 1999). (Resp. at 11–12.) We briefly summarize each case below and find that the SEC has not brought forth evidence equal in weight to the evidence alleged in any of these cases.

In *Steffes,* the SEC survived a motion to dismiss by alleging that some defendants were employees of the company whose stocks were traded and others were in contact with these employees very soon before purchasing the company's securities. The SEC also alleged that the trades were unusual for all of the defendants, sometimes representing more than their annual income and nearly all

of their liquid net worth. Based on these and other allegations, the court explained: "Here, the SEC identifies what material non-public information [defendant] is alleged to have possessed ..., when he possessed this information ..., and how he obtained sufficient underlying facts to reach that conclusion." *Steffes,* 2011 WL 3418305 at \*7. In the current case, at a later stage in litigation, the SEC has not been able to bring forth similar evidence.

In *Roszak,* the court explained "the circumstantial and undisputed evidence is that Defendant Roszak had access to insider information from Filipowski about the proposed merger.... Shortly after his contact with Filipowski, he made a large purchase of Blue Rhino stock." *Roszak,* 495 F.Supp.2d at 887. Additionally, the defendant in *Roszak* contacted four people after speaking with the insider, all four of whom then quickly made substantial purchases in the same stock. *Id.* In *Van Wagner,* the defendant was accused of insider trading in the stock of company for which he sat as chairman of the board of directors. 1999 WL 691836 at \* 1. While the defendant argued that he was not present on the second day of a two-day meeting—the day on which material, non-public information was discussed—the court denied summary judgment, holding that a jury could infer, as chairman, he was informed of details discussed on the second day. *Id.* at \*2. The evidence produced in both of these cases allowed a jury to reasonably infer that the defendants received inside information from an identified source. Without relying on impermissible speculation, the evidence in this case does not allow a jury to make the same inference.[9]

In fact, we find that the SEC has brought forth less circumstantial evidence in this case than it did in a case for which the Northern District of Illinois granted summary judgment for defendant in 2010. In *SEC v. Horn,* No. 10–cv–955, 2010 WL 5370988 (N.D.Ill.Dec.16, 2010), the SEC alleged that Dr. Horn, a doctor who performed laser-vision-correction services at LCAV facilities, traded in LCAV stock and options on the basis of nonpublic information. *Id.* at \*1. The SEC specifically alleged that Dr. Horn reviewed the company's EBL reports in order to gather the nonpublic information (i.e. the company's percentage behind or ahead of quarterly targets for surgeries and revenue); however it could not determine which specific reports contained the nonpublic information that allegedly served as the basis for his trades, which computer he used to access those reports, or on which date he obtained or possessed the nonpublic information. *Id.* In other words, "There [was] no direct evidence that prove[d] Dr. Horn accessed a computer on a particular day or viewed an EBL report on a date certain." *Id.* The SEC did, however, have evidence

that Dr. Horn used LCAV computers and the EBL reports were posted in two of the offices where he worked. *Id.* at \*2. The SEC also argued that Dr. Horn's inconsistent deposition testimony provided the necessary circumstantial evidence to support its claims, but the court found, "[e]ven when all inferences are construed in the SEC's favor, any conflict in Dr. Horn's testimony regarding his patterns do not constitute sufficient circumstantial evidence that he was actually getting information from nonpublic sources." *Id.* at \*7. The court explained that the SEC's theory rested on the success of Dr. Horn's trades (he allegedly profited by approximately \$870,000) combined with his ability to access the reports. *Id.* at \*1–2. Explaining, "it is not enough for the SEC simply to identify suspicious trading and ask a jury to infer that it was the product of insider trading," the court granted summary judgment stating, "no jury could find that Dr. Horn ever possessed material, nonpublic LCAV information without engaging in speculation." *Id.* at \*5–8.

\*15 Here, the SEC makes a few attempts to distinguish this case from *Horn.* First, it states that Sanchez purportedly traded on information about one specific event—the unsolicited tender offer—while Dr. Horn allegedly traded on unidentified information and reports. (Resp. at 11–12.) This distinction is without merit because just as the SEC in *Horn* could not identify which reports Dr. Horn used to inform his trade, the SEC here cannot identify any actual information on which Sanchez relied. Moreover, the issue of materiality is not at issue in either case. Second, the SEC argues that Dr. Horn's story was more credible because he owned LCAV options as part of his compensation; conversely, Sanchez had no connection to Potash. (*Id.* at 14–15.) As mentioned above, we do not find the lack of personal connection relevant because most traders do not have a connection to the companies in which they invest. Finally, it insists that Dr. Horn had two credible reasons for his trading activity—it served to hedge against a potential loss in options he already owned and it sought to exploit a pattern he had noticed in the stock's historical price movements—while Sanchez's explanations "lack credibility and are unsupported by the evidence." *See* discussion *supra* IV(b)(I). While we cannot address credibility on a motion for summary judgment, it is not necessary to do so, because even if Sanchez's explanations are not as credible as the ones provided by Dr. Horn, we are still left with a mere suspicion of insider trading. While Dr. Horn clearly could have accessed material nonpublic information, the SEC has not shown that Sanchez ever had an opportunity to acquire nonpublic information. Just as in *Horn,* the SEC theorizes that Sanchez was informed of some unidentified information related to the proposed acquisition, at an unidentified time, by an unidentified insider, and traded

Fed. Sec. L. Rep. P 96,703

on this unidentified information. *See Horn,* 2010 WL 5370988 at *7. And just like in *Horn,* "this chain of speculation does not raise a material issue of fact for consideration by a jury." *Id.*

## V. CONCLUSION
For the reasons stated above, we grant Sanchez's motion for summary judgment. As such, we order that the asset freeze and injunction in place on Sanchez's assets

(initially issued August 20, 2010 (Dkt. No. 10)) be released. It is so ordered.

**Parallel Citations**

Fed. Sec. L. Rep. P 96,703

Footnotes

1    As used in this opinion, "September 125 Potash Call" refers to a call option on Potash securities with a strike price of $125 and due to expire on September 18, 2010. An equity call option gives its buyer the right, but not the obligation, to purchase 100 shares of a company's underlying stock at a set price ("strike price") before a certain date ("expiration date"). The option has value until the expiration date regardless of whether the stock is above or below the strike price because the trader can sell the option position on the open market. However, if the trader does not exercise or sell the call option prior to the expiration date, the option becomes worthless and ceases to exist as a financial position. (Pl. 56.1 Stat. ¶ 11; Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 11.) At any given time, a trader can purchase specific options with a variety of expiration months and strike prices; options set to expire at quarter ends (March, June, September, December) typically offer the highest trading volume. (Pl. 56.1 Stat. ¶ 13; Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 13.) At the relevant time, Sanchez could also have purchased, and codefendant Garcia did purchase, Potash call options with an expiration date of August 21, 2010. (*See Compl.* ¶ 26.)

2    Calls are considered "out-of-the money" if they have a strike price above the price of the underlying stock. Calls are considered "in-the-money" when they have a strike price below the price of the underlying stock. (Pl. 56.1 Stat. ¶ 12.)

3    On December 16, 2010, Sanchez informed the SEC that he was seeking alternative representation. (Pl. 56.1 Stat. Ex. C–9.) On January 31, the SEC was still waiting to be contacted by his new counsel. (*Id.* Ex. C–10.)

4    Neither party explains what a MAC address is, although the SEC implies that every electronic device has a different MAC address.

5    The SEC must prove its case by a preponderance of the evidence. *See Rowe v. Maremont Corp.,* 850 F.2d 1226, 1234 (7th Cir.1988).

6    Or, as Sanchez's counsel prefers to put it: "if we had some eggs, we could have some ham and eggs, if we had some ham." (Def. Reply at 2.)

7    The other case relied on by the SEC has similar flaws. In *Oleksy v. General Elec. Co.,* the party claiming spoliation was not requesting an adverse inference but merely submitted a motion to compel. No. 06–cv–1245, 2011 WL 3471016 at *1 (N.D.Ill. Aug.8, 2011). The motion arose because the party contesting the motion had instituted a litigation hold on some documents, but had neglected to inform its off-site storage facility of the hold. The non-moving party admitted that destroyed documents were discoverable, even explaining the contents of specific documents, and the court did not give weight to their argument that the documents were irrelevant to the litigation. *Id.* at *5.

8    We agree with Sanchez that this is not the appropriate forum to debate the accuracy of the efficient market hypothesis; the general idea behind it being that the stock market incorporates and reflects all relevant information. In theory, if the market were perfectly efficient, an investor would not be able to purchase undervalued stock or sell stocks at an inflated price. Academics and professionals contentiously debate the extent to which the market fully reflects public information, and indeed, whole industries are built around perceived inefficiencies in the market.

9    The other cases relied on by the SEC are similarly unpersuasive. *See SEC v. Hollier,* No. 09–cv–0928, 2011 WL 201451 (W.D.La. Jan.18, 2011) ("Contrary to defendants' contentions, the SEC has offered direct evidence connecting Dupuis to Hollier[, an insider,] as well as sufficient circumstantial evidence to allow this case to proceed to trial."); *SEC v. Bluestone,* No. 90–cv–72525, 1991 WL 83960 (E.D.Mich. Jan.24, 1991) (finding that summary judgment cannot be based on insiders' assertion that they did not know defendant).

**S.E.C. v. Garcia, Not Reported in F.Supp.2d (2011)**

Fed. Sec. L. Rep. P 96,703

---

**End of Document**
© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

# TO BRIEF IN SUPPORT OF

# MOTION FOR SUMMARY JUDGMENT

2010 WL 5370988
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

United States SECURITIES and EXCHANGE
COMMISSION, Plaintiff,
v.
Gerald D. HORN, Defendant.

No. 10–cv–955. | Dec. 16, 2010.

**Attorneys and Law Firms**

Gregory Paul Von Schaumburg, Robin Andrews,
Securities & Exchange Commission, Chicago, IL, for
Plaintiff.

Andrew Theodore Staes, Staes & Scallan P.C., Peter B.
Shaeffer, Attorney at Law, Stephen David Scallan, Staes
& Scallan P.C., Chicago, IL, for Defendant.

**Opinion**

### *MEMORANDUM OPINION AND ORDER*

JOHN W. DARRAH, District Judge.

**\*1** The United States Securities and Exchange
Commission ("SEC") filed this action against Dr. Gerald
D. Horn, alleging that Dr. Horn engaged in insider trading
in violation of federal securities laws. Presently before the
Court is Dr. Horn's Motion for Summary Judgment.

#### BACKGROUND

Unless otherwise specified, the following facts are taken
from the parties' statements of undisputed material facts
submitted in accordance with Local Rule 56.1. Local Rule
56.1(a)(3) requires the party moving for summary
judgment to provide "a statement of material facts as to
which the moving party contends there is no genuine
issue." Rule 56.1(b)(3) then requires the nonmoving party
to admit or deny each factual statement proffered by the
moving party and to concisely designate any material
facts that establish a genuine dispute for trial. *See Schrott*

*v. Bristol–Myers Squibb Co.* ., 403 F.3d 940, 944 (7th
Cir.2005). A litigant's failure to dispute the facts set forth
in its opponent's statement in the manner required by
Local Rule 56.1 results in those facts' being deemed
admitted for purposes of summary judgment. *Smith v.
Lamz*, 321 F.3d 680, 683 (7th Cir.2003).[1]

LCA–Vision Inc. ("LCAV") is a NASDAQ-listed
company in the business of providing vision-correction
services. Dr. Horn is a Doctor of Ophthalmology, who
performs laser-vision-correction services at LCAV
facilities in the Chicago area. Def. 56.1(a)(3) ¶ 31.
According to the SEC, Dr. Horn traded in LCAV stock
and options on the basis of nonpublic information
contained in LCAV's Eyes–By–Laser reports ("EBL
reports"). Def. 56.1(a)(3) ¶ 1.

The SEC alleges Dr. Horn reviewed EBL reports during
specific months in order to determine that LCAV was a
specified percentage behind or ahead of quarterly targets
for surgeries and revenue. *See* Compl. ¶¶ 60, 67, 78, 83,
92. Dr. Horn then allegedly traded on the basis of that
information.[2] The SEC, however, does not know which
specific EBL reports contain the nonpublic information
that allegedly served as the bases for the trades at issue,
which specific LCAV computer was used to access those
reports, or on which date Dr. Horn obtained or possessed
any nonpublic information from an EBL report. Def.
56.1(a)(3) ¶¶ 10–11. There is no direct evidence that
proves Dr. Horn accessed a computer on a particular day
or viewed an EBL report on a date certain. Def. 56.1(a)(3)
¶ 9.

The SEC began its investigation of Dr. Horn's trading on
or before June 12, 2006. Def. 56.1(a)(3) ¶ 18. During the
course of that investigation, Dr. Horn submitted to two
administrative depositions conducted by the SEC—one on
September 20, 2006, and one on September 8, 2008. Def.
56.1(a)(3) ¶ 19. Dr. Horn testified that he never accessed
EBL reports and that he did not trade in LCAV common
stock or listed options on LCAV common stock while in
possession of any nonpublic information. Def. 56.1(a)(3)
¶¶ 15, 16.

The SEC also took investigative testimony from at least
14 other individuals, including eight persons who worked
with Dr. Horn on a regular basis at Chicago-area LCAV
locations. Def 56.1(a)(3) ¶ 20. Additionally, LCAV
provided the SEC with copies of its EBL reports as they
existed on the days of each of the trades at issue. PL
56.1(a)(3) ¶ 4. Each report shows the total, quarter-to-date
number of operations performed by the entire company,
as well as company-wide revenue figures. PL 56.1(a)(3) ¶

4. They do not contain any indication of targets.

*2 Despite its investigation, the SEC cannot present any direct evidence that Dr. Horn ever accessed an EBL report or based any trades on information contained in such a report. Def. 56.1(a)(3) ¶¶ 2, 3, 14. Nor has the SEC identified direct evidence of any revenue or surgical-procedure targets made by analysts against which Dr. Horn was allegedly able to compare LCAV's progress. Def. 56.1(a)(3) ¶¶ 12, 13.

Instead, the SEC's theory is based primarily on the success of Dr. Horn's trades combined with his *ability* to access LCAV's EBL reports if he had wanted to do so. Certain computers at the LCAV centers were available for use by all employees and were, in fact, used by most employees. Def. 56.1(a)(3) ¶¶ 22, 23. Dr. Horn used LCAV's computers openly, in the plain view of LCAV employees, "all the time." Def. 56.1(a)(3) ¶ 34; Pl. 56.1(a)(3) ¶ 5. The SEC is unaware, however, of any person who ever saw Dr. Horn viewing an EBL report on an LCAV computer. Def. 56.1(a)(3) 125.

Printed copies of these EBL reports were also posted in at least two of the three LCAV facilities where Dr. Horn worked. Pl. 56.1(a) (3) ¶ 1. Allison Foster testified that she printed copies of the EBL reports and posted them in the break room at the LCAV facility in Schaumburg, Illinois, a couple of times per week. Pl. 56.1(a) (3) ¶ 1. Maria Moreno testified that she routinely printed copies of the EBL reports and taped them to a board in the break room of the LCAV facility in Oak Brook, Illinois, on a weekly basis. PL 56.1(a)(3) ¶ 1. Dr. Horn routinely worked at both of these facilities. PL 56.1(a)(3) ¶ 1. Dr. Horn had seen reports left open on computer screens by other individuals using the computers, but he was not aware of what kind of reports those were. PL 56.1(a) (3) 12; Def. Resp. to Pl. 56.1(a)(3) ¶2.

During his 2006 deposition, Dr. Horn testified that his first purchase of call or put options was made to hedge the risk that his employee-incentive options would decrease in value if the price of LCAV's stock went down and to learn more about options trading. PL 56.1(a)(3) ¶ 9; Def. Resp. to Pl. 56.1(a)(3) ¶ 9. At that time (December 2005), his remaining incentive options did not begin expiring until 2009; and some did not expire for another nine years. Pl. 56.1(a)(3) ¶ 9. Dr. Horn further explained his options-trading theory by testifying that he traded on the basis of historical patterns he saw in the stock. Pl. 56.1(a)(3) ¶ 10. Dr. Horn stated that he charted this pattern and consulted it before making any of his trades and that he believed so strongly in this pattern that he would stop trading on it the day the pattern broke. Pl.

56.1(a)(3) ¶¶ 10–11. (He later stated that, even if the pattern was not working, he would continue to trade as long as he was making money. Pl. 56.1(a)(3) ¶ 12.) According to Dr. Horn, the historical pattern of LCAV's stock price showed that it increased every year after LCAV announced its first-quarter earnings. Pl. 56.1(a)(3) ¶ 13. Dr. Horn also testified that his research showed that LCAV's stock price decreased after LCAV announced its second-quarter earnings for every year going back to 2004.³ Pl. 56.1(a)(3) ¶ 14.

*3 Effective July 1, 2004, LCAV's General Counsel drafted and implemented an "Insider Trading Policy," which was applicable to all employees. PL 56.1(a)(3) ¶ 7. That policy expressly prohibits "[s]hort selling, or trading in puts, call and options, with respect to securities of [LCAV]." Pl. 56.1(a)(3) ¶ 7. Dr. Horn claimed to be unaware of this policy at the time of the trades at issue, Pl. 56.1(a)(3) ¶ 7, as did several other LCAV doctors, Def. Resp. to Pl. 56.1(a)(3) ¶ 7. Dr. Horn did not consult with anyone at LCAV before conducting his first option trade. Pl. 56.1(a) (3) ¶ 8.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir.1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The nonmoving party must go beyond the face of the pleadings to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving party's favor. *Nieves v. Bd. of Educ. of the City of Chi.,* 297 F.3d 690, 693 (7th Cir.2002) (citing *Celotex,* 477 U.S. at 324). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment,

nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir.2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (*Anderson* )).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir.2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The SEC claims Dr. Horn violated Section 10(b) of the Exchange Act and Rule 10b–5, which provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

\*4 (a) To employ any device scheme or artifice to defraud, [or]

...

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.[4] Rule 10b–5 is violated when a person breaches a fiduciary duty to a company by trading in that company's securities on the basis of material, nonpublic information. *Dirks v. SEC*, 463 U.S. 646, 663, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The SEC must prove its case by a preponderance of the evidence. *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir.1988).

Dr. Horn raises a single issue in his Motion for Summary Judgment: he argues the SEC cannot present sufficient evidence to show he ever possessed nonpublic information on which he could have based the trades at issue. For purposes of this motion, Dr. Horn has expressly

waived any argument as to the materiality of any such information. *See* Def. Mot. for Summ. J. 2 ("This Motion does not raise the issue of 'materiality,' and thus it assumes without conceding that as of a given date, EBL reports might contain material, nonpublic information.").[5]

Although it admits a lack of direct evidence, the SEC contends it can present enough circumstantial evidence to persuade a reasonable jury that Dr. Horn possessed nonpublic information. Direct evidence of insider trading is, indeed, rare; and the SEC is entitled to prove its case through circumstantial evidence. *See, e.g., Michaels v. Michaels*, 767 F.2d 1185, 1199 (7th Cir.1985) (stating that scienter can be inferred from circumstantial evidence in an insider-trading case); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir.2000) ("[A]plaintiff is not required to produce direct evidence; 'circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds.' "); *SEC v. Roszak*, 495 F.Supp.2d 875, 886–87 (N.D.Ill.2007) (*Roszak* ) ("Courts in this district and elsewhere have held that the SEC is entitled to prove its case through circumstantial evidence.") (citations omitted); *SEC v. Van Wagner*, No. 97 C 6826, 1999 WL 691836, at \*3–4 (N.D.Ill. Aug.25, 1999) (*Van Wagner* ) ("[C]ircumstantial evidence is sufficient to prove insider trading without a direct confession from either the tippee or tipper.").

In *Roszak*, for example, the court denied the SEC's motion for summary judgment, notwithstanding an absence of direct evidence that the defendant had acquired material, nonpublic information from an insider. *Roszak*, 495 F.Supp.2d at 888–89. One defendant, Roszak, was acquainted with Andrew Filipowski, a nonparty member of Blue Rhino, Inc.'s board of directors, and owned a significant interest in another of Filipowski's companies. *Id.* at 877. In 2004, when Filipowski knew about a proposed merger between Blue Rhino and another company, Roszak and Filipowski sat next to each other on a two-hour flight to Chicago. *Id.* Two hours after getting off the flight, Roszak called his broker and placed an order for approximately \$95,000 of Blue Rhino stock—an amount that was four times larger than any single-day stock purchase he had made during the past year. *Id.* Then, after receiving an email from Filipowski, in which Filipowski informed Roszak that he was busy with daily Blue Rhino meetings, Roszak called four people, all of whom subsequently purchased significant portions of Blue Rhino stock. *Id.* at 877–78. One of those four people, Edgecombe, in turn called four other people, each of whom also purchased Blue Rhino stock shortly thereafter. *Id.* at 878. The SEC filed an action against five

of the stock purchasers, four of whom consented to judgment. *Id.* at 879. The sole remaining defendant (one of Edgecombe's alleged tippees) moved for summary judgment. *Id.*

\*5 Although the SEC had no direct evidence that Roszak was given material, nonpublic information about the pending merger and passed it on to others, the court held that the circumstances supported an inference of illegal insider trading sufficient to withstand a motion for summary judgment, stating, "[T]he SEC has put forth sufficient circumstantial evidence to permit a reasonable inference that insider trading occurred. It will be for the trier of fact to decide whether to believe the version of events offered by the SEC or Defendant Michel." *Id.* at 887–88. In so holding, the court also noted that several of the defendants "offered equivocal testimony on numerous points, in some instances claiming a lack of memory about key conversations, and also offering conflicting or implausible explanations for their actions with respect to Blue Rhino stock purchase." *Id.* Based on all of the above, the court held that a trier of fact could reasonably decide to credit the SEC's theory of events. *Id.*

*Van Wagner* similarly involved a situation where numerous associates of an insider made significant stock transactions. One of the defendants, Bruce Van Wagner, served as the chairman of the board of directors of the Antec Corporation. *Van Wagner,* 1999 U .S. Dist. LEXIS 13408, at \*2. Antec held a management meeting in Denver, Colorado. *Id.* Van Wagner flew to Denver with other attendees and attended the first day of the meeting for a brief period. *Id.* On the second day of the meeting, Antec executives discussed whether the public should be notified about its earnings. *Id.* at \*2–3. One week later, Antec publicly announced that its earnings would fall short of analysts' expectations; its stock price declined significantly. *Id.* at \*3.

In between the second day of the meeting and Antec's earnings announcement, five of Van Wagner's six children and two of his neighbors sold all of their Antec stock. *Id.* All of them had contact with either Van Wagner or his wife during that time period. *Id.* at \*10. Although Van Wagner was in Denver for the second day of the meeting, he did not attend. *Id.* at \*5–6. The court nonetheless determined that Van Wagner was regularly in the presence of other attendees and that a jury could reasonably infer that he was privy to conversations about Antec's earnings—particularly in light of the fact that he was a director. *Id.* at \*6–7. The court also held that the suspicious timing of the trades by Van Wagner's children and neighbors provided further circumstantial evidence that Van Wagner had possessed material, nonpublic

information and passed it on to others who traded on that information. *Id.* at \*8–9. The court denied the defendants' motions for summary judgment. *Id.* at \*12.

On the other hand, it is not enough for the SEC simply to identify suspicious trading and ask a jury to infer that it was the product of insider trading. *See SEC v. Truong,* 98 F.Supp.2d 1086, 1097 (N.D.Cal.2000) (*Truong* ) ("Suspicious trading by itself cannot suffice to warrant an inference that an alleged tipper, the first link on the information chain, traded on the basis of material non-public information."). Furthermore, proof of access to nonpublic information is not proof of possession of that information. *See SEC v. Rorech,* 720 F.Supp.2d 367, 410 (S.D.N.Y.2010) ("Potential 'access' to material nonpublic information, without more, is insufficient to prove that [the defendant] actually possessed any such information.").

\*6 One of the defendants in *Truong* (Hahn Truong) was a manager of a software group in the engineering department of Molecular Dynamics, Inc. ("MDI"). 98 F.Supp.2d at 1089. He was not in a senior position and was not made privy to confidential sales and financial information in the normal course of his duties. *Id.* On April 7, 1994—the day after MDI's first-quarter earnings announcement—MDI's shares closed down 38 percent. *Id.* Truong, an active trader, had sold significant amounts of MDI stock in March 1994; one of the transactions was Truong's largest MDI transaction to date and accounted for 29.6 percent of MDI's trading volume for that day. *Id.* at 1090. Truong's brother and friend also sold significant amounts of MDI shares in March 2004. *Id.* at 1092–94.

The SEC claimed that Truong came into possession of material nonpublic information about MDI's weak quarter-one sales and conveyed that information to his brother and his friend. *Id.* at 1097. The court held that the SEC's evidence was insufficient to withstand Truong's motion for summary judgment as to the majority of the information Truong allegedly possessed. *Id.* at 1098. In doing so, the court rejected the SEC's argument that Truong "had access" to draft securities filings by virtue of his working in an office with open cubicles, having routine interactions with senior management, and working late the same evening as the company controller. *Id.* The court noted that the SEC's position would deem everyone in an office with open cubicles to have access to confidential information. *Id.* at 1099. Ultimately, the SEC's position was held to be too speculative:

> [A]lthough the SEC may prove that a defendant possessed material nonpublic information through the

> use of circumstantial evidence (beyond alleged "suspicious" trading), the Agency may not rest on evidence that would require a jury *to speculate* that the defendant possessed that information. Courts stress that the SEC may not base insider trading actions on strained inferences and speculation.

*Truong,* 98 F.Supp.2d at 1097–98 (citations omitted).

Like *Truong*—and unlike *Roszak* and *Van Wagner*—a finding of liability in this case would require a jury to speculate that certain successful trades were the product of acquiring nonpublic information, simply because a defendant had access to that information. Absent from this case is the kind of circumstantial evidence present in *Roszak* and *Van Wagner* that would support a reasonable inference that Dr. Horn ever had such information. In both of those cases, it was shown that an insider had access to *specific* nonpublic information (a proposed merger or an upcoming earnings announcement); and in both of those cases, numerous associates of the insider then traded shortly after having contact with the insider. Here, Dr. Horn is the only one who is alleged to have engaged in any suspicious trading, and the SEC has failed to put forth evidence demonstrating what specific information was in Dr. Horn's possession.

\*7 Indeed, the SEC has done little more than establish that Dr. Horn had five successful trades over the course of eight-and-a-half months and that nonpublic information was available to him—as it was to all employees—at his place of employment. The SEC has no evidence that Dr. Horn accessed any specific EBL reports. Nor has the SEC identified any specific EBL reports that Dr. Horn possessed. The SEC theorizes that a few successful trades made at some undetermined point in time by Dr. Horn indicates that he must have acquired unidentified reports containing unspecified information, compared it to unidentified analyst reports, drew certain conclusions, and traded in LCAV securities based on that knowledge. This chain of speculation does not raise a material issue of fact for consideration by a jury.

The SEC also argues that Dr. Horn's inconsistent deposition testimony provides the necessary circumstantial evidence to bolster its claims. First, the SEC takes issue with Dr. Horn's testimony that he began trading in options as a means to hedge against a potential loss in the value of his incentive options. Because Dr. Horn's incentive options did not expire until several years in the future, the SEC argues that it made no sense to

hedge any associated risk by purchasing put options that expired in three months. Dr. Horn did not testify, however, that he intended for his initial purchase of put options to hedge against a risk of loss on *all* of his incentive options; and the fact that he would not be forced to realize those losses by purchasing stock at a lower price does not impeach his testimony. Indeed, he specifically characterized his position with regard to his incentive options as "paper profit." Pl. 56.1(a)(3) ¶ 9. There is nothing inherently inconsistent in Dr. Horn's statement that he purchased put options to hedge against the risk that the value of LCAV's stock would decrease in the short term.

Further, the SEC argues that Dr. Horn then shifted his theory and asserted that he was trading on the basis of historical price movements. As an initial matter, Dr. Horn's testimony does not show that he changed his theory; Dr. Horn specifically explained that his reasons for his initial options purchase were not the same as his reasons for subsequent purchases. Moreover, as explained above, the SEC has not demonstrated that Dr. Horn's trades were in conflict with the historical patterns Dr. Horn purportedly identified. *See supra* note 3.

Third, the SEC claims that Dr. Horn shifted his explanation as to whether he was trading on a pattern. During his 2006 testimony, Dr. Horn testified that his strategy was to invest until there was a break in his pattern. At his 2008 deposition, he stated that he would continue trading as long as he was making money, even if the pattern was not working for him. The portion of Dr. Horn's deposition cited by the SEC, however, clarifies the issue:

> So in general, both of those statements to me are true. If the pattern is broken, I'd stop trading and if I lost money, I'd stop trading. Both points are relevant to me because as we got into Q3 especially, things happened where I was making decisions during the trading window that weren't even based on this chart and I still would have held to the same tenet. If I had lost a significant amount of money, that the 400,000 that I had decided was my total amount to consider, I would have been done.

\*8 September 8, 2008, Tr. 93. He further explained that his decisions depended on his perceived strength of the pattern, stating, "If, if it, for example, had been a Q1

pattern that didn't work, I would have been done, but that's my strongest pattern. Then I would realize it was just luck." *Id.* at 94. Even when all inferences are construed in the SEC's favor, any conflicts in Dr. Horn's testimony regarding his patterns do not constitute sufficient circumstantial evidence that he was actually getting information from nonpublic sources.

Finally, the SEC argues that Dr. Horn falsely testified that he was unable to review EBL reports because he did not have a password to access those reports on a computer. According to the SEC, once a user is logged into a computer, no additional password is required to access EBL reports. Assuming that is the case—there is conflicting testimony on the issue—Dr. Horn's claimed misunderstanding as to what it takes to access an EBL report is not circumstantial evidence that he was actually accessing those reports.

The remaining purported circumstantial evidence is also insufficient to withstand summary judgment. The SEC notes that Dr. Horn violated LCAV policies by purchasing call and put options, but it does not explain how violation of a company policy is evidence of insider trading. The SEC suggests that the size of Dr. Horn's trades is suspect but provides no evidence as to the cost of those trades, Dr. Horn's wealth, or Dr. Horn's trading history to put those trades in context or explain why they were unusual.[6] The SEC argues that Dr. Horn enjoyed "incredible success" with his trading but offers no evidence to explain why his profits on the trades at issue were incredible; nor does the SEC have any evidence of statistical probability to support its claim of incredulity. Def. 56.1(a)(3) ¶ 26.

To survive a motion for summary judgment, a party must "wheel out all its artillery to defeat it." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1270 (7th Cir.1996) (citations and internal quotation marks omitted). After investigating Dr. Horn's trading activities for four years, deposing him (twice), deposing fourteen other individuals, and reviewing documents, the SEC has now been forced to show its hand; and it has failed to demonstrate any reason for this case to proceed to trial.

The SEC's admitted lack of direct evidence is not fatal to its case, but the insufficiency of its purported circumstantial evidence is. Based upon the evidence presented in opposition to Dr. Horn's motion for summary judgment, no jury could find that Dr. Horn ever possessed material, nonpublic LCAV information without engaging in speculation. Dr. Horn is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, Dr. Horn's Motion for Summary Judgment is granted.

Footnotes

1   Dr. Horn also submitted a "Supplemental Statement of Uncontested Facts" in connection with his reply brief. Local Rule 56.1 does not provide for any such "supplemental" statements—and with good reason: the Court would have to accept those statements without affording the opposing party an opportunity to respond. Accordingly, these purported facts were not considered in resolving Dr. Horn's motion.

2   The SEC's Complaint alleges that Dr. Horn made six separate purchases of LCAV put and call options on the basis of material, nonpublic information, resulting in illicit gains of approximately $869,629. Compl. ¶ 1. The SEC also claims Dr. Horn traded on the basis of material, nonpublic information when he decided to exercise LCAV option grants and sell the stock, resulting in a loss avoided of approximately $533,603. *Id.* These trades allegedly took place between December 2005 and August 2006. *Id.* ¶ 4. The SEC's Local Rule 56.1 statements do not provide any factual support for these claims.

3   In its opposition to Dr. Horn's Motion for Summary Judgment, the SEC submitted charts, purportedly downloaded from Nasdaq.com, and argues—without explanation—that the charts conclusively prove that LCAV's stock historically *increased* on the day the second quarter earnings announcements were released. Pl. 56.1(a)(3) ¶ 14. Dr. Horn responds by arguing that the earnings patterns nonetheless exhibit a general downward trend following the announcement of second—quarter earnings. Def. Resp. to Pl. 56.1(a) (3) ¶ 14. Assuming the date marked with an "E" on the charts is the date that second-quarter earnings were announced, the charts do appear to show a general downward trend in third-quarter earnings relative to second-quarter earnings for 2004 and 2005. However, neither party has submitted facts as to the days LCAV actually issued its earnings announcements or otherwise attempted to explain how the charts should be interpreted.

4   In its single-count Complaint against Dr. Horn, the SEC alleged that Dr. Horn violated all three prongs of Rule 10b–5. On April 27, 2010, the Court granted Dr. Horn's motion to dismiss the SEC's claim to the extent it alleged Dr. Horn made any material

misstatement or omission pursuant to Rule 10b–5(b). *See* Docket No. 15. Accordingly, only the first and third prongs of Rule 10b–5 remain at issue.

5    In his Reply Brief, Dr. Horn changes course and argues that the EBL reports are not material. This argument comes too late, and it will not be considered. *Cf. Draine v. Bauman,* 708 F.Supp.2d 693, 710 (N.D.Ill.2010) (citing *United States v. Wescott,* 576 F.3d 347, 354 (7th cir.2009); *Porco v. Trustees of Ind. Univ.,* 453 F.3d 390, 395 (7th Cir.2006)).

6    Moreover, it is disingenuous for the SEC to assert that Dr. Horn "risked nearly $1 million in options premiums on his bets." Pl. Resp. 17. As alleged in the Complaint, Dr. Horn made a series of successful trades. At no time is he alleged to have had $1 million invested at one time; the largest amount he allegedly invested was $390,477. *See* Compl. ¶¶ 92, 96.

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.