IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 12 C 2473 ) |
| SIMING YANG, PRESTIGE TRADE INVESTMENTS LIMITED, CAIYIN FAN, and SHUI CHONG (ERIC) CHANG, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The United States Securities and Exchange Commission (SEC) has sued Siming Yang, Prestige Trade Investments, and Shui Chong (Eric) Chang pursuant to sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78u(d), 78u(e) & 78u–1, and section 209 of the Investment Advisers Act of 1940 (Advisers Act), 15 U.S.C. § 80b-9. The SEC alleges that the defendants engaged in insider trading in the stock of Zhongpin Inc. in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The SEC also alleges that Yang ignored shareholder reporting requirements and engaged in "front-running," violating section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 thereunder, 17 C.F.R. § 240.13d-1; sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & (2); and section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (b) & (c).

Yang, Prestige, and Chang have moved for summary judgment on all of the SEC's claims. For the reasons stated below, the Court denies defendants' motions.

**Overview**

The SEC's claims arise from the defendants' purchases of significant quantities of Zhongpin stock and call options shortly before the company announced on March 27, 2012 that it was going private. The announcement resulted in a significant increase in the price of Zhongpin's stock and in large (though unrealized) gains for the defendants. The SEC filed this suit on April 4, 2012 and, the next day, sought and obtained from the Court a temporary restraining order, later converted to a preliminary injunction, barring the defendants from realizing their gains.

From January 2008 through March 2012, Yang, a Chinese citizen, worked as a research analyst at a New York-based financial firm called Baron Capital, Inc., evaluating companies in China and other emerging markets. In November 2011, an account was opened in the names of Yang and Fan at Wang Investments, a U.S.-based brokerage firm. In January 2012, Yang formed Prestige, an investment firm of which he is director, part-owner, general manager, and investment adviser.

The next month, February 2012, Yang traveled to China, where he marketed Prestige to potential investors. He allegedly represented that Prestige would establish a diverse portfolio. Yang also conducted research on Zhongpin, a Chinese company that specializes in pork products and was listed on the American Stock Exchange. The SEC contends that Yang met with Zhongpin directors while in China.

On March 13, 2012, Yang opened a brokerage account in Prestige's name. At the time, Prestige had about $30 million in a bank account in Hong Kong. Yang

2

transferred $29.7 million of it into Prestige's brokerage account in the U.S. and then used nearly all of it, $28 million, to purchase 3.2 million shares of Zhongpin stock between March 15 and March 21, 2012.

Between March 14 and March 26, 2,571 Zhongpin call options were purchased for the Yang / Fan account. Most of the options had a short expiration date (within a month of the purchase), and the overwhelming majority of them had a $10 strike price and were thus "out of the money," because the market price for Zhongpin stock was lower than that. In addition, 58,000 shares of Zhongpin stock were purchased for the Yang / Fan account during the same period, for a little over $500,000. The Zhongpin securities represented nearly all of the securities in the Yang / Fan account.

On March 27, 2012, Zhongpin announced that its management was proposing to take the company private by purchasing all of its stock at a price that represented a forty-six percent premium over its market price on that date. This led to an immediate twenty-one percent increase in the market price of Zhongpin stock.

Maggie Shum, a friend of Yang, placed the Zhongpin stock trades for Prestige, because Yang lacked the license needed to do so. During the relevant period, defendant Chang was in a long-term relationship with Shum. Shum told Chang that she was placing the trades for free, as a favor to Yang. The SEC alleges that Chang used information that he misappropriated from Shum to acquire a substantial amount of Zhongpin stock.

As indicated earlier, the SEC has asserted claims of insider trading against Prestige, Yang, and Chang and front-running against Yang. The defendants have moved for summary judgment. The Court will discuss the evidence further in the body

3

of this decision.

### Discussion

Summary judgment is appropriate no reasonable juror could return a verdict in favor of the non-movant based on the evidence that the parties have provided. *See, e.g., Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). The Court views the evidence in the light most favorable to the SEC, the non-moving party, and draws reasonable inferences in the SEC's favor. *Id.* at 821.

Because Yang and Prestige have moved for summary judgment together, the Court considers their motion separately from Chang's.

**1.      Insider trading claims against Yang and Prestige**

Under the classical theory of insider trading, a person is guilty of the offense if he trades in the securities of a corporation based on material, nonpublic information and either owes a fiduciary duty to the corporation's shareholders or knows (or should know) that the source of the information owes a fiduciary duty to the shareholders. *Dirks v. SEC*, 463 U.S. 646, 659-61 (1983). Under the misappropriation theory of insider trading, a person is guilty of the offense if he trades in a corporation's securities based on material, nonpublic information in violation of a fiduciary duty that he knows or should know that he owes to the source of the information. *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). Information is material if there is a substantial likelihood that a reasonable investor would consider it important to deciding how to invest. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

Yang and Prestige argue that the SEC has not offered evidence that would permit a reasonable juror to find that they engaged in insider trading. They contend that

the SEC has failed to offer evidence that Yang had material, nonpublic information when he bought shares of Zhongpin stock and call options on behalf of Prestige. They also contend that SEC has failed to offer evidence that Yang made such purchases for himself while in possession of material, nonpublic information. Yang also argues that the SEC has failed to offer evidence from which a reasonable jury could find that he had, and knew he had, information from someone that owed a fiduciary duty to Zhongpin shareholders.

The SEC has no direct evidence of insider trading, but that is not required. Circumstantial evidence can suffice under either the classical or misappropriation theory. *SEC v. Van Wagner*, No. 97 C 6826, 1999 WL 691836, at *3 (N.D. Ill. Aug. 25, 1999). *See also Michaels v. Michaels*, 767 F.2d 1185, 1199 (7th Cir. 1985). The SEC's evidence, along with reasonable inferences from that evidence, would permit a jury to find the following facts.

### a. Nature and timing of trades

Over a very short period just before Zhongpin announced that it was going private, Yang and Prestige invested nearly all of their investors' money in what a jury reasonably could find were, at least on the surface, highly risky trades in Zhongpin securities. As summarized earlier, between March 15 and 21, 2012, Prestige committed nearly all of its assets that it had only recently raised from investors, some $28 million altogether.

There is evidence that in marketing Prestige, Yang represented, or at least planned to represent, that it would acquire a diversified portfolio—exactly the opposite of what these trades reflected. Yang and Prestige contend that the SEC cannot show

5

that the marketing materials were actually disseminated to investors. A reasonable jury could find, however, that the statements in these materials, whether distributed or not, represented Yang's intention, from which he departed quite dramatically in putting nearly all of Prestige's eggs in a single basket. A jury reasonably could infer that Yang would not have committed virtually the entirety of his investors' money unless he knew the stock purchases represented a sure thing.

The trades made for the Yang / Fan account, though they involved far less money than Prestige's trades, were also highly risky, at least on the surface. Between March 14 and 26, over 2,500 Zhongpin call options and over $500,000 worth of Zhongpin stock was purchased for this account. The put options were out of the money when purchased, and they had a short expiration period. As such, they represented a high-stakes bet that the price of Zhongpin's stock would rise very quickly within a very short time. These trades represented virtually the entire value of the Yang / Fan account. Again, a reasonable jury could infer that Yang would not have made these trades unless he considered them to represent a sure thing—more specifically, unless he knew the price of the stock would be going up shortly.

The account was in the names of both Yang and Fan. There is evidence from which a reasonable jury could find that Yang directly participated in opening the account. Specifically, there is evidence that the account opening documents, which included Yang's photo identification, were sent to the brokerage firm from Yang's personal e-mail address.[1] The evidence also indicates that Yang, not Fan, funded the

---

[1] A reasonable jury could also find that the account opening documents, which were handwritten, were filled out and signed by two different people, not by Fan alone as Yang suggests.

account. In addition, there is considerable evidence that the Zhongpin trades in the account were placed by Yang, not by Fan (a school teacher, not an investment adviser like Yang). Finally, there is also evidence from which a reasonable jury could find that Yang has tried to cover up his involvement in this account and the trades made for it and that he has deceptively tried to distance himself from it, both prior to and during this litigation (the Court will discuss that evidence in more detail momentarily).

Yang has offered an explanation for his trading in Zhongpin stock that tends to exculpate him. In a nutshell, he says that he had conducted significant research on Zhongpin, there were publicly disclosed indications that it was a candidate to go private, and just before Prestige started buying, the price dropped enough that the stock represented a good buying opportunity. There is no question that a jury could believe Yang's explanation. But a reasonable jury likewise could reject the explanation. Among other things, there is enough evidence of deceptive statements and conduct by Yang to permit a reasonable jury to disbelieve Yang's version of the events and his rationale for purchasing the stock. In short, a reasonable jury could find that Yang and Prestige happened to make their facially highly risky trades in the days leading up to Zhongpin's announcement not as a result of good research or lucky timing, but because they knew they had a sure thing.

  **b. Inside information**

There is evidence from which a reasonable jury could find that Yang had, and knew he had, inside information about the impending going-private transaction by Zhongpin. Perhaps, as defendants contend, drawing this inference would be too big a leap from the timing and nature of the trades themselves. But that is not all the

evidence the SEC has offered.

Yang prepared marketing materials for Prestige stating that it had access to "exclusive networks," including "CEO networks" and "current employees," and he made specific reference to companies that were "proactively considering management level privatization." Pl.'s Ex. 24 at 6-7, 17. Again, whether or not these materials were distributed to investors or potential investors, a reasonable jury could find that these particular statements, penned by Yang, represented the actual state of affairs, a near-admission of possession of inside information from persons with a fiduciary duty to shareholders. In addition, and along these same lines, there is admissible evidence that indicates that during a February 2012 trip to China, Yang visited Zhongpin's headquarters and met with the company's directors. This, taken with Yang's representation about access to inside information (as well as the high-stakes bets Yang made, as discussed in the previous section), is evidence that a reasonable jury could find reflected that he had a source inside Zhongpin about the company's plan to go private.[2]

In addition, during the relevant time, Yang had on his computer at Baron Capital a document from an investment bank, HSBC, that a jury reasonably could find described a proposal for a management buyout of Zhongpin. The proposal was marked

---

[2] Defendants argue that information about the possibility of Zhongpin going private was already disclosed, but that information is limited to an earlier statement by Zhongpin's CEO, in response to a question about whether it intended to go private, that the company would disclose any such decision according to law. That revealed nothing about Zhongpin's intentions, much less in the near future. The market had no significant reaction to this statement—in sharp contrast to its reaction to the company's March 2012 announcement of an actual plan to go private. The earlier suggestion that going private was a possibility does not render immaterial the later, more pointed evidence that a jury reasonably could infer Yang had.

"HIGHLY RESTRICTED" on each page, referred to the proposed buyout by a code name, and contained a disclaimer that the document "is not for public circulation, must not be copied, transferred or the contents disclosed to any third party." Pl.'s Ex. 6. Though it is unclear whether the proposal was commissioned by or given to Zhongpin itself, there is evidence, in the form of an affidavit by an HSBC managing director, that it was prepared for a client with whom or which HSBC was discussing a management buyout of the company, including steps that could be taken to effectuate such a transaction. A logical inference would be that the client or clients included Zhongpin management representatives, people with a fiduciary duty to shareholders. A reasonable jury could find the nature of this proposal and the existence of a fiduciary duty would have been obvious to Yang. See SEC v. Cherif, 933 F.2d 403, 412 (7th Cir. 1991) (treating the attribution of code names to parties in certain transactions as evidence of the nonpublic nature of the information relating to those transactions).

When Yang was terminated from his job at Baron Capital in March 2012, there is evidence that he attempted to delete the HSBC proposal from his computer in a way that would have prevented its discovery and eliminated any indication it had been there in the first place. Defendants argue that this suggests nothing more than an effort to keep a terminating employer from getting information that Yang considered personal. Though a jury might agree with this, it could also reasonably infer from the attempted concealment awareness of the significance and confidential nature of the document.

Defendants contend that the HSBC proposal for Zhongpin was available and obtained from a public source. The evidence tending to support that proposition, however, is debatable. In addition, the previously-mentioned HSBC managing director

9

stated in his affidavit that the company maintained the proposal's confidentiality. And a reasonable jury could find that if the proposal were the relatively innocuous publicly available document that defendants contend, there would have been no reason for Yang to go to the lengths he arguably did to prevent its discovery on his work computer.

    c.    **Deceptive conduct by Yang[3]**

There is evidence of deceptive conduct by Yang to attempt to cover his tracks. The account opening documents for the Yang / Fan account in which Zhongpin stock and options were traded falsely described Yang as an accountant with a company called Guangzhou Goldstar Retail and as residing in Guangzhou and said that he was not an associated person of a broker, which is, in fact, what he was. As indicated earlier, the completed form was sent to the brokerage firm from Yang's personal e-mail address, and there is plenty of evidence from which a jury reasonably could infer that he opened the account.

In addition, a jury reasonably could find that Yang not only knew about those trades but was directly involved in making them: the purchase orders for the trades were made from the same IP address as e-mails that were sent contemporaneously from Yang's personal e-mail account. A jury reasonably could conclude that the trades were anything but the coincidence that he apparently contends they were.

Yang has denied that he completed the form and has claimed that Fan filled it out and sent it in. He has also denied having anything to do with the trades conducted in the account. A jury could, however, reasonably disbelieve these contentions and

---

[3] The Court has omitted (as unnecessary) any discussion of the so-called "Robert Susman" e-mail evidence offered by the SEC, but that should not be taken as an indication that this evidence is in some way deficient or inadmissible.

10

conclude that Yang lied about his background, his involvement in opening the account, and his participation in the trades made in the account. A jury that so found could take Yang's false exculpatory statements as further evidence supporting the SEC's claims.

In addition, there is evidence tending to show that Yang concealed from his employer, based Baron Capital, the fact that he was violating its policies barring trading in the stock of public companies, barring personal trading without preclearance, and requiring disclosure of brokerage accounts. Defendants argue that this is not evidence of insider trading. It certainly is not direct evidence of that. But it is further evidence of deception by Yang regarding his trading activity, from which a jury reasonably could infer consciousness of guilt.

Finally, there is the matter of the allegedly false Schedule 13D submitted by Prestige. Federal securities law requires anyone who acquires more than five percent of a class of common stock to file a Schedule 13D with the SEC. The form requires disclosure of the preparer's identity, the purpose of the acquisition, the number of shares acquired, and any of the preparer's transactions in that stock within the past two months. On April 2, 2012, Prestige filed a Schedule 13D disclosing its acquisition of Zhongpin stock, and there is evidence that Yang was involved in the form's preparation. Despite the acquisition of stock for the Yang / Fan account, the Schedule 13D stated that none of Prestige's directors, including Yang, had effected any transactions in Zhongpin common stock in the past two months. Defendants characterize this as evidence that Yang was not, in fact, involved in the trading in the Yang / Fan account. But accepting that argument would require the Court to draw inferences from the evidence in defendants' favor, which is not how inferences are drawn when a court

considers a motion for summary judgment.[4]  A reasonable jury could find the Schedule 13D to be evidence of a cover-up.

### d. Conclusions

The Court has, by necessity, discussed each item of evidence separately.  But determining whether there is evidence sufficient to permit a reasonable jury to find in the SEC's favor, the Court must consider the evidence as a whole.  *Cf. Trejo v. Hulick*, 380 F.3d 1031, 1032 (7th Cir. 2004) (analyzing sufficiency of evidence in a state criminal case; "a number of weak proofs can add up to a strong proof.").  In addition, the law is clear that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The evidence reflects that Yang made very large and (facially at least) highly risky trades that were timed just right.  Despite his apparent intention to create a diversified portfolio for Prestige, he bet virtually the entirety of his investors' money on a single stock.  And his personal trades in Zhongpin call options represented a high-stakes bet that the price of Zhongpin stock was going to go up by quite a bit, quickly.  A jury would not be required to believe that it was a coincidence that all of this worked out for Prestige and Yang, or (as the Court has indicated) that the trades were the result of good, and legal, research.

---

[4]  The Court has the same view of defendants' contentions that those who engage in illegal insider trading do not disclose their trades at all, do not try to keep acquiring stock after the inside information becomes public, etc.  These might be good arguments to make to a jury, but in the present context, they amount to an argument that the Court should view the evidence in the light most favorable to the parties who have moved for summary judgment.  That, of course, is not the correct standard.

Rather, the evidence of the nature and timing of the trades, along with the traces Yang left (despite efforts to the contrary to erase them) of possession of inside information, would permit a reasonable jury to find that Yang possessed, and knew he possessed, material nonpublic information from persons who owed a fiduciary duty to Zhongpin's shareholders. *See, e.g., SEC v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007) (drawing an inference of insider trading from circumstantial evidence); *Van Wagner*, 1999 WL 691836, at *3-4 (defendant's access to material and nonpublic information, coupled with the suspicious trading of his family and friends, created an inference of insider trading preventing summary judgment). To be sure, there is no direct evidence that any such person, or any particular person, fed inside information to Yang. But the law does not require the SEC to have direct evidence on this or any other point. It is sufficient that there is circumstantial or inferential evidence from which a reasonable jury could make such a finding. There is, as the Court has discussed.

The Court acknowledges Yang and Prestige's arguments, made in rather strong terms, that these are not reasonable inferences from the evidence, and that the reasonable inferences all cut in defendants' favor (or at least not in the SEC's favor). But a plaintiff is not required to show that the inferences it seeks to draw from the evidence are more likely than those that defendants seek to draw. Rather, the plaintiff need show only that the inferences it seeks are reasonable. In this case, they are. That is all that is required. "It is not for [the court] to choose among inferences . . . and determine which inference is most likely." *Broich v. Incorporated Vill. of Southampton*, 462 F. App'x 39, 44 (2d Cir. 2012) (employment discrimination case). "A justifiable inference is not necessarily the most likely inference or the most persuasive inference.

Rather, an inference as to another material fact may be drawn in favor of the nonmoving party . . . if it is rational or reasonable." *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (internal quotation marks omitted).

For the reasons the Court has described, Yang and Prestige are not entitled to summary judgment on the SEC's insider trading claims.

## 2.  Shareholder reporting and front-running

The SEC also alleges that Yang engaged in illegal "front-running," trying to profit personally by secretly authorizing personal trades in anticipation of much larger trades that he knew he would be authorizing on behalf of Prestige. The Supreme Court has held that the Advisers Act prohibits such behavior. *See SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963). In that case, the Supreme Court stated that "[a]n adviser who . . . secretly trades on the market effect of his own recommendation may be motivated—consciously or unconsciously—to recommend a given security not because of its potential for long-run price increase (which would profit the client), but because of its potential for short-run price increase in response to anticipated activity from the recommendation (which would profit the adviser)." *Id.* at 196.

Yang has moved for summary judgment on the front-running claim. He denies that he personally traded in Zhongpin securities. Based on the evidence already discussed, the Court concludes that a reasonable jury could conclude that Yang purchased Zhongpin stock and call options on March 14, 2012, one day before he bought thousands of shares of Zhongpin stock for Prestige. The Court therefore denies Yang and Prestige's motion for summary judgment on the SEC's shareholder reporting and front-running claims.

14

### 3. Insider trading charge against Chang

The SEC alleges that Chang engaged in insider trading, relying on the misappropriation theory described earlier. Chang argues that no reasonable jury could find that the information he gleaned from Shum was material, that he owed her a fiduciary duty, or that he acted with scienter.

The Court first addresses the issue of materiality. Information is material if a reasonable person would consider it important in deciding whether to invest. *See Basic, Inc.*, 485 U.S. at 231-32. As noted earlier, Shum, with whom Chang was living at the time, conducted the trades that Prestige made in Zhongpin stock. On March 14, 2012, Chang found in their apartment a document containing Zhongpin's ticker symbol, some percentages, and corresponding numbers. That day, after visiting the Yahoo Finance website, Chang bought 900 shares of Zhongpin stock. On March 16, Shum was out of the country and having trouble logging into her personal computer, so she asked Chang to do so for her, providing him her user name and password. While logged in, Chang observed that Prestige had acquired additional shares of Zhongpin stock. On March 19, Chang looked over Shum's shoulder and saw that she was buying even more shares of Zhongpin stock for Prestige. Chang then bought more shares of Zhongpin stock and call options for additional shares, which were set to expire within ten days. The jury could find that Chang had information regarding an experienced trader's consistent and sizable purchases of a single company's stocks and call options and that a reasonable investor would find such information important in deciding how to invest.

The Court addresses next the issue of breach of fiduciary duty. Chang stresses that he and Shum were not married at the time of the allegations and argues that they

lacked a relationship of trust and confidence pertaining to financial and employment matters. A fiduciary duty can exist, however, "[w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences . . . ." 17 C.F.R. § 240.10b5-2(b)(2). Chang and Shum were not married, but that is not determinative. They were, at the time, in what a reasonable jury could find was a very close personal relationship that had lasted six-years, during which they shared all sorts of information, including information relating to their careers. Shum's casual disclosure to Chang of her login name and password, which provided access to her trading history, is perhaps the best evidence of the trust and confidence she shared with him. And despite their relationship and living arrangements, Chang refrained from telling Shum that he had observed her trade in Zhongpin securities or done so himself after each and every one of his purchases. In fact, Chang testified, Shum was shocked to hear that he had used information about her trading for Yang to make personal trades. The Court concludes that a reasonable jury could find that Chang owed Shum a fiduciary duty at the time and that he knew this.

Scienter encompasses an "intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686 (1980). A person acts with scienter when he knew or should have known that the information on which he traded was misappropriated. *See, e.g., SEC v. Michel*, 521 F. Supp. 2d 795, 823 (N.D. Ill. 2007). The SEC has offered evidence from which a jury could find Chang realized that he had misappropriated information from Shum and should not have used it to trade.

For these reasons, Chang is not entitled to summary judgment.

**Conclusion**

For the reasons stated above, this Court denies defendants' motion for summary judgment [docket nos. 159 and 163]. The case is set for a status hearing on November 19, 2013 at 9:30 a.m. for the purpose of setting a trial date.

```
                                    _____
                                           MATTHEW F. KENNELLY
                                        United States District Judge
```

Date: November 14, 2013