IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : Case No. 12-cv-02473 |
| | : Hon. Matthew F. Kennelly |
| SIMING YANG, PRESTIGE TRADE INVESTMENTS LIMITED, CAIYIN FAN SHUI CHONG (ERIC) CHANG | : |
| Defendants. | : |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR REMEDIES AND FINAL JUDGMENT AGAINST DEFENDANT SIMING YANG**

Between March 14 and 15, 2012, 50,000 shares of Zhongpin, Inc. and more than 1,900 call option contracts of Zhongpin stock were purchased in the Yang/Fan Sogotrade account. (Trial Tr. Jan. 8, 2014, pp. 285, 290-91, 311.) At trial, defendant Siming Yang took the stand and disclaimed knowledge of, or responsibility for, such trading. (*Id*. at 872-79.) He testified that the account, and the funds in it that were used to purchase Zhongpin securities, belonged not to him but to his co-defendant, Caiyin Fan. (*Id*. at 872-79) The jury didn't buy it, as evidenced by their verdict finding Yang liable for two types of securities fraud: (1) front running and (2) making material misrepresentations in disclosures to the SEC. In connection with the latter fraud count, the jury also found Yang liable for violating the disclosure requirements of Section 13(d) and Rule 13d-1 of the Securities Exchange Act of 1934 ("Exchange Act").

After Yang traded for his personal account, he then caused his hedge fund, Prestige Trade Investments Limited ("Prestige") to buy millions of shares of Zhongpin stock. (Trial Tr. Jan. 6, 2014 at pp. 306-07.) As SEC accountant John Kustusch testified at trial, Prestige's trades represented 40.7% of the total market trading volume in Zhongpin stock from March 15 through March 23, 2012. (*Id.*) Predictably, Prestige's ravenous appetite for Zhongpin stock had an unmistakable impact on the price. Over the course of 7 trading days – between March 15, when Prestige began its buying spree, until March 23, after it had finished buying 3 million shares of Zhongpin stock – the stock price spiked 15.5%. (Ex. 1, Kustusch Declaration ¶ 6.) Critically for present purposes, this run-up in the price of Zhongpin stock – the focus of the disgorgement analysis discussed below – all **preceded** the March 27 announcement of the proposed buyout by Zhongpin's CEO. (Trial Tr. Jan. 6, 2014 at pp. 301-07.) And because Yang bought for himself before he bought for Prestige, he was the real beneficiary of that pre-announcement spike – to the tune of about $150,000. (*See* Ex. 1, Kustusch Declaration ¶ 10.)

Prestige's ownership interest in Zhongpin stock soon exceeded 5%, which triggered a disclosure obligation under Section 13(d) and Rule 13d-1 of the Securities Exchange Act of 1934 ("Exchange Act"). In Prestige's resulting Schedule 13D filings with the SEC, Yang – while acknowledging his status as a reporting person – nonetheless failed to disclose his front-running in Zhongpin securities. (*See* Pl.'s Trial Exhibit 103, Schedule 13D Item 5(c).) Instead, he lied, misrepresenting that he had not bought or sold Zhongpin stock during the previous 60 days. (*Id.*) The jury found that he made that misrepresentation either knowingly or recklessly.

Based upon both the jury's finding that Yang committed securities fraud and the supporting evidence established at trial, in this motion the SEC seeks: (a) a permanent injunction enjoining Yang from continued violations of those securities laws for which the jury found him liable (Section I below); (b) disgorgement of $151,432 (Section II); (c) prejudgment interest of $8,911.59 (Section II); and (d) civil monetary penalties of $750,000 (Section III).

I.  **THE COURT SHOULD PERMANENTLY ENJOIN YANG FROM VIOLATING THE SECURITIES LAWS OF WHICH THE JURY FOUND HIM LIABLE.**

Given the jury's verdict finding that Yang violated the antifraud provisions of the Exchange Act and the Investment Advisers Act of 1940 ("Advisers Act") – as well as the reporting requirements of Exchange Act Section 13(d) – an order permanently enjoining him from violating such laws is appropriate once the SEC demonstrates a "a reasonable likelihood of future violations." *SEC v. Michel*, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007) (quoting *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)); 15 U.S.C. §78u(d)(1); 15 U.S.C. §80b-9(d).[1]

By committing securities fraud and violating Section 13(d) and Rule 13d-1 of the Exchange Act, Yang "caused injury to other market participants who sold stock without knowledge of [his] holdings." *SEC v. First City Financial Corp, Ltd.*, 890 F.2d 1215, 1230

---

[1] Courts adjudicating a defendant's likelihood of future violations have considered such factors as (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Holschuh*, 694 F.2d at 144. The Commission need not establish the existence of any one factor, however, in order to demonstrate a likelihood of future violations. *SEC v. Church Extension, Inc.*, 429 F. Supp. 2d 1045, 1048 (S.D. Ind. 2005).

(D.C. Cir. 1989). In this regard, "Section 13(d) is not a mere 'technical' reporting provision; it is, rather, the 'pivot' of a regulatory scheme that may represent the only way that corporations, their shareholders and others can adequately evaluate . . . the possible effects of a change in substantial shareholdings." *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (quoting *First City*, 890 F.2d at 1230 (D.C. Cir. 1989)). Section 13(d) is thus "a crucial requirement in the congressional scheme, and a violator . . . improperly benefits by purchasing stocks at an artificially low price because of a breach of the duty Congress imposed to disclose his investment position." *First City*, 890 F.2d at 1230. That a securities professional intentionally ***lied*** to the SEC in his public disclosures cuts to the core of the regulatory scheme embodied in the federal securities laws.

The jury also found Yang liable for front-running, which in turn required a finding that he "knowingly purchased stock or options of Zhongpin for his personal account before purchasing Zhongpin stock for Prestige and that Mr. Yang did so to obtain a personal financial benefit without disclosing to Prestige the purchases and the conflict of interest created by the purchases." (Jury Instructions, ECF No. 243, pp. 11-12.)

Beyond the severity of these violations is the ***manner*** in which Yang engaged in such fraud. In furtherance of his misdeeds he engaged in rampant deception, lying to Sogotrade and Interactive Brokers to open the accounts that he used to trade; lying to Baron Capital, his employer, to hide his trading activity; and lying to the SEC (and the investing public by extension) in the two false Schedule 13Ds he caused to be filed. In the Schedule 13D filings Yang not only failed to disclose his personal Zhongpin trades; he affirmatively represented that he did not hold any other Zhongpin securities. (*See* Pl.'s Trial Exhibit 103, Schedule 13D Item 5(c).) Moreover, the jury found that Yang either knew or at the very least was

reckless in not knowing of the false information in the public filings. (Jury Instructions, ECF No. 243, pp. 13-14.)

It is precisely "this type of intentional, knowing conduct, as opposed to more minor, technical violations, for which injunctions are reserved." *SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004); *see also SEC v. Payne*, No. 00-CV-1265, 2011 WL 693630, at *3 (S.D. Ind. Feb. 18, 2011) ("Although no single factor is determinative the degree of scienter bears heavily on the decision to issue an injunction.") (internal quotation marks omitted)

As a 37 year-old securities professional with an indisputable passion for investing, Yang will have ample future opportunities to break the securities laws. *SEC v. Olins*, 762 F. Supp. 2d. 1193,1196 (N.D. Cal. 2011) (the defendant "had an extensive history of securities trading" and was "in a position whereby he will be faced with decisions implicating the securities laws."); *SEC v. Savino*, No 01-CV-2438, 2006 WL 375074, at *17 (S.D.N.Y. 2006) ("Due to [the defendant's] current occupation as a licensed securities professional . . . [he]is in a position to engage in further fraudulent conduct.")

Yang's failure to recognize – let alone appreciate the gravity of – his misdeeds bespeaks his likelihood of future violations. Rather than owning-up to his securities laws violations, Yang has instead steadfastly denied any wrongdoing. (Trial Tr. Jan. 8, 2014, p. 872-79; Trial Tr. Jan. 9, 2014, pp. 902-04.) An unfortunate corollary to such continued denials is his concomitant inability to meaningfully or sincerely assure this Court that he won't engage in such misconduct ***going forward***. As the Seventh Circuit has recognized, "the criminal who in the teeth of the evidence insists that he is innocent . . . demonstrates by his obduracy the likelihood that he will repeat his crime." *See SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002). *See also SEC v. Abernathy,* 1:11–cv–00580, 2012 WL 7679270, at *5 (W.D.

Mich. Nov. 30, 2012) ("Defendants have never acknowledged the wrongful nature of their conduct, nor have they provided any assurances against future violations. The absence of such acknowledgments and assurances weighs in favor of a permanent injunction.").

Last—but by no means least—was Yang's lack of candor at trial. He testified under oath that he did not purchase Zhongpin securities in the Yang/Fan Sogotrade account. (Trial Tr. Jan. 8, 2014, pp. 877-78.) But, as the jury determined, the evidence established otherwise. Detective Balzanto established that the trading in that account occurred in all the places Yang was present at the time such trades were executed. Moreover, Yang himself admitted that he signed the Sogotrade account opening document, and that the forms were submitted to Sogotrade from his email address. (*Id.* at 793-95.) Despite Yang's concessions, he vehemently maintained that he had no control over the trades executed in the account. (*Id.* at 877-78.) The jury apparently found that Yang's testimony in this regard was not believable; its verdict reflected the jurors' unanimous assessment that it was **Yang** who was responsible for the trading in the Yang/Fan account.

Courts adjudicating remedies in SEC enforcement actions have found that such demonstrable lack of candor is among the factors that presage future violations. *See Holschuh*, 694 F.2d at 145 (the defendant lacked candor and offered inconsistent positions at various stages of the proceedings); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1478 (2d Cir. 1996)(the defendant's testimony was "belligerently evasive"); *SEC v. Gunn*, 3:08-CV-1013, 2010 WL 3359465, at * 6 (N.D. Tex. Aug. 25, 2010) ("[I]f a defendant is dishonest, exhibits a lack of candor, or offers inconsistent testimony during the course of the action, an injunction is more likely to be warranted.").

In the final analysis, both the jury's finding that Yang committed securities fraud and the supporting evidence elicited at trial reflect a high degree of likelihood of his future securities law violations. Accordingly, this Court should issue an order permanently enjoining Yang from violating the securities laws for which the jury found him liable.

## II. THE COURT SHOULD ORDER YANG TO DISGORGE HIS ILL-GOTTEN GAINS FROM HIS FRONT-RUNNING, WITH PREJUDGMENT INTEREST.

Yang should be required to disgorge the profits he made owing to his front-running. *SEC v. Jakubowski*, No. 94 C 4539, 1997 WL 598108, at *2 (N.D. Ill. Sept. 19, 1997); *SEC v. Randy*, 38 F. Supp. 2d 657, 674 (N.D. Ill. 1999). This Court enjoys broad authority to order such disgorgement. *Jakubowski*,1997 WL 598108, at *2. "The SEC is only required to show that the amount of disgorgement is a 'reasonable approximation' of the profits that the defendant reaped from his wrongful conduct." *Randy*, 38 F. Supp. 2d at 674. The burden then shifts to the defendant to demonstrate that the approximation is not accurate. *Id*. Throughout such burden shifting, however, "the risk of uncertainty [in calculating disgorgement] must generally fall on the defendants, whose illegal conduct created the uncertainty in the first instance." *SEC v. Antar*, 97 F. Supp. 2d 576, 578-79 (D.N.J. 2000); *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991), *aff'd*, 12 F.3d 214 (6th Cir. 1993) ("[A]ll doubts concerning the determination of disgorgements are to be resolved against the defrauding party") (internal quotation marks omitted).

Here, Yang's disgorgement amounts to $151,432, as established in the declaration of SEC accountant John Kustusch. (Ex. 1 ¶¶ 8-10). This sum constitutes a reasonable calculation of Yang's ill-gotten gains, as it reasonably approximates the profits he personally made buying and selling in Zhongpin securities during the relevant timeframe.

7

Yang's actual gains precisely traceable to his malfeasance might have been somewhat more or somewhat less than $150,000 depending upon various intervening market-moving events. Such events could have goosed Yang's profits above and beyond the impact of Prestige's purchases of the stock. Or such events could have hurt the price of Zhongpin securities, in which case Yang's front-running alone caused $150,000 in profits.

The SEC has not commissioned an expensive, time-consuming events study to analyze such variables. Nor is that a prerequisite for Court-ordered disgorgement of ill-gotten gains in an SEC enforcement action. And for good reason. As the Third Circuit noted in *SEC v. Teo,* such a requirement would contravene the well-established proposition that "in proving Section 13(d) and 10(b) violations, the Commission need not prove reliance, nor must it show that any investor lost money as a result of the violation." *SEC v. Teo*, --- F.3d ----, 2014 WL 503455, at *9 (3rd Cir. Feb. 10, 2014). This reality – together with the "economic and social policies" served by SEC enforcement actions – underlies the SEC's "reasonable approximation" standard for disgorgement. *Id. See also SEC v. First City Financial Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("If exact information were obtainable at negligible cost, we would not hesitate to impose upon the government a strict burden to produce that data to measure the precise amount of the ill-gotten gains. Unfortunately, we encounter imprecision and imperfect information. Despite sophisticated econometric modelling, predicting stock market responses to alternative variables is, as the district court found, at best speculative. Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task."); *SEC v. Sierra Brokerage Services, Inc.*, 608 F. Supp. 2d 923, 970 (S.D. Ohio 2009) ("Courts are not required to engage in counterfactual scenarios to speculate about how much a defendants' disclosure

violation inflated the market price of a security. . . . The SEC's calculation is . . . a reasonable approximation of the profits causally related to the Promoter Defendants' violations.") (citations omitted); *SEC v. Bilzerian,* 814 F. Supp. 116, 121 (D.D.C. 1993) ("In many cases, separating legal from illegal profit is difficult. This is due to the inherent difficulty in predicting stock price responses to alternative variables. That is, separating price appreciation due to illicit activities from price appreciation which would have otherwise occurred is nearly impossible.") (citations omitted).[2] Mr. Kustusch's straightforward calculation based on the price of Zhongpin securities during the relevant period constitutes a reasonable approximation of Yang's ill-gotten gains.

Yang should also pay **prejudgment interest** on the disgorged profits. The imposition of prejudgment interest "prevents a defendant from obtaining the benefits of what amounts to an interest free loan procured as a result of illegal activity." *Jakubowski*, 1997 WL 598108, at *2. Prejudgment interest is generally calculated according to the underpayment rate published by the Internal Revenue Service. *See, e.g. SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007). As of February 28, 2014, based on a disgorgement amount of $151,432, prejudgment interest amounted to $8,911.59. The methodology for this calculation is set forth in Paragraph 11 of the Kustusch Declaration. (Ex. 1 ¶ 11.)

---

[2] Of course, Yang is free to offer a causation analysis. But as made clear in *Teo,* he would face a high hurdle: "The Appellants also asserted that the Best Buy tender offer was the direct, intervening cause of their profits. However, it was the Appellants' burden to provide the District Court with evidence that the SEC's approximation of profits was unreasonable. This burden is not simply one of carrying the ball back across the fifty-yard line by presenting a merely plausible alternative explanation for the profit. Rather, the defendant must adduce—at a minimum—specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue, the market valuation of the stock at fixed points in time, and any other cause for the profits they assert were untainted by illegality. In so doing, they must account for the ambiguities, uncertainties and myriad market forces inherent to any analysis of fluctuations in stock pricing to credibly demonstrate the unreasonableness of the government's proposed disgorgement." *Teo*, 2014 WL 503455, at *13 (footnotes omitted).

### III. THE COURT SHOULD IMPOSE SUBSTANTIAL CIVIL PENALTIES AGAINST YANG.

Pursuant to Section 21(d)(3) of the Exchange Act and Section 209(e) of the Advisers Act, federal courts are authorized to impose monetary penalties for securities law violations. Civil penalties serve to protect investors and maintain the integrity of the nation's securities markets. *See* S. Rep. No. 101-337, 101st Cong., 2d Sess. 2 (1990). Standing alone, the disgorgement remedy "merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud." *Jakubowski*, 944 F. Supp. at 296 (quoting congressional legislative history regarding civil penalties provisions). By contrast, the imposition of civil penalties punishes the securities law violator while also deterring future violations. *Id*.

The Securities Act and the Advisers Act set forth three tiers for determining the appropriate civil penalty amounts:[3]

| TIER | MAXIMUM PENALTY IS THE HIGHER OF | ADDITIONAL REQUIREMENTS FOR APPLICATION OF 2ND AND 3RD TIERS |
|---|---|---|
| **FIRST TIER** | (1) $7,5000 for a natural person or $75,000 for any other person; or <br><br>(2) the gross amount of pecuniary gain to such defendant as a result of the violation. | n/a |

---

[3] The applicable penalty amounts are periodically adjusted for inflation. The penalty amounts set forth in this table apply to the timeframe when Yang's violations occurred, between March 3, 2009 and March 5, 2013. (*See* 17 C.F.R. §§201.1004 -201.1005 and, Table IV to Subpart E.)

| TIER | MAXIMUM PENALTY IS THE HIGHER OF | ADDITIONAL REQUIREMENTS FOR APPLICATION OF 2ND AND 3RD TIERS |
|---|---|---|
| **SECOND TIER** | (1) $75,000 for a natural person or $375,000 for any other person; or<br><br>(2) the gross amount of pecuniary gain to such defendant as a result of the violation. | "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." |
| **THIRD TIER** | (1) $150,000 for a natural person per violation or $725,000 for any other person; or<br><br>(2) the gross amount of pecuniary gain to such defendant as a result of the violation. | (a) "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and<br><br>(b) "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." |

Civil penalties may be imposed for "each violation" of the securities laws. As discussed below, in this case appropriate second tier and third tier penalties for each of Yang's violations amounts to $750,000.

The jury found that Yang's false 13D filings violated two free-standing statutory provisions: (1) the antifraud provision of the Exchange Act, Section 10(b); and (2) the disclosure requirements of Exchange Act Section 13(d). For each statute, there were two violations – one for each of the false Schedules 13D filed with the Commission. Therefore, for Yang's **false Schedules 13D**, the Commission seeks **a civil penalty of $300,000**, an amount equal to a second tier penalty for four violations.

Second tier penalties are appropriate for the false filing claims in light of the jury's finding that Yang "committed a fraud in connection with his filing of the Schedule 13D form." (*Id.*) This finding comfortably conforms to the malfeasance for a second tier penalty, that is, "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3).

For Yang's **front-running**, the Commission seeks **civil penalties equal to $450,000**, an amount equal to a third tier penalty for three violations. Yang's front running was comprised of myriad trades, but the SEC has not sought to construe each such purchase as its own "violation" for penalties purposes. Instead, from these many trades three broad categories have been identified for purposes of quantifying appropriate civil penalties for Yang's front-running: (1) Yang's purchase of stock on March 14; (2) Yang's purchase of call options on March 14; and (3) Yang's purchase of call options on March 15.

Third tier penalties are appropriate for Yang's front-running because imbedded within the jury verdict was a finding that he either "(a) employed a device, scheme, or artifice to defraud Prestige or its clients, or (b) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon Prestige or its clients." (Jury Instructions, ECF No. 243, pp. 10-11.) This finding reflects the requisite "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" for third tier penalties. 15 U.S.C. § 80b-9(e). The jury verdict also satisfies the other requirement for third tier penalties, that is, that "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* The jury necessarily found that Yang knowingly purchased stock in order to "obtain a personal financial benefit

without disclosing to Prestige the purchases and the conflict of interest created by the purchases." (Jury Instructions, ECF No. 243, pp. 11-12.)

The Court enjoys broad discretion to assess civil penalties. *See* 15 U.S.C. § 78u(d)(3). To determine appropriate penalties, a court may consider the need for deterrence; defendant's acceptance of responsibility; defendant's net worth; the flagrancy of his violation; and other sanctions already imposed for the same conduct. *SEC v. Michel*, 06 C 3166, 2008 WL 516369 (N.D. Ill. Feb. 22, 2008). These factors weigh decidedly in favor of significant penalties – particularly considering the flagrance and degree of Yang's malfeasance. The jury found that Yang, a securities professional, engaged in widespread deception for the express purpose of breaking the securities laws. To state the obvious, securities professionals must be deterred from dishonesty in the purchase and sale of securities.

This is all the more true for Yang given his lack of contrition for, or even so much as his simple acknowledgment of, his misconduct. There can be no doubt that going forward, Yang will continue focusing his undivided attention on the buying and selling of securities. Given this certainty, the Court's message to Yang in the wake of the jury verdict must be clear and unmistakable. Such a message includes as a necessary ingredient civil penalties well in excess of Yang's ill-gotten gains.

## CONCLUSION

For these reasons, the Court should order (a) a permanent injunction corresponding with the securities law violations that were the subject of the jury's finding of liability; (b) disgorgement of $151,432; (c) prejudgment interest of $8,911.59; and (d) civil monetary penalties of $750,000 – $450,000 for front-running (a third tier penalty for each of three violations) and $300,000 from the false Schedule 13D filings (a second tier penalty for each of four violations).

Dated: February 24, 2014

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/ Jonathan S. Polish
Jonathan S. Polish
U.S. Securities & Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Phone: (312) 353-7390



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>SIMING YANG, PRESTIGE TRADE INVESTMENTS LIMITED, CAIYIN FAN, and SHUI CHONG (ERIC) CHANG,<br><br>      Defendants. | Case No. 12-cv-02473<br><br>Hon. Matthew F. Kennelly |

## DECLARATION OF JOHN E. KUSTUSCH

I, John E. Kustusch, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct and further that this declaration is made based on my personal knowledge and that I am competent to testify as to the matters stated herein.

1. I am employed as a staff accountant by the United States Securities and Exchange Commission (the "Commission" or "SEC") in its Chicago Regional Office, located at 175 West Jackson Boulevard, Suite 900, Chicago, Illinois, 60604. I have been employed with the Commission since August 2000. My official duties with the Commission include participating in fact-finding inquiries and investigations to determine whether the federal securities laws have been, are presently being, or are about to be violated, and assisting in the Commission's litigation of enforcement actions.

2. Before joining the Commission, I was a Senior Director in the Market Regulation Department of the Chicago Mercantile Exchange, where I worked for nineteen years. Before then, I was employed for five years as an investigator with the U.S. Commodity Futures Trading Commission (the "CFTC"). In that capacity, I participated in fact-finding inquiries and investigations of potential violations of the federal commodities laws, and assisted in the CFTC's litigation of commodities laws violations.

3. As part of my duties with the SEC, I was assigned to participate in an investigation related to trading in the securities of Zhongpin, Inc. ("Zhongpin") by Defendants Siming Yang ("Yang") and Prestige Trade Investments Limited ("Prestige"). Zhongpin's common stock was traded on the NASDAQ stock exchange under the symbol "HOGS" and Zhongpin equity options traded on the Chicago Board Options Exchange and other options markets. Since being assigned to the investigation, I have undertaken various tasks to assist the Commission attorneys conducting the investigation and litigation, including reviewing and analyzing records and other information related to securities trading.

4. In connection with this declaration I have reviewed documents produced by Yang, Prestige and others, including brokerage firms. I have prepared summaries based on those documents. The information contained in those summaries is a fair, accurate, and complete summary of the documents and information I have reviewed. The underlying documents for my summaries are voluminous and, therefore, have not been submitted as exhibits to this declaration. However, any or all of the underlying records will be made available to the Court for its inspection upon request.

5. Based on my review of documents and information described in paragraph 4 above, I have prepared the summary tables included in this declaration. In those tables, the

entries in the "Realized or Unrealized Gain / (Loss)" column represent either a "realized" gain or loss, or an "unrealized" gain or loss, depending upon whether the security was sold before the close of trading on the date indicated in the table. A realized gain or loss is the difference between the cost of acquiring the security and the net proceeds from its sale. An unrealized gain or loss is the difference between the cost of acquiring the security and the value of that security compared to a particular market price for that security, typically the closing price on a specific date. In this case, I was asked by SEC trial counsel to calculate unrealized gain or loss marked to the March 23, 2012 closing prices in Zhongpin stock and options.

## Prestige's Trading

6. The records produced for Prestige's brokerage account at Interactive Brokers show that during March 15 through March 23, 2012 Prestige bought 3,190,393 shares of Zhongpin stock. During that time, Zhongpin's stock price rose 15.5% from a closing price of $8.31 on March 15 to a closing price of $9.60 on March 23, 2012.

7. Prestige's trading in Zhongpin stock is summarized in the table below:

### *Prestige Stock Trading*:

| Trade Date | Bought / Sold | Quantity | Stock | Price(s) | Cost |
| --- | --- | --- | --- | --- | --- |
| 3/15/2012 | Bought | 600,000 | HOGS | 8.29 - 8.42 | (5,026,106.64) |
| 3/16/2012 | Bought | 400,000 | HOGS | 8.28 - 8.33 | (3,328,548.92) |
| 3/19/2012 | Bought | 138,050 | HOGS | 8.19 - 8.37 | (1,150,809.99) |
| 3/20/2012 | Bought | 243,300 | HOGS | 8.37-8.53 | (2,060,146.22) |
| 3/21/2012 | Bought | 266,237 | HOGS | 8.51 - 8.71 | (2,285,153.23) |
| 3/22/2012 | Bought | 608,425 | HOGS | 8.59 - 9.23 | (5,473,687.16) |
| 3/23/2012 | Bought | 934,381 | HOGS | 9.07 - 9.64 | (8,799,124.53) |
|  | Totals: | 3,190,393 |  |  | (28,123,576.69) |

## Yang's Trading

8. Trading records produced for Yang's joint brokerage account with Caiyin Fan ("Fan") at Wang Investments show that during March 14 through March 16, 2012, Yang bought 2,878 and sold 307 Zhongpin call options for a net purchase of 2,571 call options.

9. The Wang Investments records also show that during March 14 through March 23, 2012, Yang bought 50,000 and sold 5,000 shares of Zhongpin stock for a net purchase of 45,000 shares.

10. As of the close of the market on March 23, 2012, Yang and Fan had realized losses and unrealized gains totaling $106,339 on their Zhongpin calls and $45,093 on their Zhongpin stock, for a total gain of $151,432. The gains and losses are summarized in the tables below:

### *Yang's and Fan's Options Trades:*

| Trade Date | Bought / Sold | Quantity | HOGS Call Option (2012) | Price(s) | (Cost) or Proceeds | Mar 23 Closing Price | MTM Value @ Mar 23 Close | Realized or Unrealized Gain / (Loss) |
|---|---|---|---|---|---|---|---|---|
| 03/14/12 | Bought | 307 | Apr 10.00 | 0.2 | (6,303.60) | | | |
| 03/14/12 | Bought | 1,493 | Apr 10.00 | 0.2 - 0.3 | (39,655.54) | 0.50 | 74,650.00 | 34,994.46 |
| 03/14/12 | Bought | 178 | Jun 10.00 | 0.5 | (8,998.36) | 1.05 | 18,690.00 | 9,691.64 |
| 03/15/12 | Bought | 400 | Apr 7.50 | 1.35 | (54,214.79) | 1.95 | 78,000.00 | 23,785.21 |
| 03/15/12 | Bought | 500 | Jun 7.50 | 1.55 | (77,767.26) | 2.35 | 117,500.00 | 39,732.74 |
| 03/16/12 | Sold | (307) | Apr 10.00 | 0.15 | 4,438.87 | | | (1,864.73) |
| | | 2,571 | | | (182,500.68) | | 288,840.00 | 106,339.32 |

4

### Yang's and Fan's Stock Trades:

| Trade Date | Bought / Sold | Quantity | Stock | Price(s) | (Cost) or Proceeds | Mar 23 Closing Price | MTM Value @ Mar 23 Close | Realized or Unrealized Gain / (Loss) |
|---|---|---|---|---|---|---|---|---|
| 03/14/12 | Bought | 3,000 | HOGS | 8.6 | (25,801.80) | | | |
| 03/14/12 | Bought | 2,000 | HOGS | 8.6 | (17,201.20) | | | |
| 03/14/12 | Bought | 45,000 | HOGS | 8.52 - 8.60 | (385,824.00) | 9.60 | 432,000.00 | 46,176.00 |
| 03/16/12 | Sold | (3,000) | HOGS | 8.3002 | 24,897.14 | | | (904.66) |
| 03/21/12 | Sold | (2,000) | HOGS | 8.513 | 17,022.69 | | | (178.51) |
| | | 45,000 | | | (386,907.17) | | 432,000.00 | 45,092.83 |

11. At the request of the Commission's attorneys, I also calculated prejudgment interest on the $151,432 gain for the period April 1, 2012 to February 28, 2014. In calculating the interest, I applied the rate used by the Internal Revenue Service for the computation of interest on underpayment of taxes. Based on this calculation, the prejudgment interest is $8,911.59. The total gain plus the prejudgment interest thereon is therefore $160,343.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2014
Chicago, Illinois

John E. Kustusch