**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 12 C 2473** |
| **SIMING YANG, et al.,** | ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After a six-day trial, a jury found in favor of defendant Siming Yang on the SEC's claim of insider trading but in favor of the SEC against Yang on its claims of "front running" and filing false Schedule 13D forms with the SEC. The Court later denied Yang's motion for judgment as a matter of law or a new trial on the latter claims. In this order, the Court determines the appropriate remedies and the nature of the appropriate final judgment. This order assumes familiarity with the background of the case. *See SEC v. Yang*, No. 12 C 2473, 2014 WL 1303457 (N.D. Ill. Mar. 30, 2014) (decision denying Yang's post-trial motions); *SEC v. Yang*, ___ F. Supp. 2d ___, 2013 WL 6049074 (N.D. Ill. Nov. 14, 2013) (decision denying Yang's motion for summary judgment).

## 1. Permanent injunction

A permanent injunction is appropriate if the SEC shows a reasonable likelihood of future violations by the defendant. *See SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir.

1982).  In making this determination, a court considers all of the circumstances involving

the defendant and the violations, including factors such as –

- the gravity of harm caused by the violations;

- the extent of the defendant's participation and his degree of scienter;

- whether the violations were isolated or recurrent;

- whether the defendant's usual business activities might involve him in such transactions in the future;

- the defendant's recognition of his culpability; and

- the sincerity of his assurances against future violations.

*See id.*

There was no significant harm to investors from Yang's violations.  In the scheme

of things, the Schedule 13D violations (which involved Yang's nondisclosure of his own

stock purchases) were not terribly significant to the investing public given that Yang

accurately disclosed on the forms the purchases of vastly greater amounts of stock by

Prestige.  And it is unlikely that Prestige experienced any quantifiable harm from Yang's

front-running.  The market was harmed in the sense that Yang traded based on

information (regarding Prestige's impending large purchases) to which only he had

access, but the degree of harm was not great due to Yang's limited purchases.

Yang fought and continues to fight the SEC's claims, but in the Court's view, he

should not be penalized for this.  *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229

(D.C. Cir. 1989).  In this regard, it is important to keep in mind that Yang prevailed on

the SEC's insider trading claim, which was the centerpiece of the case.  That claim was

the primary focus of the dispute prior to and during the trial.

On the other hand, Yang was shown to have the level of scienter required to prove the violations, and he was the sole participant (at least the sole direct participant). These factors tilt in favor of imposition of an injunction.

The SEC also contends, and the Court agrees, that Yang has engaged in further misconduct following the conclusion of the trial. First of all, as the Court previously found, Yang participated in a transaction with Prestige that resulted in the denial of compensation that he had coming to him, in a way that ran afoul of the stipulated asset freeze order that the Court entered. This had both the purpose and anticipated effect of making it difficult if not impossible for the SEC to collect any disgorgement or civil penalties that the Court ordered. The Court took steps necessary to prevent Yang and Prestige from effectuating this transaction, but what is significant here is the intent to evade legal sanctions and the rather obvious implication this has regarding the likelihood of future violations.

Second, the SEC has shown that Yang engaged in further trading via a separate account (at Fidelity) in May 2013, while the litigation was under way, that he did not disclose in responses or amended responses to interrogatories from the SEC that sought disclosure of his brokerage accounts. Yang says that he opened this account and conducted the trading after the close of discovery, but the applicable rules quite clearly required him to supplement his interrogatory responses when they became incorrect, and the fact that discovery had closed did not absolve him of that responsibility. *See* Fed. R. Civ. P. 26(e)(1). The trading also likely violated the stipulated asset freeze order, which (contrary to Yang's suggestion) was not limited to the accounts in which he had conducted the Prestige trading. Yang also made a profit

3

trading in the Fidelity account, purchasing 23,000 shares of a company just before it announced it was going private and selling the shares at a significantly higher price just a few days later, just after the company made the announcement. *See* Pl.'s Reply, Exs. C & D. This suggests, if nothing else, an ongoing intention to trade on U.S. markets, despite Yang's protestations to the contrary.

Were it not for these post-lawsuit incidents, the Court might be inclined not to impose an injunction against Yang; his violations of the securities laws were non-recurrent and were limited to a brief period of time in 2013. But these incidents and the other injunction-favoring factors noted above indicate a reasonable likelihood of future violations, making an injunction appropriate.

### 2. Disgorgement

The Court declines to order disgorgement in this case. The purpose of disgorgement is to prevent unjust enrichment. *See, e.g., SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 95, 102 (2d Cir. 1978); *SEC v. McDonald*, 699 F.2d 47, 54 (1st Cir. 1983). Yang was not, in fact, enriched by the trading that constituted front-running. He purchased Zhongpin options but then let them expire; he bought some Zhongpin stock and sold it at a loss; and he did not sell even more Zhongpin stock that he had purchased. *See* Pl.'s Motion for Remedies, Ex. 1 (Kustusch Affid.) ¶ 10.

The SEC says, and Yang does not dispute, that if one calculates the value of the stock and options as of a relevant date, March 23, 2012, Yang had unrealized gains with a net total of about $151,000. The SEC also argues, and the Court acknowledges that it has the authority to order "disgorgement" of paper "profits" that existed at one time but were not realized. According to the SEC, the lack of profit was a matter of

4

choice on Yang's part, and he should not get the benefit of that choice for purposes of disgorgement.

The fact of the matter, however, is that even assuming Yang could have made a lot of money if he had sold his stock and options at the opportune time, he chose not to do so, and as a result he made no profits. In the Court's view, it would turn the purpose of disgorgement on its head to require Yang to "give up" profit that he elected not to take.

### 3.     Civil penalties

The Securities Exchange Act and the Investment Advisers Act both authorize imposition of civil penalties for violations of those statutes. *See* 15 U.S.C. §§ 78u(d)(3) & 80b-9(e). The purpose of these civil penalties is to provide a financial disincentive to violate the securities laws over and above the remedy of disgorgement, which simply involves requiring the violator to give back his profits. *See, e.g., SEC v. Moran*, 944 F. Supp. 296 (S.D.N.Y. 1996).

Both statutes provide for three levels (called "tiers") of penalties based on the nature of the violation. The first tier is the base level and provides for a maximum penalty of $7,500 for an individual (higher for an entity) for the period at issue here. The second tier applies where the violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and provides for a maximum of $75,000 for an individual. The third tier applies when the requirements for the second tier are met and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons"; it provides for

a maximum of $150,000 for an individual. *See id.* §§ 78u(d)(3)(B)(i-iii) & 80b9(e)(2)(A-C); 17 C.F.R. §§ 201.1004 – 2011005 & Subpart E, Table IV.

The SEC argues that "the jury found that Yang's false 13D filings violated two free-standing statutory provisions: (1) the antifraud provisions of the Exchange Act, Section 10(b); and (2) the disclosure requirements of Exchange Act Section 13(d)" and that "[f]or each statute, there were two violations—one for each of the false Schedules 13D . . . ." Pl.'s Mot. for Remedies at 11. The SEC therefore seeks for these violations a civil penalty of four times the maximum tier two penalty of $75,000, for a total of $300,000. For the front-running claim, the SEC seeks a civil penalty totaling $450,000, "an amount equal to a third tier penalty for three violations." *Id.* at 12. It proposes to group Yang's personal trades in Zhongpin stock and options into three groups for this purpose: his purchase of stock on March 14; his purchase of call options on March 14; and his purchase of call options on March 15. *Id.*

The SEC's proposed breakdown of the front-running claim is artificial and arguably at odds with the jury's findings, because the jury was asked to find only *a violation*, not separate violations. The Court finds it appropriate to maintain that breakdown in determining the appropriate civil penalties.

The Court likewise disagrees with the SEC's proposed breakdown of the Schedule 13D violations. The jury was asked to make two separate findings regarding the Schedule 13D forms, but these were essentially alternative theories for the same wrongdoing (a fraud theory and a false disclosure theory). The Court can find no appropriate basis to treat these as separate violations for the purpose of civil penalties. The Court likewise declines to order separate penalties for the original Schedule 13D

that Yang filed and the amended one he filed later the same day.  Among other things, the jury was not asked to find that Yang filed two false Schedule 13D forms; the jury instructions were worded in the singular.

Both sides agree that the Schedule 13D violation is appropriately treated as a tier two violation.  They dispute how the front-running violation should be treated.  The Court agrees with Yang that this violation is likewise appropriately treated as a tier two violation.  In particular, the tier three requirement of "substantial losses or . . . a significant risk of substantial losses" is missing in this case.

The Court finds that, particularly in view of the absence of disgorgement and the Court's decision to treat the violations as singular rather than plural in nature, a penalty for each at the statutory maximum is appropriate.  The Court imposes upon Yang a civil penalty of $75,000 for the front-running violation and $75,000 for the Schedule 13D violation, for a total of $150,000.

### Conclusion

For the reasons stated above, the Court directs the Clerk to enter judgment in favor of plaintiff and against defendant Siming Yang, imposing civil penalties in the amount of $150,000 as well as a permanent injunction.  A separate judgment order embodying these terms will be entered.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 27, 2014