

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 14-2636

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

SIMING YANG,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 2473 — **Matthew F. Kennelly**, *Judge.*

_____

ARGUED FEBRUARY 13, 2015 — DECIDED JULY 28, 2015

_____

Before WOOD, *Chief Judge*, and BAUER and RIPPLE, *Circuit Judges*.

WOOD, *Chief Judge*. Just before investing in Zhongpin (a Chinese company) on behalf of Prestige Trade Investments, Siming Yang purchased both shares and option contracts for Zhongpin's stock for his personal use. Taking the position that this was deceptive "front-running," the U.S. Securities and Exchange Commission (SEC) instituted this civil suit against Yang. The jury found that Yang had violated the law

both by front-running and by filing a fraudulent disclosure
form. As relief, the district court imposed a $150,000 civil
penalty and issued a permanent injunction barring Yang
from future violations of U.S. federal securities law. Yang
appeals both the finding of violations and the propriety of
the injunction. We affirm both aspects of the district court's
judgment.

## I

Yang is a Chinese citizen who works in investment re-
search. While employed at an investment advisory firm in
the United States, he formed Prestige under the laws of the
British Virgin Islands. Yang funded Prestige with capital
from several Chinese investors, including himself. Yang was
Prestige's only officer and employee and acted as its sole in-
vestment manager.

Yang's dealings with the stock of Zhongpin, a Delaware
corporation that processes pork products in China, form the
basis of this lawsuit. During the relevant period, Zhongpin's
common stock was traded on the NASDAQ exchange, and
options contracts for its stock were traded on the Chicago
Board of Options Exchange (CBOE). The company was regis-
tered with the SEC pursuant to Section 12(b) of the Securities
Exchange Act (Exchange Act). See 15 U.S.C. § 78$l$(b).

Between March 15 and March 23, 2012, Prestige (at Yang's
instruction) purchased 3,194,893 shares of Zhongpin com-
mon stock. Before he did so, Yang purchased 2,878 Zhongpin
call options and 50,000 shares of Zhongpin common stock on
March 14 and 15, 2012, through a SogoTrade account that he
had opened jointly with Chinese citizen Caiyan Fan. In the
district court, Yang argued that he was not the person who

made these purchases; he has not pursued this contention on appeal, however, and so that defense is waived. Yang did not disclose these purchases to Prestige.

After its purchases were completed, Prestige owned more than five percent of Zhongpin's common stock; this triggered an obligation under federal securities law to file a Schedule 13D form disclosing its ownership. See Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d). Yang and two other people associated with Prestige (all listed as "Reporting Persons" on the form) filed an original and amended Schedule 13D on behalf of the company. Both forms disclosed that Yang had shared voting and dispositive power over the Zhongpin shares that Prestige had recently purchased, but they failed to list the shares that Yang had purchased for his own benefit, as required by Section 13(d) and SEC Rule 13d-1, 17 C.F.R. § 240.13d-1. The original Schedule 13D misleadingly stated that, except for the transactions listed on the form, "no transactions in the Common Stock were effected by any Reporting Person" in the 60 days prior to Prestige's attainment of a five percent interest in Zhongpin.

These events prompted the SEC to file suit against Yang and Prestige, alleging that both had engaged in insider trading in violation of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 CFR § 240.10b-5. The SEC also alleged that Yang had violated Section 10(b), Rule 10b-5, and Section 206 of the Investment Advisers Act (Advisers Act), 15 U.S.C. § 80b-6, by engaging in front-running, a practice that involves trading for one's personal gain in advance of trades for one's client. Finally, the SEC contended that Yang's failure to include his personal purchases of Zhongpin

stock in the Schedule 13D that he filed on behalf of Prestige constituted a violation of the reporting requirements in Exchange Act Section 13(d) and SEC Rule 13d-1. Thus, the SEC asserted, Yang's filing of the form was fraudulent or deceptive for purposes of Section 10(b) and Rule 10b-5(b).

A jury found that Yang had violated the law by engaging in front-running and by failing to disclose his personal purchases on the Schedule 13D. It rejected the SEC's claims that Yang and Prestige had failed to comply with the insider-trading rules. Yang then moved for judgment as a matter of law or a new trial, relying on the theory that the jury could not reasonably have concluded that Yang was the person who made the trades in the SogoTrade account. Finding that the evidence was sufficient to support the verdict, the court denied the motion. After considering Yang's awareness of wrongdoing, the lack of harm resulting from his actions, and some of his recent trading activity, the court issued a permanent injunction prohibiting Yang from violating federal securities law. It also imposed a $150,000 civil penalty.

Yang's appeal challenges both the jury's verdict and the permanent injunction. He raises four principal arguments: 1) the district court lacked jurisdiction because of the foreign nature of Yang's activities; 2) front-running does not constitute a violation of federal securities law; 3) his failure to disclose his personal purchases of Zhongpin stock in Schedule 13D was not a material omission; and 4) the district court abused its discretion in issuing a permanent injunction.

## II

### A

We first discuss Yang's arguments about the authority of the court to act in this case, given his own nationality and that of his company.

Yang casts this as an argument that the court lacked jurisdiction over him under the Exchange Act and the Advisers Act. He asserts that these statutes do not reach his actions, because he is a citizen of China, Prestige is organized under the laws of the British Virgin Islands, and its owners are all Chinese. There was some dispute at oral argument over the question whether this is a challenge to subject-matter jurisdiction or merely an argument that there was a lack of legislative authority to regulate Yang's actions (and thus that the SEC had failed to state a claim). If it is the former, we would be able to reach the issue even if it had not been raised in the district court; if the latter, we could not address the argument on appeal unless it was properly preserved. See *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513–15 (2006). Because Yang did raise the issue in the district court, we do not need to resolve this point; we can address the argument whether the claim is truly jurisdictional or not.

Section 206 of the Advisers Act provides that district courts have jurisdiction over actions brought by the SEC relating to "conduct within the United States that constitutes significant steps in furtherance of the violation, even if the violation is committed by a foreign adviser and involves only foreign investors." 15 U.S.C. § 80b-14(b)(1). Yang purchased shares of common stock (and options contracts for that stock) of Zhongpin, which as we have noted is incorpo-

rated in Delaware and at the time was traded on NASDAQ and the CBOE. Trades involving stocks or option contracts for stock of U.S. companies made on U.S. exchanges easily qualify as "conduct within the United States," regardless of the citizenship of the purchaser. This activity, moreover, was essential to the alleged violations: Yang could not have engaged in front-running without making these trades.

Yang argues that the maintenance of this suit would violate the principles underlying *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), where the Supreme Court limited the extraterritorial reach of Section 10(b) of the Exchange Act. See *id.* at 265. But even assuming that *Morrison* applies to the Advisers Act, its reasoning does not help Yang. The *Morrison* Court found that Section 10(b) extends to "the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 273. Yang's purchase of Zhongpin stock, "a security listed on an American stock exchange," falls comfortably within that scope. Thus, *Morrison* actually supports the conclusion we now reach: both the Advisers Act and Section 10(b) of the Exchange Act can be applied to Yang's purchases of Zhongpin securities.

B

Yang next argues that front-running is not a violation of either the Exchange Act or the Advisers Act. Unfortunately for him, this is an afterthought. Yang did not make this argument in the district court either at trial or in his motions under Federal Rule of Civil Procedure 50; he has therefore forfeited it on appeal. *Cf. Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404–05 (2006) (litigant forfeited

right to seek a new trial on appeal because it did not seek a
new trial in the district court); *Cone v. W. Va. Pulp & Paper
Co.*, 330 U.S. 212, 215–17 (1947) (finding that "a party's fail-
ure to make a motion in the District Court for judgment
notwithstanding the verdict, as permitted in Rule 50(b), pre-
cludes an appellate court from directing entry of such a
judgment"). As we have noted, Yang did file a Rule 50(b)
motion in which he objected to the jury's verdict on suffi-
ciency-of-the-evidence grounds, but that objection was based
on the contention that the jury did not have sufficient evi-
dence from which to conclude that he, rather than another
person (such as Caiyan Fan), made the trades in the
SogoTrade account. That argument is plainly a different one
from the contention Yang is now putting forward on appeal.
In this court, he asserts that even if he did make the trades,
his actions in doing so did not violate federal securities law
as a matter of law. *Cf. Libertyville Datsun Sales, Inc. v. Nissan
Motor Corp. in U.S.A.*, 776 F.2d 735, 737 (7th Cir. 1985) (liti-
gant must raise the particular *argument* in the district court
in order to preserve it on appeal).

While we may consider a new argument on appeal in
criminal cases under plain error review, see FED. R. CRIM. P.
52(b), our ability to review for plain error in civil cases is se-
verely constricted. See *Russian Media Grp., LLC v. Cable Am.,
Inc.*, 598 F.3d 302, 308 (7th Cir. 2010) ("In civil litigation, is-
sues not presented to the district court are normally forfeited
on appeal."); *Deppe v. Tripp*, 863 F.2d 1356, 1360–61 (7th Cir.
1988). There is no Federal Rule of Civil Procedure explicitly
authorizing plain error review in civil litigation. This silence
flows from the fact that a civil litigant "should be bound by
his counsel's actions" and has the option to sue for malprac-

tice if his counsel's work is bad enough (an option that rings hollow for criminal defendants). See *Deppe*, 863 F.2d at 1360.

We "may consider a forfeited argument if the interests of justice require it," but such cases are rare. *Russian Media Grp., LLC*, 598 F.3d at 308 (citing *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749–50 (7th Cir. 1993)) (singling out cases "in which failure to present a ground to the district court has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note"); see also *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1333 (7th Cir. 1977) (court may conduct plain error review if "justice demands more flexibility"). Yang has made no attempt to demonstrate why his case qualifies as one of these "rare civil case[s] where exceptional circumstances exist." *Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010).

Yang's complete failure to raise this issue below means that the record is undeveloped on this point. The SEC had no opportunity to respond to this facial attack on the front-running theory in the district court. Instead, it reasonably focused its efforts at trial on proving that it was Yang who made the trades in question. The district court also had no opportunity to address this theory. And it is far from clear that the elements of plain error review would be satisfied in any case; Yang has made no attempt to show why he deserves to be relieved of his forfeiture. See *id.* (pointing to the lack of a developed record, the inability of the opposing party to add to that record, and the appealing party's failure to show the elements of plain error review as indicating that the court should not address the argument). As we have noted before, "to reverse the district court on grounds not presented to it would undermine the essential function of the

district court." *Domka v. Portage Cty., Wis.*, 523 F.3d 776, 784
(7th Cir. 2008) (quoting *Economy Folding Box Corp. v. Anchor
Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008)) (altera-
tion omitted). On the record before us, we see no exceptional
circumstance that should cause us to depart from this pru-
dential rule. We thus decline to reach Yang's argument that
"'front-running' should never be considered fraudulent con-
duct within the meaning of … Section 10(b) and Rule 10b-5."

### III

   Yang next contends that his failure to disclose his person-
al purchases of Zhongpin stock on Schedule 13D was so triv-
ial that it cannot be a material omission. This is essentially an
argument that the SEC presented insufficient evidence from
which the jury could reasonably have concluded that the
omission of his purchases on that form was material. Yang
stresses that his personal purchase of 50,000 shares of stock
on March 14, 2012, was a tiny fraction of Zhongpin's market
volume for that day's trading, and that disclosing those
50,000 shares would have changed the amount of shares dis-
closed on the Schedule 13D by only a miniscule percentage.

   Once again, however, Yang failed to raise this argument
at any point during the proceedings in the district court. He
never mentioned materiality in any of his trial motions, in-
cluding his motion for judgment as a matter of law. Guided
by the same principles we just reviewed, we conclude that
Yang has failed to present a compelling reason for us to take
this matter up on appeal. Normally we do not review a suf-
ficiency-of-the-evidence claim "unless the party seeking re-
view has made a timely motion for a directed verdict in the
trial court." *Hudak v. Jepsen of Ill.*, 982 F.2d 249, 250 (7th Cir.
1992) (quoting *Rogers v. ACF Indus., Inc.*, 774 F.2d 814, 818

(7th Cir. 1985)); see also *Van Bumble v. Wal-Mart Stores, Inc.*, 407 F.3d 823, 827 (7th Cir. 2005) (refusing to review sufficiency-of-the-evidence claim because litigant "failed to move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) or make any other motions challenging the sufficiency of the evidence").

At times we have implied that there is an exception to this rule of forbearance when the failure to review a sufficiency-of-the-evidence argument would result in "manifest injustice." *Hudak*, 982 F.2d at 250–51. Even when that exception applies, however, the review is limited to determining "whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a manifest miscarriage of justice." *Id.* (quoting *Thronson v. Meisels*, 800 F.2d 136, 140 (7th Cir. 1986)). Here, there is no manifest injustice in failing to address Yang's newly minted argument. If Yang had made it clear that he was contesting the materiality of his omission, the SEC could have responded with additional evidence; for all we know, it might have reconsidered its litigation strategy. Yang points to nothing that convinces us that adherence here to the normal rules requiring initial presentation of arguments to the district court would result in manifest injustice. In any case, we are satisfied that there is at least *some* evidence in the record supporting the materiality of Yang's omission. The form requires disclosure and Yang certified that it was complete, but it was not. Even though the percentage of shares was small, the absolute number was not negligible. We must leave for another day the question whether that number can fall so low that an SEC action for noncompliance with the Schedule 13D reporting requirement must fail for lack of materiality.

## IV

Yang's final argument relates to the district court's injunction. We will set aside an injunction only if the district court abused its discretion in imposing it. See *SEC v. Cherif*, 933 F.2d 403, 408 (7th Cir. 1991). Yang contends that the district court impermissibly relied on facts not before the jury and unrelated to the violations alleged by the SEC at trial. He objects to the fact that the court looked to his undisclosed trading while the litigation was pending. In one instance he traded in a separate Fidelity account, and in another he engaged in a transaction with Prestige that "ran afoul of the stipulated asset freeze order that the Court had entered."

Yang's premise about the universe of information the district court was entitled to consult before making its decision to impose an injunction is incorrect. The Exchange Act allows federal courts to grant "any equitable relief that may be appropriate or necessary for the benefit of investors" in an action brought by the SEC. See 15 U.S.C. § 78u(d)(5); see also *id.* § 78u(e) (granting district courts jurisdiction to issue injunctions requiring persons to comply with federal securities law); *id.* § 78u(d)(1) (authorizing the SEC to bring suit in federal district court to enjoin a person from engaging in violations of federal securities law). The Advisers Act provides a similar grant of authority. See 15 U.S.C. § 80b-9(d).

Once the SEC has demonstrated a past violation, it "need only show that there is a reasonable likelihood of future violations in order to obtain [injunctive] relief." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). To predict such a likelihood, the court "must assess the totality of the circumstances surrounding the defendant and his violation." *Id.* This assessment includes consideration of "the gravity of harm caused

by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations." *Id.*

This district judge was thus authorized to consider Yang's continued trading; both the Fidelity trade and the Prestige transaction confirmed the likelihood that Yang would violate federal securities laws again. The undisclosed Fidelity trading was similar to Yang's earlier purchases of Zhongpin stock (*i.e.*, a large purchase of a company's stock just before the company announced it was going private). The new transaction with Prestige undermined the earnestness of Yang's assurances that he would cease all trading on U.S. markets and would not violate U.S. securities laws in the future. Finally, both actions implied that Yang's "customary business activities" might involve transactions similar to those that the jury had found to violate the law.

Yang also argues that the injunction was too harsh, particularly because of its potential impact on his ability to trade in U.S. securities in the future and the risk that the SEC might impose a life-time trading ban on him. The judge's concession that Yang's violations caused "no significant harm to investors" indicates, Yang says, that his penalty is disproportionately severe and may become worse. But the judge undertook a thorough analysis, weighing the slight injury against the other relevant factors, including the extent of Yang's participation and knowledge of the violations (which the judge found was extensive) and the potential that

No. 14-2636                                                            13

Yang would be involved in similar transactions in the future.
The judge did not abuse his discretion in determining that
these factors demonstrated a reasonable likelihood that Yang
would commit future violations. He was not required to
consider future actions that the SEC might take against Yang
in coming to this conclusion.

## V

Both the Exchange Act and the Advisers Act reach the ac-
tivities of which Yang was accused in this case. The district
court had jurisdiction over this matter, which dealt with ac-
tivities on U.S. markets. Yang has forfeited his arguments
regarding the illegality of front-running and the materiality
of his Schedule 13D disclosure. Finally, the district court did
not abuse its discretion when it permanently enjoined Yang
from committing future violations of the U.S. federal securi-
ties laws. We thus AFFIRM the judgment of the district court.